1   Christopher G. Paulos, Esq.               John A. Yanchunis, Esq.
    CA Bar #272750, FL Bar #0091579           FL Bar# 324681
2   Peter J. Mougey, Esq.                     MORGAN & MORGAN, P.A.
3   James L. Kauffman, Esq.                   201 North Franklin Street, 7th Floor
    Erica A. Reed, Esq.                       Tampa, Florida 33602
4   Levin, Papantonio, Thomas, Mitchell,      (813) 223-5505 Telephone
    Rafferty & Proctor P.A.                   (813) 223-5402 Facsimile
5   316 S. Baylen Street
6   Pensacola, Florida 32502
    Office: 850-435-7067
7   Fax: 850-436-6066

**FILED**

FEB 0 4 2013

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

8           **UNITED STATES DISTRICT COURT**
            **SOUTHERN DISTRICT OF CALIFORNIA**
9

10  UNITED STATES OF AMERICA
    ex rels. TINA CALILUNG and JAMIE KELL,    **FILED UNDER SEAL PURSUANT TO 31**
                                              **U.S.C. §3730(b)(2)**
11
                Plaintiffs,
12
                                              **'13 CV 0261 BEN DHB**
13  v.
14  ORMAT INDUSTRIES, LTD.,                   **☐ORIGINAL**
15  ORMAT TECHNOLOGIES, INC.,
    ORMAT NEVADA, INC.,
16  PUNA GEOTHERMAL VENTURE II, L.P.,
    ORNI 18, LLC., and
17  FIRST ISRAEL MEZZANINE INVESTORS LTD.
18
                Defendants.
19  _____/

20          **COMPLAINT FOR DAMAGES AND OTHER RELIEF**
21          **UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730)**

22              **I.    INTRODUCTION**

23      On behalf of the United States of America, Plaintiff, Tina Calilung and Jamie Kell,

24  Plaintiffs/Relators, file this qui tam Complaint against Defendants, Ormat Industries, LTD., Ormat

25  Technologies, Inc., Ormat Nevada, Inc., Puna Geothermal Venture II, L.P., ORNI 18, LLC., and First

26  Israel Mezzanine Investors Ltd pursuant to Section 3729-3732 (False Claims Act) to recover all

27

28

damages, penalties, and other remedies under the False Claims Act, including disgorgement, and alleges as follows:

1.    In response to a deepening recession in the late 2000's, Congress passed The American Recovery and Reinvestment Act of 2009, commonly referred to as the Stimulus or The Recovery Act, to stimulate the economy in the United States.   The primary objective of The Recovery Act was to save and create jobs immediately.   The secondary objectives' were to provide temporary relief programs for those most affected by the recession and invest in the infrastructure, education, health and "green energy."   The approximate cost of the economic stimulus package was estimated to be $787 billion at the time of passage, later revised to $831 billion between 2009 and 2019.

2.    Unfortunately, one of the unintended consequences of The Recovery Act was the creation of opportunities for abuse and fraud on the Government as will be explained below.

3.    Defendant Ormat Industries, Ltd., and its subsidiaries, Ormat Technologies, Inc., Ormat Nevada, LLC, Puna Geothermal Venture II, LP, and ORNI 18, LLC, (hereinafter collectively referred to as "Ormat") engaged in a scheme to defraud the United States by knowingly causing fraudulent applications, and certifications of compliance, to be submitted to the federal Government under section 1603 of the American Recovery and Reinvestment Tax Act of 2009 thereby resulting in hundreds of millions of dollars in payments to sustain non-conforming geothermal energy projects. The federal agencies to which fraudulent information was routinely submitted in order to apply for, and receive, section 1603 payments and otherwise perpetrate an on-going fraudulent scheme include:

      i.   The United States Department of Treasury;

      ii.   The United States Internal Revenue Service; and

      iii.   The United States Securities and Exchange Commission.

4.    Ormat's fraudulent scheme was perpetrated to obtain funds for projects that were unqualified for section 1603 payments, in order to decrease the carrying value of failing geothermal projects, artificially inflate the value of Ormat's energy assets, and maintain the appearance of viability of certain geothermal ventures, thereby defrauding the United States by purposefully submitting falsified and inaccurate information pertaining to Ormat's geothermal projects' in-service

dates, certain geothermal projects' known energy outputs and capacities, and the allocation of section 1603 funds to otherwise nonqualified geothermal expansion projects. This fraudulent scheme involved Ormat's blatant misrepresentations on section 1603 applications, continued deception on certifications regarding the viability of projects that received section 1603 funds, and the misuse of section 1603 funds on geothermal projects not intended by the federal Government to be supported by section 1603 of the American Recovery and Reinvestment Tax Act of 2009.

5.      Ormat's scheme is illegal and fraudulent under the False Claims Act because Ormat knowingly submitted false information in order to obtain section 1603 payments from the United States Treasury, specifically, Ormat misrepresented:

   a) The dates upon which specific projects were placed in service,

   b) The energy output capacity of specific projects,

   c) The nature and purpose of expansion projects, and

   d) The property value basis upon which the grant payments were based.

6.      But for these purposeful misrepresentations, Ormat would not have received section 1603 funds to support these projects and such funds could have been invested by the U.S. Treasury into truly viable geothermal projects actually qualified to receive the funds.

7.      Ormat knowingly and purposefully undertook this fraudulent scheme in violation of the terms of the section 1603 application guidelines. Furthermore, Ormat continues to fraudulently file certifications pertaining to the success and viability of the geothermal projects that received grant funds so as to prevent the enforcement of the recapture provision of section 1603(F), and make public statements claiming its use of funds obtained from the Government were appropriate.

8.      To date Ormat has received at least $122,116,769.00 in section 1603 payments through fraudulent section 1603 grant applications resulting in payments to the following non-qualifying geothermal properties:

   a)      Puna Geothermal Power Plant

   b)      North Brawley Geothermal Power Plant

9.      Ormat has also received section 1603 payments totaling an additional $58,431,073.00 for the following geothermal properties:

| | |
|---|---|
| 1 | c) ORNI 15 LLC, |
| 2 | d) ORNI 42 LLC. |

10.     As of November 7, 2012, Ormat currently had three section 1603 applications pending, including an additional grant request for the North Brawley plant at issue in this case.

11.     Relators, Ms. Tina Calilung and Ms. Jamie Kell, are original sources. Each has direct, independent and personal knowledge of the information on which the allegations herein are based.

## II.     JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in this Court pursuant to  the False Claims Act because Relator's claims seeks remedies on behalf of the United States for multiple violations of §3729 of Title 31 of the United States Codes which occurred in this District, and because Defendants transact business in this District.

## III.     PARTIES

**A.     Co-Relator Tina Calilung:**

13.     Ms. Tina Calilung is a citizen of the state of Nevada. Ms. Calilung graduated from the University of Pennsylvania in 2004 with a degree in Economics.

14.     In 2007, Ms. Calilung was recruited by Ormat Technologies, Inc. After her hiring, Ms. Calilung was the Asset Manager of Ormat Technologies, Inc., from November 2007 until June 30, 2012. In this role, Ms. Calilung's primary function was to manage the long-term Power Purchase Agreements (PPAs) for Ormat's U.S. operations and advise Ormat on how the company could best position itself to maximize the benefits under the various PPAs to which it was a party. During her time at Ormat, Ms. Calilung's job responsibilities included managing much of Ormat's financing and regulatory operations including, negotiating terms of PPAs, providing due diligence on project financing, managing and developing investor relations, and testifying on behalf of Ormat before the Nevada Public Utilities Commission and various County Boards of Equalization.

15.     Ms. Calilung left Ormat Technologies on her own volition on June 30, 2012, in part due to the business practices which she felt were morally and ethically repugnant. Prior to her departure, Ms. Calilung had, on multiple occasions, internally voiced her opposition to the Defendants' management of business practices described herein. On the day of her departure from

Ormat, Ms. Calilung's laptop computer was confiscated and her email account locked. She signed a waiver of employment-related claims and severance agreement on July 3, 2012.

16.    Ms. Calilung has direct, independent and personal knowledge of the aforementioned fraudulent scheme because, as Ormat's Asset Manager, she has knowledge of the internal processes developed by Ormat to apply for, and receive, section 1603 payments from the federal Government. Additionally, Ms. Calilung has an in-depth knowledge regarding the section 1603 payment program, and, at the time Ormat was submitting applications for payment under section 1603, Ms. Calilung was aware of the actual value, feasibility and nature of Ormat's geothermal properties. Ms. Calilung participated in, and was privy to, the drafting of language used by Ormat in specific section 1603 applications and has personal knowledge that the CEO of Ormat Industries, Mrs. Yehudit "Dita" Bronicki, personally insisted on the inclusion of language that was false and purposefully inaccurate prior to the submission of at least one section 1603 application to the Government.

**B. Co-Relator Ms. Jamie Kell:**

17.    Ms. Jamie Kell is a citizen of the state of Nevada. Ms. Kell was the Administrator to Ormat Technologies. Inc.'s Business Development Department from January 2008 until September 2011. In this role she personally assisted all seven directors of Business Development, including Vice President of Business Development, Mr. Robert "Bob" Sullivan, and Ormat's Manager of Public Policy, Mr. Paul Thomsen.

18.    Ms. Kell assisted the Business Development Department with researching new geothermal projects including contract negotiations with outside parties for project construction, pricing, PPA negotiations, and negotiations with various Public Utility Commissions (PUCs). Ms. Kell transferred from Business Development to Travel Coordinator in October 2011. In this role, Ms. Kell coordinated all U.S. and international travel for Ormat Technologies, Inc. employees and officers.

19.    On April 3, 2010, Ms. Kell was diagnosed with breast cancer. In light of her illness and the impact on her ability to work, Mr. Bob Sullivan launched a campaign of emotional abuse and harassment against Ms. Kell. From approximately May 1, 2010, until her severance from Ormat, Ms.

Kell was forced to endure a near-constant hostile work environment due to her need to take time off to treat her cancer.

20.     Because of Mr. Sullivan's actions, Ms. Kell filed a formal United States Equal Employment Opportunity Commission (EEOC) complaint and an Employment Discrimination Claim with the state of Nevada Equal Rights Commission (NERC) on April 18, 2012.

21.     In May 2012, Ormat, having been notified of the pending EEOC and NERC complaints, sent a security team to Ms. Kell's private residence and confiscated her work-issued laptop computer. Ormat also blocked her access to their servers and her work-related email accounts.

22.     Once Ms. Kell's health was such that she could return to work, Ms. Kell returned to Ormat on August 23, 2012, but was told that she was not welcome on the premises due to her pending employment complaints. On this day, Ms. Kell was escorted out of the building by security.

23.     Ms. Kell subsequently settled her EEOC and other complaints on August 31, 2012 and signed a severance agreement on September 24, 2012.

24.     Ms. Kell has direct, independent and personal knowledge of the aforementioned fraudulent scheme because, as the Administrator to Ormat Technologies. Inc.'s Business Development Department, Ms. Kell witnessed the drafting of section 1603 payment applications by Ormat officers and employees. Ms. Kell personally viewed drafts of section 1603 application narratives and has knowledge of Ormat Executive Officers involved in the drafting process inserting false information and excluding relevant material information from Ormat's section 1603 payment applications.

25.     At the time Ms. Kell witnessed this conduct, she and Ms. Cathy Tsaniff, Ormat Technologies' Tax Manager, had a conversation regarding the legality of submitting Ormat's section 1603 application that both purposefully excluded relevant material information, and included false information. In this conversation Ms. Tsaniff acknowledged that she was aware of the incorrect information and the legal implications of submitting a false section 1603 application. Despite this, Ms. Tsaniff expressed to Ms. Kell that Ormat Technologies CEO, Dita Bronicki, had made the changes herself and that she feared retaliation if she were to raise the issue.

26.     Ms. Kell's concerns were ultimately, ignored, dismissed and unaddressed by Ms. Tsaniff, her superiors or any other Ormat officer.

27.     In the process of investigating the basis for this *qui tam* cause of action, Ms. Kell submitted a FOIA request to the Department of the Treasury on September 19, 2012, seeking to obtain copies of the section 1603 payment applications submitted by Ormat. As per their protocol, The Department of the Treasury notified Ormat Technologies of the FIOA request, including Ms. Kell's identity, due to the possibility for the response to contain proprietary information. On November 20, 2012, Ormat counsel contacted Ms. Kell's employment counsel and threatened to revoke her health insurance if the FIOA request was not rescinded. Because Ms. Kell was still being treated for cancer, she had no choice but to rescind the FIOA request on November 20, 2012.

**C. Defendant Ormat Industries Ltd.:**

28.     Defendant Ormat Industries Ltd., is a foreign corporation organized and existing under the laws of Israel. Its principal place of business is located at Dereh Shidlovski 1, Ezor Hata'Asiya Hahadash, Yvne81100, Isreal, ISR. At this time, pursuant to the Hague Convention, the proper of method of service is through the central authority located at the Ministry of Justice, Department of International Affairs, 7 Mahal Street, Ma'alot Dafna, P.O. Box 94123, Jerusalem 97765, Israel. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163, C.T.S. 198912.

29.     Ormat Industries Ltd. was founded in Israel in 1965 as "Ormat Turbines Ltd." by Yehuda "Lucien" Bronicki (Chief Technology Officer) and wife, Yehudit "Dita" Bronicki (Director, Chief Executive Officer). Ormat Industries Ltd., is a publicly traded company listed on the Tel Aviv Stock Exchange (TASE: ORMT) and is considered one of the top twenty-five TASE companies for market capitalization on that exchange.

30.     Ormat Industries Ltd.'s largest shareholders include the Bronicki family and First Israel Mezzanine Investors (FIMI), each owning 22.5% of the company.

**D. Defendant Ormat Technologies, Inc.:**

31.     Defendant Ormat Technologies, Inc., is a wholly-owned subsidiary of Ormat Industries Ltd. and is a for-profit corporation formed on September 15, 1994. Ormat Technologies,

Inc. is organized and existing under the laws of the state of Delaware. Its principal place of business is located at 6225 Neil Road, Reno, Nevada, 89511-1136. The registered agent for service of process in the United States is HIQ Corporate Services, Inc. located at 3500 South Dupont Highway, Dover, Delaware, 19901-6041.

32.     Ormat Technologies is a publicly traded company on the New York Stock Exchange (NYSE: ORA). The company owns and operates geothermal power plants around the globe, including power plants in California, Nevada, and Hawaii.

**E. Ormat Nevada, Inc.**

Ormat Nevada, Inc. is a Delaware corporation whose principal place of business if at 6225 Neil Road, Reno, Nevada 89511. Ormat Nevada, Inc. is a wholly owned subsidiary of Ormat Technologies, Inc. Ormat Nevada, Inc. constructs and operates geothermal power plants in the United States and internationally. Ormat Nevada, Inc. was responsible for the construction and operation of the North Brawley. The company also operates the Puna plant, however, and Ormat Nevada, Inc. is not authorized to do business in the state of Hawaii, therefore, all costs are paid through Puna Geothermal Venture II, L.P. The costs of constructing production well KS-14 and the 8 MW Expansion plant were paid by Ormat Nevada, Inc. through subordinated loans to Puna Geothermal Venture.

**F.      Defendant Puna Geothermal Venture II, L.P.:**

33.     Defendant Puna Geothermal Venture II, LP is a wholly-owned subsidiary of Ormat Technologies, Inc. and is a for-profit limited partnership organized and existing under the laws of the state of Delaware. Its principal place of business is located at 6225 Neil Road, Reno, Nevada, 89511-1136. The registered agent for service of process in the United States is Corporation Service Company located at 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808-1660.

34.     Puna Geothermal Venture II, LP, is the business entity responsible for the management and operation of the Puna Geothermal Venture (PGV), a geothermal power plant located in the Puna district on the Big Island in Hawaii at 14-3860 Kapoho Pahoa Road, Pahoa, Hawaii, 96778. Ormat Technologies, Inc., through this subsidiary partnership, has operated PGV since June 2004. Immediately after its acquisition of PGV, Puna Geothermal Venture II, LP, sold

PGV to Southern Company who in turn leased PGV back to Puna Geothermal Venture II, LP in a sale leaseback transaction.

**G.      Defendant ORNI 18, LLC:**

35.      Defendant, ORNI 18, LLC, is a wholly-owned subsidiary of Ormat Technologies, Inc. and is a for-profit limited liability company organized and existing under the laws of the state of Delaware. Its principal place of business is located at 6225 Neil Road, Reno, Nevada, 89511-1136. The registered agent for service of process in the United States is HIQ Corporate Services, Inc. located at 3500 South Dupont Highway, Dover, Delaware, 19901-6041.

36.      ORNI 18, LLC, is the business entity responsible for the management and operation of the North Brawley Geothermal Power Plant located in Imperial County, California at 4982 Hovely Road, Brawley, California, 92227.

**H.      Defendant First Israel Mezzanine Investors Ltd. (FIMI):**

37.      Defendant First Israel Mezzanine Investors Ltd. owns 22.5% of Ormat Industries, Ltd. making it one of the largest shareholders of Ormat. FIMI was founded in 1996 and is located at 98 Yigal Alon St., Tel Aviv, Israel, 67891. Pursuant to the Hague Convention, the registered agent for service of process if Ministry of Justice, Department of International Affairs, 7 Mahal Street, Ma'alot Dafna, P.O. Box 94123, Jerusalem 97765.

38.      FIMI is a private equity firm specializing in mezzanine financing, mature middle market growth capital, financing investments, mergers and acquisitions, leveraged buyouts, bridge financing prior to IPO, turnarounds, and management buyouts. It invests up to $25 million in companies with minimum revenues of $50 million. It seeks to acquire controlling stakes in companies and is presently poised to take over Ormat Industries Ltd. and its subsidiaries.

39.      To date, FIMI has invested $150,000,000.00 into Ormat and has an option to purchase an additional 9.3 million shares.

**IV.      SECTION 1603 OF THE AMERICAN RECOVERY AND REINVESTMENT TAX ACT OF 2009: PAYMENTS IN LIEU OF TAX CREDITS TREASURY GRANT PROGRAM**

40.      The American Recovery and Reinvestment Tax Act of 2009 was signed into law by President Barack Obama on February 17, 2009. The purpose of the law was to invest Government

funds into critical infrastructure, health care services, education, and energy projects that were intended to reignite the faltering U.S. economy and create 3.5 million jobs. See 2009 U.S.C.C.A.N. S6, WL 395189 (Leg. Hist.) Statement by President Barak Obama.

41.    Section 1603 American Recovery and Reinvestment Tax Act of 2009 (hereinafter, "ARRTA") provides that the United States Treasury Department will issue cash grants for specified energy properties in lieu of tax credits, and in relevant part states:

> (a) IN GENERAL.--Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). No grant shall be made under this section with respect to any property unless such property—
>     (1) is placed in service during 2009 or 2010, or
>     (2) is placed in service after 2010 and before the credit termination date with respect to such property, but only if the construction of such property began during 2009 or 2010.
> (b) GRANT AMOUNT.—
>     (1) IN GENERAL.--The amount of the grant under subsection (a) with respect to any specified energy property shall be the applicable percentage of the basis of such property.
>     (2) APPLICABLE PERCENTAGE.--For purposes of paragraph (1), the term "applicable percentage" means... (A) 30 percent [of the property's value] in the case of any [eligible] property[.]

*See* ARRTA, PL 111-5, February 17, 2009, 123 Stat 115. §1603.

42.    According to the U.S. Treasury Department Office of the Fiscal Assistant Secretary's revised Program Guidelines of April 2011, "[t]he purpose of §1603 payments by the Treasury is to reimburse eligible participants for a portion of the expense of such property... [a]pplicants must agree to the terms and conditions applicable to the Section 1603 program." See U.S. Treasury Department- Office of the Fiscal Assistant Secretary, "Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Tax Act of 2009", July 2009/Revised March 2010/Revised April 2011, Program Guidance at 2, hereinafter "Program Guidance."

43.    Section 1603 payments were designed and expected to off-set or temporarily fill the gap created by the diminished investor demand for tax credits. As such, the payments would help achieve the ARRTA's near-term goal of creating and retaining jobs. Furthermore, the section 1603

program would have the long-term benefit of expanding the use of clean and renewable energy and decreasing the United States' dependency on foreign energy resources and non-renewable energy sources. Id. at 3.

44.    Property owners who apply for and receive section 1603 payments become ineligible for Production or Investment Tax Credits (PTCs and ITCs) per section 45 and section 48 of the Internal Revenue Code for the table year in which the payments are received, or for any subsequent years.

45.    The window period to apply for section 1603 payments closed on October 1, 2012.

46.    In order to apply for and receive payments under the section 1603 Treasury grant program, applicants must establish that:

    i.    The subject property is qualified to receive payments in lieu of tax credits;

    ii.    The applicant is qualified to receive the payments,

    iii.    The applicant must adhere to the application procedures, including providing the proper and accurate supporting documentation and subscribing to the Terms and Conditions of the §1603 program.

    iv.    The recipient of §1603 funds must provide reports, as required by the U.S. Treasury, including annual performance reports as set forth in the Terms and Conditions of the program.

**A. Property Eligibility Framework: Internal Revenue Code Sections 45 & 48**

47.    The section 1603 program relies upon the United States Internal Revenue Code (IRC) in order to define the particular types of property that are eligible for payment under the program.

48.    Defined as such, only energy property used in a trade or business or held for the production of income are eligible for the section 1603 payments.

49.    All property that is eligible for tax credits under section 45 or section 48 of the Internal Revenue Code can apply for section 1603 payments but are required to forego any IRC section 45 or section 48 tax credits on the same property the year in which the payment is made and any subsequent year thereafter.

50.    Internal Revenue Code section 45(c)(4) defines geothermal energy as "energy derived from a geothermal deposit (within the meaning of section 613(e)(2))." See 26 U.S.C. § 45.

51.    Internal Revenue Code section 613(e)(2) defines a geothermal deposit as:

"... a geothermal reservoir consisting of natural heat which is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure). Such a deposit shall in no case be treated as a gas well for purposes of this section or section 613A, and this section shall not apply to a geothermal deposit which is located outside the United States or its possessions."

26 U.S.C. § 613.

52.    Internal Revenue Code section 48(a)(3)(A)(iii) regarding Energy Tax Credits defines Geothermal Energy Property as such:

"... equipment used to produce, distribute, or use energy derived from a geothermal deposit (within the meaning of section 613(e)(2)) (*see above*), but only, in the case of electricity generated by geothermal power, up to (but not including) the electrical transmission stage..."

26 U.S.C. § 48.

**B.  Property Eligibility Framework: In-service Date and Date of Construction**

53.    A crucial component of ARRTA and the section 1603 program is the in-service date requirement. By requiring that geothermal properties be constructed and placed in service within a finite period of time, the in-service-date requirement is designed to ignite the spark of stimulating growth and investment in sustainable energy resources during a time of stalled economic growth.

54.    Thus, if a property is used for business, trade or profit, and is geothermal property as per IRC section 45, section 48 and section 613, to be eligible for section 1603 payments, the property must also have been placed in-service, or construction started, by specific qualifying dates.

55.    As such, section 1603 appropriated specific funds for payments to persons who place in service specific energy property during 2009, 2010, or 2011, or after 2011. If the property is placed in service after 2011, construction of the property must have begun during 2009, 2010 or 2011 and the property must be placed in service by a specific date known as the "credit termination date."

56.    Depending on the properties definition under Internal Revenue Code section 45 and section 48, the relevant credit termination dates for eligible properties will differ. For geothermal properties the credit termination dates are either January 1, 2014 (for geothermal properties defined by IRC section 45 & IRC section 613) or January 1, 2017, (for geothermal properties defined by IRC section 48, as well as Geothermal Heat Pump properties).

57.     Qualified properties must be placed in service between January 1, 2009 and December 31, 2011 (regardless of when construction began), or placed in service after 2011 and before the credit termination date if construction began on the property between January 1, 2009 and December 31, 2011. Qualified properties include expansions of an existing property that is qualified property under sections 45 or 48 of the Internal Revenue Code.

58.     If the geothermal property was constructed prior to 2009 and was placed in service in 2009, 2010, or 2011, the credit termination date is irrelevant for the purpose of determining a property's eligibility for section 1603 payments. For pre-2009 constructed properties, the in-service date of the property will determine its eligibility. If a property was placed in service before January 1, 2009, it is not eligible for section 1603 payments.

59.     Property that satisfies the placed-in-service requirement may be qualified property even if it is an addition to or expansion of a qualified facility placed in service before 2009. Id. at 11, emphasis added. "Placed in service" means that the property is ready and available for its specific use.

**C. Property Eligibility Framework: Original Use**

60.     In order to be eligible for section 1603 payments, the original use of the property must begin with the applicant. If the cost of used parts contained within the property is not more than 20 percent of the total cost of the property, an applicant will be considered an original user of the property despite the use of the used parts.

61.     If the new property is originally placed in service by a person and is sold to an applicant and leased back to the person by the applicant within three months after the date the property was originally placed in service by the person, unless the lessor and lessee elect otherwise, the applicant-lessor is considered the original user of the property and the property is considered to be placed in service not earlier than when it is used under the lease back.

**D.          Property Eligibility Framework: Types of Property**

   **(i)     Specified Energy Property**

62.     Property eligible to receive section 1603 payments is considered "Specified Energy Property".

63. In order to determine if property is Specific Energy Property and therefore eligible to receive section 1603 payments, it must first be determined if the property is tangible property. Next it must be determined if the property is part of a Qualified Facility or is otherwise considered to be energy property defined by IRC section 48.

### (ii) Tangible Property

64. Specified Energy Property can only include tangible property (not including a building) that is an integral part of the Qualified Facility (QF) or any other energy property described under IRC section 48. Tangible property is tangible personal property and other tangible property as defined in section 1.48-1(c) and (d) of the Income Tax Regulations.

65. In relevant part section 1.48-1(c) and (d) of the Income Tax Regulations define tangible personal property as:

§1.48-1 (c): ... For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

(d) Other tangible property— (1) In general. In addition to tangible personal property, any other tangible property (but not including a building and its structural components) used as an integral part of manufacturing, production, or extraction, or as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service, or which constitutes a research or storage facility used in connection with any of the foregoing activities, may qualify as section 38 property.

26 C.F.R. § 1.48–1

66.     The term "tangible" is significant because in geothermal energy production there are certain intangible costs, namely the cost of drilling, such as the labor and services for the actual drilling of the wellfield.  An example of tangible drilling costs would the cost of the materials that make up the permanent part of the well, such as the lining, casing and wellhead.

67.     Other property that is tangible or integral to a geothermal facility includes equipment that transports geothermal steam or hot water from a geothermal deposit to the site of ultimate use. This includes components of a heating system, such as pipes and ductwork that distribute within a building the energy derived from the geothermal deposit and, if geothermal energy is used to generate electricity, includes equipment that transports hot water from the geothermal deposit to a power plant.

68.     For qualified property that generates electricity, qualified property includes storage devices, power conditioning equipment, transfer equipment, and parts related to the functioning of those items, but does not include any electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical.

**(iii)    Qualified Facility Property**

69.     Specified Energy Property, within the meaning of section 1603, consists of two broad categories of property:

     i.    Property that is part of a facility described in IRC section 45, Qualified Facility Property and;

    ii.    Property described by IRC section 48, energy property.

70.     To be a Qualified Facility, the geothermal property must be described in IRC section 45(d)(4) and meet the placed-in-service requirements of that IRC section.

In relevant part, IRC section 45(d)( provides:

(d) Qualified facilities. For purposes of this section:
(4) Geothermal or solar energy facility.--In the case of a facility using geothermal or solar energy to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which is originally placed in service after the date of the enactment of this paragraph and before January 1, 2014 (January 1, 2006, in the case of a facility using solar energy). Such term shall not include any property described in section 48(a)(3) the basis of which is taken into account by the taxpayer for purposes of determining the energy credit under section 48.

26 U.S.C. § 45.

71.     Not until the enactment of the American Jobs Creation Act of 2004, was geothermal energy eligible to receive the Production Tax Credits under IRC section 45. See AMERICAN JOBS CREATION ACT OF 2004, PL 108-357, October 22, 2004, 118 Stat 1418, § 710 et seq. At the very earliest, only geothermal property placed in service after the 2004 expansion of IRC section 45 may potential qualify under section 1603 as specific energy property.

72.     Qualified Facility Property includes only tangible property that is an integral part of a Qualified Facility. Property will only be considered an integral part of a qualified facility if the property is used directly in the qualified facility and is essential to the completeness of the activity performed in that facility. See Program Guidance at 11.

73.     Qualified Property must be placed in service pursuant to the placed-in-service requirements discussed above.  Property that satisfies the placed-in-service requirement may be Qualified Property even if it is an addition to or expansion of a qualified facility placed in service before 2009. Id. at 11, emphasis added.

### (iv)     Mixed Property

74.     Specified Energy Property may be installed on "Other Property". Other Property is property that is not described in section 48 of the IRC.

75.     For the purpose of calculating a section 1603 payment for mixed property, only costs of the portion of property that is described in section 48 of the IRC should be used in calculating the amount of the 1603 payment.

### (v)     Leased Property

76.     A lessor who is eligible to receive a section 1603 payment with respect to a property may elect to pass-through the section 1603 payment to a lessee. The election may only be made with respect to property that would be eligible for the section 1603 payment if owned by the lessee. This election treats the lessee as having acquired the property for an amount equal to the independently assessed fair market value (FMV) of the property on the date the property is transferred to the lessee, and will generally follow the rules in the IRC and Treasury regulations governing elections to allow lessees to receive energy tax credits.

77.     The lessor and lessee must agree in writing that the lessor waives all right to a section 1603 payment, or a production or investment tax credit, with respect to the eligible property, before the lessee may apply for a section 1603 payment with respect to that property. The lessee must agree to include ratably in gross income over the five year recapture period (discussed below) an amount equal to 50% of the amount of the section 1603 payment.

78.     To make this election, both the lessor and the lessee must be persons eligible to receive a payment under section 1603. Additionally, this election may not be made by a lessor that is a mutual savings bank or similar financial organization, a regulated investment company or a real estate investment trust.

79.     The election of a lessor to allow the lessee to receive a section 1603 payment may be made with respect to each property leased by the lessor to the lessee. The lessee's written consent is required. The lessor's election is made by a written agreement with the lessee that contains the following information:

       i.    A waiver of the lessor's right to receive any payment under §1603 with respect to the subject property, as well as a waiver of the lessor's right the claim a production or investment tax credit under §45 and §48 of the IRC with respect to the same property for the taxable year of the payment or subsequent years;

      ii.    All information necessary to determine the amount of lessee's §1603 payment;

      iii.   The name, address and employer identification number of the lessor and the lessee;

      iv.   A description of each property with respect to the election being made;

      v.    The date on which possession of the property is transferred to the lessee; and

      vi.   The lessee's consent to the election

80.     A copy of this agreement must be included in the lessee's application for the section 1603 payment. This election is irrevocable.

81.     The Treasury has enacted a special rules pertaining to properties involving sale-leaseback transactions. In a sale-leaseback transaction, the lessee, who is not the owner of the property, may claim the section 1603 payment, if three conditions are satisfied:

      i.    The lessee must be the person who originally placed the property in service and;

ii.   The property must be sold and leased back by the lessee, or must be leased to the lessee, within three months after the date the property was originally placed in service and;

iii.  The lessee and lessor must not make an election to preclude application of the sale-leaseback rules.

**E. Location of Property:**

82.   Only Property that is used predominantly in the United States qualifies for section 1603 payments. The determination of whether property is used predominantly in the United States is made by comparing the period of time in which the property is physically located outside of the United States with the period of time the during which the property is with in the United States in a given year/if the property is located outside of the United Sates more than 50% of the year, such property is considered predominantly outside of the United States during that year. This limitation does not apply to property described in section 168(g)(4) of the IRC.

**F. Applicant Eligibility Framework:**

83.   To be eligible for a section 1603 payment, the applicant must be the owner or lessee of the property and must have originally placed the property in service., emphasis added.

84.   Certain person/entities are not eligible to receive section 1603 payments, including:

i.   Any Federal, state or local government, including any political subdivision or instrumentality thereof;

ii.  Any organization that is described in §501(c) of the IRC and is exempt from tax under §501(a) of the IRC;

iii. Any entity referred to in paragraph (4) of §5(j) of the IRC; or

iv.  Any partnership or other pass-thru entity, any direct or indirect partner (or other holder of an equity or profits interest) of which is an organization or entity described above, unless this person only owns an indirect interest in the applicant through a taxable C corporation.

85.   As long as each direct and indirect partner in the partnership or shareholder or similar interest holder in any pass-thru entity is eligible to receive section 1603 payments, the partnership or pass-thru entity is eligible to receive section 1603 payments.

86.   A foreign person or entity may be eligible for a section 1603 payment if the person or entity qualifies for an exception in section 168(h)(2)(B) of the IRC, which reads in relevant part:

(B) Exception for certain property subject to United States tax and used by foreign person or entity.--Clause (iii) of subparagraph (A) shall not apply with

respect to any property if more than 50 percent of the gross income for the taxable year derived by the foreign person or entity from the use of such property is--
> (i) subject to tax under this chapter, or
> (ii) included under section 951 in the gross income of a United States shareholder for the taxable year with or within which ends the taxable year of the controlled foreign corporation in which such income was derived. For purposes of the preceding sentence, any exclusion or exemption shall not apply for purposes of determining the amount of the gross income so derived, but shall apply for purposes of determining the portion of such gross income subject to tax under this chapter.

26 U.S.C. § 168.

87.     An applicant's eligibility will be determined as of the time the application is received.

**G. Eligible Basis:**

88.     "Eligible basis" refers to the precise value of the property as defined by the IRC, the amount of which allows the Treasury Department to calculate the specific payment due a qualified recipient of a section 1603 cash grant in lieu of tax credit.

89.     Geothermal properties may receive a payment of either 10% or 30% of the eligible basis value of the property depending on whether the property is defined by section 45 or section 48 of the IRC, as discussed above.

90.     The basis of property is determined in accordance with the general rules for determining the basis of property for federal income tax purposes. Thus, the basis of property generally is its cost unreduced by any other adjustment to basis, such as that for depreciation, and includes all items properly included by the taxpayer in the depreciable basis of the property, such as installation costs and the cost for freight incurred in construction of the specified energy property. See IRC §1012.

91.     If property is acquired in exchange for cash and other property in a transaction described in IRC section 1031, in which no gain or loss is recognized, the basis of the newly acquired property is equal to the adjusted basis of the other property plus the cash paid.

92.     Costs that will be deducted for federal income tax purposes in the year in which they are paid or incurred are not includible in the basis on which the payment is determined. For example,

if the applicant will take the IRC section 179 deduction for all or part of the cost of the property, then no payment is allowed for the portion of the cost of the property for which the IRC section 179 deduction will be taken.

93.     For geothermal property, if the intangible drilling and development expenses will be deducted by the applicant, no payment will be allowed on the costs that will be deducted by as intangible drilling and development expenses. If the applicant capitalizes intangible drilling and development expenses only those costs that may be recovered through depreciation can be included in the basis on which the payment is allowed. However, if the applicant will elect under IRC section 59(e) to deduct intangible drilling and development costs over 60 months, the payment is based on the amount for which the election under section 59(e) applies because the effect of the section 59(e) is to treat these costs as amortizable.

94.     Only the cost basis of property placed in service after 2008 is eligible for a section 1603 payment. Thus, if property is placed in service in 2009 at a qualified facility that was placed in service in an earlier year, only the basis of the property placed in service in 2009 is eligible for a section 1603 payment.

95.     The Treasury has clearly defined several limitations on the eligible basis of a property. First, the eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a nonqualifying activity. In the case of costs that relate to both a nonqualifying activity and a qualifying activity, the costs must be reasonably allocated between the nonqualifying and qualifying activities.

96.     Applicants must submit with their application for a section 1603 payment documentation to support the cost basis claimed for the property. Supporting documentation includes a detailed breakdown of all costs included in the basis. Other supporting documentation, such as contracts, copies of invoices, and proof of payment must be retained by the applicant and made available to Treasury upon request.

97.     For applicants that claim an eligible property cost basis of $500,000.00 or more, a certification from an independent account must be submitted and attest to the accuracy of all costs claimed as part of the eligible basis of the property.

98.     To calculate the amount of the section 1603 payment for specified energy property relating to geothermal energy production, the following applicable percentage of eligible cost basis is utilized:

     i.     Geothermal Property under IRC §45 will receive a §1603 payment equal to 30% the eligible cost basis.

     ii.    Geothermal Property under IRC §48 will receive a §1603 payment equal to 10% the eligible cost basis.

     iii.   Geothermal heat pump property will receive a §1603 payment equal to 10% the eligible cost basis.

**H.  Application Procedure:**

99.     The application from requests, among other identifying data elements, the applicant's Data Universal Numbering System (DUNS) number from Dunn and Bradstreet.

100.     Applicants must also register with the System for Awards Management (SAM). Such registration must be completed before any payment will be made to the applicant.

101.     Once the Treasury approves an application, it sends notice of the payment to the applicant. This notice incorporates the information contained in the applicant's completed application form and the Terms and Conditions for the section 1603 program.

102.     Payment is made within five business days from the date of the Treasury notice, and is made by Electronic Funds Transfer based upon the banking information in the SAM.

103.     If an applicant submits insufficient information for the Treasury to make a final determination, the applicant will be notified of the deficiency and has twenty-one days from the notice to submit the additional information required. If this deadline is not met, the application will be denied.

104.     Upon submission of the application materials, the applicant, under the penalty of perjury, declares that:

"... I have examined this application, which includes any application submitted using the same Treasury Identification Number for the purpose of demonstrating that construction began on the property in 2009-2011. And to the best of my knowledge and belief, it is true, correct, and complete. I declare that I am the applicant or an authorized official for the applicant. Further, I agree the information in this application can be disclosed to the Internal Revenue Service."

## V.    Required Documentation:

105.    In order to receive payment under the section 1603 Program, prospective recipients must complete an official Application Form. The Application Form requires that that the applicant accurately and truthfully, under the penalty of perjury, identify the property's owner, entity type, location, purpose, value, applicant's interest in the property, number of jobs created/retained,  and provide a narrative summary about the property.

106.    Section 1603 applicants must also submit accurate and truthful supporting documentation demonstrating that the property is eligible property and that it was placed in service, or construction began, within the specified timeframe of section 1603.

107.    The required documentation specific to geothermal properties and relevant to this action includes:

    i.     Application (including Narrative Summary);
    ii.    Design Plans;
    iii.   Commissioning Report;
    iv.    Cost Breakdown;
    v.     Independent Accountant's Verification;
    vi.    Notarized Authority to Represent;
    vii.   Lease Waiver
    viii.  SAM Registration Confirmation and;
    ix.    Signed Terms and Conditions of the §1603 Program

108.    To prove property eligibility, applicants must submit as-built, legible and accurate design plans by a professional engineer (PE). For energy property, this includes the submission of a site layout showing the energy property in relation to infrastructure. If a PE seal was required to install the property, a letter explaining why the seal was not required must be submitted.

109.    To prove in-service date eligibility, applicants must submit a signed and dated commissioning report. The commissioning report must contain a statement from the installer or engineer stating that the property has been placed in service. The statement should provide the specific date the energy property was placed in service and as built capacity. A local agency inspection is not acceptable as a commissioning report.

110.    To prove the cost basis upon which the section 1603 payments are based, the applicant must submit a detailed cost breakdown in table format. This includes all costs and components related to the cost basis.

111.    If the claimed cost basis for the energy property is $500,000.00 or more, the applicant must submit an independent accountant's certification. This certification should include a detailed cost breakdown or cost segregation report for the Treasury Review Team to see both eligible and non-qualifying costs. Applicants must include the method of allocation for indirect costs allocated between eligible and ineligible costs.

112.    If the section 1603 application is being prepared by someone other than the property owner, the application must include a notarized authorization from the owner granting permission to the preparer to represent the owner for purposes of the section 1603 programs.

113.    If the section 1603 payment is to be received by the lessee of a property, the Lessor and Lessee must agree that the lessor waives all right to the 1603 payment. The applicant must include an executed written agreement between the lessor and the lessee of the energy property.

114.    All applicants must make sure the DUNS number provided on the application is active and registered in the SAM.

115.    Upon completion and submission of the application, all applicants must, under the penalty of perjury, declare that they have examined the Terms and Conditions of the section 1603 Program and agree that said terms and conditions will be followed. The signatory of the Terms and Conditions further declares that they are an authorized official of the applicant entity and are authorized to bind the applicant to the Terms and Conditions. See Terms and Conditions.

## VI.    Duty to Amend & Update Application Materials:

116.    Applicants have a strict duty to amend and update application materials if the information contained therein changes or is discovered to be materially inaccurate or incorrect.

117.    Clause 3(a) and (b) of the Terms and Conditions provide:

"The applicant understands that Treasury is relying on the accuracy of the information contained in the application in making determinations with respect to the applicant's eligibility for a Section 1603 payment. If the applicant determines that any information included on or with the application was materially inaccurate or incorrect, the applicant must immediately inform

Treasury. If Treasury determines, as a result of this information, that the applicant does not qualify for funds or that the applicant received funds in excess of the amount to which the applicant was entitled, the applicant must immediately return the funds to Treasury... [t]he applicant understands that none of the applicant's obligations herein terminate upon the sale or other disposition of the property to an eligible entity.

118.    Failure to amend or update the information conveyed in the application process as required by the Treasury is a material breach of the Terms and Conditions of the 1603 Program.

### VII.    Duty Report:

119.    Recipients of section 1603 payments are obligated to routinely report to the Treasury.

120.    Pursuant to the Program Guidance, "[a]pplicants are required to provide reports, as required by the Treasury, including an annual performance report as set forth in the Terms and Conditions."

121.    The Treasury can request reports as it deems necessary to ensure compliance with ARRA guidance.

122.    At a minimum, recipients must provide project performance reports on an annual basis for a period of five years after the property was placed in service. Annual performance reports are due no later than twenty-one days following the end of the reporting period. The first reporting period begins on the date the property is placed in service.

123.    Per the Terms and Conditions, the annual project performance report must include all of the following elements:

a)  Name of Applicant;
b)  Current owner of property;
c)  Treasury application number;
d)  Name of project;
e)  Location of project: city/county, State, zip code;
f)  Number of jobs retained;
g)  Annual production in (in kilowatt hours, MMBTUs, or horsepower as applicable);
h)  Installed nameplate capacity (in kilowatts, MMBTUs, or horsepower as applicable.

124.    Pursuant to the Terms and Conditions, "[t]he applicant must immediately report any indication of fraud, waste, abuse, or potentially criminal activity pertaining to Section 1603 funds to Treasury and the cognizant Treasury inspector general.

125.    Failure to timely submit truthful and accurate reports as required by the Treasury, or to report fraud, waste, abuse, or potentially criminal activity pertaining to section 1603 funds, is a material breach of the Terms and Conditions of the section 1603 Program.

### VIII.    Duty to Maintain and Provide Access:

126.    A section 1603 applicant has a duty to maintain proper accounting procedures and provide access to the Treasury for the purposes of auditing and evaluating the use of the section 1603 funds.

127.    Clause 7(a) of the Terms and Conditions provides:

> "The applicant must maintain project, financial, and accounting records sufficient to demonstrate that §1603 funds were properly obtained in accordance with the §1603 program and the Terms and Conditions. The Treasury, as the awarding office, the cognizant Treasury inspector general, and the Comptroller General of the United States, or any of their authorized representatives, shall have the right of physical access to the applicant's facilities and to any pertinent books, documents, papers, or other records (electronic and otherwise) of the applicant and each partnership and pass-thru entity that directly or indirectly owns an interest in the applicant which are pertinent to the § 1603 payment, in order to conduct audits, examinations, and evaluations."

128.    Failure to maintain proper accounting procedures and provide access to the Treasury, or its representatives, is a material breach of the Terms and Conditions of the 1603 Program.

### IX.    Certification & Recapture of §1603 Payment Funds:

129.    The section 1603 programs has built-in safeguards to prevent the misappropriation of funds by applicants. These safeguards provide for routine certification and the recapture of any funds inappropriately allocated, used or obtained.

130.    Pursuant to Terms and Conditions Clause 6(a), "[t]he applicant shall certify to Treasury on an annual basis for a period of five years from the date the property was placed in service

that the property has not been disposed of to a disqualified person and that the property continues to qualify as specified energy property (as that term is used in Section 1603)."

131.    The annual certifications must be submitted at the same time as the performance report described in paragraphs 126-129.

132.    If the property ceases to qualify as specified energy property or is transferred to an unqualified person, the Treasury considers this a "disqualifying event." (Hereinafter, DQE). A DQE will result in recapture of the funds paid to the disqualified recipient.

133.    If a DQE occurs within five years from the date the property is placed in service the applicant must repay the section 1603 funds to the Treasury as follows:

> a) 100% of the funds if DQE occurs within one year of in service date.
> b) 80% of the funds if DQE occurs after one year but within two years of in service date.
> c) 60% of the funds if DQE occurs after two years but within three years of in service date.
> d) 40% of the funds if DQE occurs after three years but within four of in service date.
> e) 20% of the funds if DQE occurs after four years but within five of in service date.

134.    Any amount of the funds subject to the recapture provisions of section 1603 become a debt owed to the United States, owed to the General Fund of the Treasury. The collection of such debts is enforceable by all available means including enforcement by the Unites States Department of Justice against any assets of the applicant entity. Debts arising under the section 1603 recapture provisions are not considered tax liabilities.

## X.     Disallowance:

135.    Pursuant to Terms and Conditions Clause 8(a), "[i]f the applicant materially fails to comply with any term of the award, whether stated in a Federal statute or regulation, program guidance, these Terms and Conditions, or a notice of award, Treasury may take any remedial action that is legally available including disallowing all or a part of the Section 1603 payment."

136.    Any payment that is determined by the Treasury to be disallowed must be immediately returned to the Treasury.

## XI.     North Brawley Project

**A. Description of Project:**

137.　ORNI 18, LLC, is the business entity responsible for the management and operation of the North Brawley Geothermal Power Plant (the "North Brawley Plant") located in Imperial County, California.

138.　Geothermal power plants utilize production wells that draw up hot geothermal fluid, which is passed through the power plant to generate steam. The steam rotates a turbine, which generates electricity. In a binary system, after the steam is produced, the hot water is passed through another liquid with a lower boiling point than water. The secondary liquid vaporizes, which also helps drive the turbine to generate electricity.

139.　The North Brawley plant is a binary system that consists of five Ormat Energy Converter (OEC) units, which utilize water-cooled condensers. ORNI 18 sells the North Brawley Plant's electrical output to Southern California Edison (SCE) under a long term 20 year power purchase agreement (the "PPA").

**B. Construction:**

140.　Drilling activities for the North Brawley Plant commenced in February 2007. In its 2007 Annual Report, Ormat first indicated that it was in the advanced stages of constructing the 50 MW North Brawley Plan. By June 2007, ORNI 18's PPA with SCE was finalized, and key power plant equipment had arrived on site.

141.　The North Brawley Plant was expected to be online by the end of 2008.

142.　Construction of the North Brawley plant was substantially completed in December 2008. At this time, the North Brawly property was ready and available for its specific use, to wit; provide energy to SCE in return for payment per the terms of the 2007 PPA.

**C. Start-up Testing Phase:**

143.　The commencement of start-up testing revealed the first of many troubles that would plague the North Brawley Plant and eventually lead to substantial write-downs of the plant's value by Ormat Technologies, Inc.'s parent company in Israel, Ormat Industries Ltd. in March 2011, for fiscal year 2010, and again in August 2012. Full-time operation of the North Brawley Plant's production wells during the commissioning phase revealed significant amounts of sand being drawn up along

with production fluids.  The sand would clog the production pumps making continuous operation impossible.  As a result, Ormat subsequently communicated the start-up delay to SCE and received an extension of the Firm Operation Date.

144.   The PPA with SCE allowed for the sequential start-up of North Brawley's multiple units, with the provision, however, that the plant must demonstrate the contract capacity within six to nine months after the first unit is initially synchronized to the grid.

145.   By December 2008, all five generating units for the North Brawley Plant were synchronized to the power grid. At this time, the North Brawley Plant began generating revenue from energy sales to SCE paid at the full contract rate as provided by the PPA.

146.   By deferring the capacity demonstration and thus the Firm Operation Date, Ormat intentionally and indefinitely postponed the North Brawley Plant's contractually mandated milestone.

147.   During this deferral period, the company experimented with various filtration methods to handle the solids in the resource.   These temporary solutions allowed the plant to maintain generation levels at 17MW. As a permanent solution, the company planned to install cyclone filters at the injection wells and later the production wells.

148.   Ormat management provided a brief discussion of the resource issues at North Brawley in the company's 2009 Annual Report.  In addition to the issues relating to sand build-up, Ormat also advised that the system's injection capacity was "disappointing."  Specifically, because the injection fluid could not be re-injected, production fluid could not flow throughout the plant, thereby limiting the plant's ability to increase its generating capacity.

149.   By the time Ormat was willing to allow the North Brawly Plant to undergo Capacity Demonstration and thereby achieve, as defined by the PPA, a "Firm Operation Date" of April 1, 2011, the plant had been consistently operating and selling energy to SCE for over two years, beginning prior to January 1, 2009.

**D.  Adverse Developments in the Commercial Life of the North Brawley Facility:**

150.   For the purpose of obtaining the section 1603 cash grant, Ormat fraudulently concocted the in-service date of January 15, 2010. At that time the plant was only generating 17MW net capacity.   Therefore, with this fraudulent "grant online date," Ormat sought federal funds to

support a geothermal project that was still not considered to have achieved viable commercial operation under the PPA with SCE. Because of the failure of the project, Ormat asked for and received a deferral of the capacity demonstration test and Firm Operation Date from SCE until March 31, 2011.

151.    As of February 28, 2011, in the company's 10-K Annual Report for Fiscal Year 2010, Ormat management reported that the North Brawley Plant was utilizing 16 production wells and 21 injection wells in its gathering system. Ormat had increased North Brawley injection capacity by cannibalizing the East Brawley injection area.1 Ormat reported that the addition of the four new East Brawley injection wells increased the North Brawley Plant generating capacity to 30 MW net. This estimate was false and misleading, because at that time, Ormat knew the plant could not sustain 30 MW.

152.    During the third quarter earnings call for Fiscal Year 2010 held on November 3, 2010, Yoram Bronicki, Ormat Technologies, Inc. President and Chief Operating Officer, reported:

> The generation in North Brawley was steady with the average net output in September being a little over 25 megawatts. This improvement has been achieved in part by the improvement in solids removal which allowed safeguarding the operating injection wells, and partially by rebalancing the flow in the western field, which was done by converting production (wells into injectors). Our next substantial step will be opening up a new injection area to the east of the existing field. Although we started work on this in the third quarter, the bulk of the construction is taking place in the fourth quarter. As of today, we've completed most of the pipeline and expect to commission the injection lines in the second half of December. We anticipate that this will improve our injection capability and allow further increase in generation. The next step will be to complete the additional production. We expect this program to improve the financial performance of North Brawley and the whole Electricity segment.

153.    As late as September 26, 2011, at an evidentiary hearing in response to a complaint by the California Unions for Reliable Energy (CURE) held before the California Energy Resources Conservation and Development Commission, Tom Buchanan, Ormat Technologies, Inc. Senior Engineer, testified that the North Brawley facility had performed a capacity demonstration test on

---

[1] In 2008, Ormat Technologies, Inc. announced that the company planned to construct and had in fact begun manufacturing equipment for an additional 50 MW plant, designated as the East Brawley project, which would be situated two miles east of the North Brawley plant, on the other side of the New River.

March 31, 2011, and that the generating capacity was determined to be 33MW, but the plant's actual average net generating capacity was "in the range of 25 MW."

154.    When questioned, Mr. Buchanan testified that with the current state of the resource, the generating capacity of the project could not be increased beyond production levels (as of that date) by drilling additional production wells. Mr. Buchanan cited diminishing plant efficiencies as well as diminishing return on investment as the basis for his opinion.

155.    Five months later, in direct contradiction to the previous public statements presented to the CEC, Ormat management provided in the company's 2011 10-K Annual Report filed on February 29, 2012, the following statement on North Brawley's status and near-term outlook:

> The ramp up of the field has been slow and expensive. While we believe that the reservoir is large enough to support the designed generation capacity of 50 MW, the operation of production wells, injection wells and the handling of the geothermal field has been a challenge.
> On March 31, 2011, Southern California Edison set the demonstrated capacity of the power plant at 33 MW. Southern California Edison also agreed to modify the PPA to allow us the option of performing an additional capacity demonstration until March 31, 2012.
>
> There is ongoing work to increase the generation of the power plant. We have set new targets for production wells and identified improvements we can make to the injection wells, all in parallel with our effort to reduce the operating expenses, mostly through modifications that would extend the service time of the production pumps.

156.    In fact, the failure of the North Brawley Plant to demonstrate the original contract capacity of 50 MW resulted in a de-rating of the ORNI 18 PPA with SCE to 33 MW.  Ormat subsequently paid SCE approximately $340,000 in damages as a penalty for the deficient capacity. Even in the manifestly improbable event that North Brawley is someday able to generate 50 MW of net capacity, SCE would have no obligation to purchase the incremental output, defined in the PPA as "Unincluded Capacity."  Moreover, the PPA prohibits ORNI 18 from marketing the Unincluded Capacity to third party off-takers for two years.

157.    Given the plant's reduced earning potential and operating costs, the ability to increase the PPA contract capacity through a second capacity demonstration would be critical to the plant's future financial viability.  In light of the previous failures at the North Brawley Plant, when the time

came to prove that the project was capable for achieving 50 MW, Ormat purposefully choose not to exercise the option to perform a second 2012 capacity demonstration test.

158.   In the intervening year between the first capacity demonstration test conducted in March 2011 and the option date, Ormat was unable to achieve any appreciable improvement in the plant's performance despite additional capital expenditures. As a result, in the absence of a more favorable sales agreement, the North Brawley Plant's future revenue stream is limited to a maximum sale of 33 MW based on the de-rated ORNI 18 PPA with SCE.

159.   Interestingly, despite the overwhelmingly negative effects of five years of adverse developments in the commercial life of the North Brawley facility, Ormat management never made a determination of impairment.    And despite the plant's extraordinarily high capital basis of approximately $400 million coupled with its reduced earning potential, Ormat management continuously falsely affirmed the recoverability of the North Brawley Plant.  Indicative of the true potential for the plant, Ormat Technologies, Inc.'s Israeli parent company Ormat Industries, Ltd., however, wrote off almost $150 million of the plant's asset value prior to August 2012.[2]

**E. §1603 Cash Grant in Lieu of Tax Credits:**

160.   On or about June 18, 2010, Ormat filed an application for a section 1603 payment with the Treasury.

161.   On August 17, 2010, ORNI 18, the ORA subsidiary that owns the North Brawley Plant, was awarded a cash grant by the Treasury Department in the amount of $108,285,626.

---

[2] On January 23, 2013, Ormat Technologies, Inc. announced that it will recognize an impairment charge of up to $230 million of the asset value of North Brawley.  After the impairment, the carrying value of the plant will be reduced to approximately $30 million.  The decision to write down the plant was necessitated by notification from Southern California Edison, the off-taker under the North Brawley PPA, that it had retracted its permission to allow Ormat to market North Brawley energy output to other off-takers in search of higher energy pricing.  Given the continued from page 44, footnote 4, ... plant's low output sold at the fixed PPA energy price, it is impossible to recover the project's high capital cost and an impairment charge is required.  In August 2010, Ormat received a cash grant of over $108 million under the ARRTA.  In March 2011 and August 2012, Ormat Technologies, Inc.'s parent company in Israel, Ormat Industries, Ltd. recognized asset impairment charges totaling $128 million.  The US subsidiary did not record the same adjustments at the time.

Ormat Industries, Ltd. also announced that it would record an impairment charge for the Jersey Value geothermal plant in an amount equal to $30 to $40 million.  In May 2012 Ormat Technologies, Inc. received a cash grant of $34.6 million for Jersey Valley.  Despite the determination of impairment by its parent company, Ormat Technologies, Inc. will not record a similar write off on the books of the US company at this time.

162. As of July 19, 2012, the grant awarded to ORNI 18 for North Brawley was the largest cash award distributed to a project developer under the 1603 program. The award amount equates to reported eligible basis capital cost of $360,953,087.

163. Utilizing this eligible basis coupled with an estimated historical average generating capacity of approximately 20 MW, the North Brawley Plant cost almost $20 million for every megawatt of installed net capacity or $20,000/kW, making the project the most expensive geothermal power plant ever constructed.

164. In addition, as previously reported by Ormat, the plant utilizes 16 production wells (with additional producers in development) and 21 injection wells to deliver less than 30 MW of net generation. This makes the North Brawley Plant the most inefficient geothermal power plant when compared to other operating geothermal projects. Further, by its own admission, ORA continues to increase capital expenditures on the North Brawley Plant, thus driving up the plant's investment cost rate and diluting its return on investment.

165. In May 2010, the International Energy Agency, Energy Technology Systems Analysis Program (IEA ETSAP) published "Technology Brief E07: Geothermal Heat and Power." In 2010, the year in which the North Brawley Plant was fraudulently placed in service for cash grant purposes, the IEA reported that the investment cost of conventional geothermal power ranged from $3,400/kW to $4,000/kW (in US$ 2008). Further, the investment cost, including interest during construction, in 2010 for binary systems specifically was projected to be $4,000/kW (in US$ 2008).

166. While these figures represent indicative average costs with considerable variation, it is implausible, if not completely impossible, to attribute the staggering disparity between the North Brawley Plant investment cost rate and industry averages solely to resource attributes. Mismanagement, poor planning, and execution by Ormat were the major contributing factors in the utter, and presently concealed, failure of the North Brawley Plant project development.

167. In two years of full-time operation (since January 15, 2010), the North Brawley Plant generated $15 million and $15.3 million of revenues in 2010 and 2011, respectively. The plant's operating costs for the same periods were $39.6 million and $41.8 million, respectively. Simple

1    arithmetic shows that North Brawley's operating losses actually grew from $24.6 million in 2010 to
2    ($26.5 million) in 2011.

3        168.    Despite management's false statements to the contrary, the prospects for an economic
4    turnaround do not readily present themselves in light of the actual plant performance and realistic
5    outlooks on future market conditions. Under normal circumstances, the North Brawley Plant project
6    would be rendered bankrupt and asset impairment justified. Indeed, approximately $128 million of
7    value was written off in 2010 and 2011 by the parent company ORMT. And while the continuing net
8    operating losses at the North Brawley Plant should have justified a write-off by the American
9    subsidiary, ORA, as well, no such measure has been taken.

10       169.    In truth, the capital infusion of $108 million in the form of a Treasury cash grant was
11   treated as a checking account by ORNI 18 and Ormat Technologies, Inc., to keep an insolvent and
12   failed project afloat. Even in the best of economic times, North Brawley would be a failed geothermal
13   venture.

14       170.    In fact, prior to applying for the section 1603 payment, Ormat had sought private
15   capital from willing investors, however, these investors grew cold on the project, not because of the
16   recession, but because in doing their due diligence it became known to them that the project was
17   unable to generate sufficient revenue to cover its operating costs.

18       171.    Internal Memos regarding the North Brawley financing negotiations were handled by
19   Dita Bronicki and the project finance department in Israel.

20       172.    The section 1603 Treasury funds, though intended to replace private capital in light of
21   the economic recession should never have been provided to the grossly mismanaged North Brawley
22   Plant and, but for Ormat's ongoing fraudulent misrepresentations, the section 1603 funds received by
23   Ormat would have been dispensed to other more viable and stable geothermal and/or alternative
24   energy projects.

25   **F.  North Brawley Asset Impairment:**

26       173.    In its 2010 10-K Annual Report, Ormat Technologies, Inc. reported:

27       We refinanced a portion of the equity invested in the North Brawley power plant with
         the cash grant we received under the ARRA. We expect that once we bring the plant
28

---

closer to its original design capacity, we will able to refinance a portion of the remainder with long-term debt.

174.    For auditing purposes, ORA recorded the $108 million cash grant received for the North Brawley Plant as a "reduction" in the carrying value of the plant.   Assuming a depreciable life of 30 years, the grant would significantly reduce the annual depreciation expense by approximately $3.6 million a year. Despite these reductions in future costs, the North Brawley Plant was tested for impairment in 2010 due to the low output and higher than expected operating costs. At that time Ormat Technologies, Inc., stated:

> Based on these indicators, the Company tested North Brawley for recoverability by estimating its future cash flows taking into consideration the various outcomes from different generating capacities, rates to be received under the PPA through the end of its term and expected market rates thereafter, possible penalties for underperformance during periods when the plant is expected to operate below the stated capacity in the PPA, projected capital expenditures to complete the development of the plant and projected operating expenses over the life of the plant. The Company applied a probability-weighted approach and considered alternative courses of action. Using a probability-weighted approach, the estimated undiscounted cash flows exceed the carrying value of the plant ($245 million as of December 31, 2010) by approximately $46 million and therefore, no impairment occurred. ...If actual cash flows differ from the Company's current estimates due to factors that include, among others, if the plant's generating capacity is less than approximately 45 MW, or if the capital expenditures required to complete development of the plant and/or future operating costs exceed the level of our current projections, a material impairment write-down may be required in the future.

**G.  Violations of the Federal False Claims Act:**

175.    Ormat's primary violation of the Federal False Claims Act is directly related to the fraudulent calculation of the in-service date of the North Brawley Plant.

176.    In the North Brawley section 1603 application materials, Ormat falsely claimed that the plant was placed in service in January 2010 when, in fact, the plant was delivering energy and generating revenue in December 2008. As such, the plant was ready for specific purpose prior to January 2009 and therefore, does not qualify for a section 1603 payment.

177.    The methodology employed by Ormat to calculate and justify the in-service date of January 2010 directly contradicts the process used by Ormat in other section 1603 grant applications for which they have received payments.

178.   Additionally, Ormat misled and continues to deceive the U.S. Treasury by falsely attesting to the plants viability as a geothermal project.

179.   In 2010, the year in which ORA secured $108 million in a Treasury cash grant for the North Brawley Plant facility, the plant itself suffered a net loss of $24.6 million. That loss grew the following year to $26.5 million. On the whole, Ormat could have made an extra $51.1 million during those two years if it had simply ceased operations at the North Brawley Plant in 2010. Instead, Ormat management obtained a taxpayer subsidy of $108 million for a plant that had more value as scrap metal than as an electricity generating asset.

180.   Ormat received the cash grant for the North Brawley Plant in August 2010. Seven months later in March 2011, Ormat Technologies Inc.'s parent company in Israel wrote down $128 million of the plant's value, while in the U.S., Ormat Technologies Inc. insisted that the plant's future cash flows exceed its carrying value.

181.   The North Brawley project as a stand-alone entity was insolvent at the time Ormat, through its subsidiary ORNI 18, applied for the Treasury cash grant.   In the absence of the Government subsidy, the North Brawley Plant project would not have sustained its operations with such massive losses.

182.   It is important to note, that the PPA between ORNI 18 and SCE is a "must-take" contract. This means that, so long as the plant operates, SCE is obligated to purchase all of the energy that North Brawley was capable of delivering. Therefore, North Brawley's insolvency was wholly unrelated to a decline in energy sales resulting from reduced demand, or an increase in supply for competing sources (all factors potentially related to economic market conditions), but solely due to its high operating costs and blatant failure to achieve its lofty and unrealistic output goals.

183.   Without the Government subsidy, the project would have been shut down and Ormat would have been forced to forfeit its $17 million performance security to SCE for breaking the North Brawley Plant contract. Even still, paying this penalty to SCE would have cost the company less than the plant's operating losses in 2010 alone. Given this reality, the North Brawley Plant would never have operated long enough to avail of any tax credits under 26 USC section 45 and 48 and should not have qualified for a cash grant in lieu of tax credits.

184.    Given that the grant was awarded, however, Ormat's end game has become abundantly clear. Even as management in the U.S. continues, until January 23, 2012, to claim that the plant will somehow miraculously generate enough revenue to cover the $360 million of capital cost, in Israel the same management team has been writing down the asset's value for nearly three years. The Israeli parent company will continue to write down the asset until management can justify shutting down the plant based on the claim that it has no book value.

185.    All the while, in the U.S., Ormat delayed any write-downs to escape the 5-year grant recapture period provided by section 1603. Once the U.S. company is no longer in danger of being required to return the $108 million cash grant, rather than operating the North Brawley Plant at a loss for 30 years, Ormat will likely shut the plant down.

186.    After five years of operating at less than 50% of its original design capacity, it is clear that the North Brawley Plant is a failed project.   In normal market conditions without the availability of Government subsidies, a responsible management team would have shut down the plant rather than operate at a loss for this long.

187.    Rather than taking responsibility for its mistakes and cutting its losses on the North Brawley Plant project, Ormat management perpetrated a fraud on the Government in order to obtain and keep over $108 million of taxpayer money that was intended to stimulate the economy through investments in viable enterprises.

188.    Section 1603 funds were intended for enterprises that, if the stimulus funds could support them through the great recession, would ultimately prosper and succeed once the economic tides had shifted.

189.    It is readily apparent by the conduct of Ormat Industries Ltd. and the statements made by Ormat Technologies CFO, Joseph Tenne, that Ormat considers the North Brawley project a failed venture, and yet, Ormat has routinely failed to inform the Government of the true viability of the project so as to avoid recapture of the section 1603 funds, thereby unjustly retaining the funds and enriching itself.

190.    But Ormat's massive fraud did not end in the desert of California.

### XII.    Puna Geothermal Venture

**A.   Description of the Project:**

191.    Puna Geothermal Venture II, L.P. ("PGV") is a wholly-owned subsidiary of Ormat. PGV was acquired by Ormat from Constellation Energy in 2004. PGV owns and operates two geothermal power plants located in the Puna district of the island of Hawaii. PGV sells electrical output generated at the Puna complex to Hawaii Electric and Light Company ("HELCO") pursuant to three separate long-term power purchase agreements.

192.    The Puna complex consists of a geothermal combined cycle system with an alleged net capacity of 30 megawatts (the"30MW Plant") and a binary system with a net capacity of 8 MW (the "8 MW Expansion").

**B.     The 30 MW Plant:**

193.    The 30 MW Plant was placed in service by its original owner, Constellation Energy, in 1993. Ormat's acquisition of PGV occurred in 2004, eleven years after the original owner placed PGV in service.

194.    In May 2005, more than three months after the purchase of PGV by Ormat, the 30 MW plant was sold to Southern Company as an equity investor, who then leased the 30 MW Plant back to PGV in a sale-leaseback transaction.   The sale leaseback transaction allowed Southern Company to account for all depreciation in the 30 MW Plant, but PGV still retained all rights in the resources generated from the 30 MW Plant.

195.    The 30 MW plant is "unqualified" for purposes of the section 1603 Program for the following reasons:

      i.    The 30 MW plant was placed in service by its original owner in 1993, sixteen years prior to the earliest allowable in service date of the §1603 program, and

      ii.   Neither Puna Geothermal Venture, II, L.P., or Southern Company qualify as "original owners" per §1603, and

      iii.  PGV does not qualify under IRC §45 because, due to its age, the 30 MW does not generate Production Tax Credits that could be offset by the §1603 program;

      iv.  PGV does not qualify under IRC §48 because the system was not constructed by PGV at a time when PGV was the "taxpayer" as defined by the IRC.

      v.   PGV, prior to seeking §1603 grant funds, had no plans to increase the number of jobs at the Puna site, and in fact, has reduced jobs at the site.

196.    Under the sale leaseback transaction, PGV maintains a well maintenance reserve account, which set aside funds annually for continued maintenance on the Puna wellfield.  The use of this account was to be for future drillings of production wells and to work-over existing production wells at the plant.  In her interactions with investors and Ormat, Ms. Calilung was told that the reserve account was supposed to generate $17 Million in cash reserves for maintenance over the life of the 30 MW plant.

197.    Although the 30 MW Plant was supposed to be generating 30 megawatts of electricity, by February of 2010, the 30 MW Plant was reduced to only generating approximately 17 MW.  This shortfall created an issue for PGV and Ormat because the contracts with HELCO stated that the energy production was supposed to be at least 30 megawatts. On February 8, 2010, Israeli newspaper Haaretz reported that Ormat had announced that its revenues would decline by $1 million per month as a result of the drop in steam production from the geothermal reservoir feeding the 30 MW Plant.

198.    PGV attempted to stimulate the wellfield with chemical and mechanical cleanouts of the blocked production wells, but such measures ultimately proved unsuccessful.

a.    **Well KS-14: An expansion of an unqualified property**

199.    In order to restore the 30 MW Plant to full capacity, PGV commenced the drilling of a new production well, KS-14, in early 2010.

200.    The Participation Agreement and Project Lease Agreement under the sale leaseback transaction required PGV, as Lessee, to obtain investor approval in order to drill KS-14.  The work plan submitted to the investors by Ormat outlined the KS-14 well's need and justification, drilling targets, project schedule and budget.

201.    Southern Company was concerned that if Ormat invested significant resources in the leased property that the IRS would perform a compulsion test and find that Ormat, not Southern Company, was the true owner of the 30 MW Plant.  A consequence of such a finding by the IRS would be that Southern Company would lose the tax benefits for claiming depreciation on the 30 MW Plant. Southern Company agreed to the KS-14 well when it learned that the project would only bring the 30WM Plant back to full capacity, and would not generate additional capacity.  Based on

these circumstances, Judy Rosenberg, Southern Company's finance manager, and Southern Company's Vice President of Tax determined that the KS-14 would not result in a compulsion test and Southern Company signed off on the KS-14 well.

202.   PGV was also required to obtain a certification from Geothermex, a geothermal resource consulting firm, verifying that the KS-14 well would not materially adversely affect Southern Company's rights as Equity Investor and Owner Lessor under the Sublease of the Resource Sublease and that the proposed Optional Modification as defined in the Project Lease Agreement would not cause the 30 MW Plant to become a limited use property under IRS regulations.

203.   In order to pay for the KS-14 production well, PGV asked the investors in the 30 MW Plant Project to approve the use of the funds in the reserve account, which at the time held approximately $4 Million, and to finance the remainder of the costs. Ms. Calilung was involved in getting investor approval and consent to tap the reserve account for the project. The total cost of KS-14 was between $12 and $13 Million.

204.   PGV submitted the KS-14 work plan for approval via electronic and certified mail to Southern Company, AIG Investment Group (Noteholder), Allstate Investments, LLC (Noteholder) and Union Bank (Indenture Trustee) in early 2010.

205.   The KS-14 well was initially very successful and, at first, it added about 14 MW of net capacity, which brought the 30 MW Plant back up to its production capacity of 30 megawatts. However, as the resource stabilized in 2011, the production was reduced slightly and the 30 MW Plant generated about 28 megawatts at the time the 8 MW Expansion was placed in service.

**C.     The 8 MW Expansion Plant:**

206.   The 8 MW Expansion Plant was added to the Puna complex in late 2011. Construction of the expansion was completed and financed entirely by Ormat. The 8 MW Expansion Plant utilizes a binary system to generate electricity.

207.   In the binary system of the Puna facility, the 30 MW Plant draws the resources from its production wells, including KS-14, and uses those resources to generate steam. The condensed hot water from the 30 MW Plant, also termed geothermal injection fluid, is passed to the 8 MW

1   Plant. The fluid heats a motive fluid with a lower boiling point than water, which vaporizes and turns
2   a turbine to generate electricity.

3   208.   The 8 MW Expansion Plant provides for the bypass of the injection fluid from the 30
4   MW Plant to the new binary generating units, which allows for a second phase of electrical
5   generation prior the re-injection of the spent fluid into the wellfield's injection wells.   Ormat
6   describes this configuration of the Puna complex as "Integrated Combined Cycle Units Geothermal
7   Power Plants."

8   209.   As such, all geothermal resources used by the 8 MW Expansion Plant are pulled from
9   the earth through the production wells of the 30 MW Plant.

10   210.   At the time Ormat sought investor approval from Southern Company, AIG and
11   Allstate for the 8 MW expansion PPA, Ormat expressly represented to the investors that the
12   expansion project would not require the addition of plant staff. This representation is also supported
13   be a pro-forma financial model that was provided to PGV investors that demonstrated only a
14   marginal increase in total plant operating cost after the expansion was placed in service, Additionally,
15   the impact of the costs of the expansion were detailed in in a memorandum Ms. Calilung sent to
16   investors on to kick off the review of the 8 MW PPA.

17   211.   Around this time, there were multiple emails between Ormat and the PGV investors in
18   which Ormat claimed the expansion would result in marginal cost increases because the current staff
19   was capable of operating the new 8 MW plant in conjunction with the 30 MW plant.

20   212.   Therefore, Ormat applied for and received section 1603 funds for the 8 MW expansion
21   project at a time when it knew that the funds would not be used or provide for any additional jobs at
22   the site.

23   213.   Additionally, after receiving the stimulus funds, rather than increasing the number of
24   jobs provided by the Puna plant, Ormat set about making employment conditions more difficult for
25   the current employees. Ormat systematically cut jobs at the Puna plant by eliminating previous
26   positions and failing to replace them. Moreover, Ormat cut back on the benefits that the remaining
27   Puna employees received.

28

214.   In light of the downsizing and cutbacks, on May 14, 2012, the operations staff of Puna voted to unionize because of concerns about their job and benefit security.  After the union organization was approved by the Puna staff, executive management reassigned the plant manager, Michael Kalekini; a move widely to be considered retaliation for his failure to prevent the unionization of the Puna staff.

215.   It was also known to Ormat that, at the time of applying for section 1603 funds, a significant portion of the funds would be used to refinance a portion of the equity investment in the 8 MW plant. Construction on the plant had been completed by primarily Israeli engineers who were temporary hires, and thus, the section 1603 grant funds provided to the Puna project had little, if any, stimulating effect on local jobs or the economy.

**D.   Violation of the Federal False Claims Act:**

216.   In December 2011, Cathy Tsaniff, Ormat's Tax Manager, began drafting PGV's application for a section 1603 Cash Grant in Lieu of Tax Credits for the 8 MW Expansion, a Specified Renewable Energy Property.

217.   In complete contrast to the in-service date calculation methodology employed in the North Brawly project and for purposes of the section 1603 grant application, the in-service date for the Puna 8 MW expansion was purposefully set at December 2011. This date would ensure that the 8 MW expansion project would qualify for section 1603 funds.

218.   The construction of the expansion was substantially completed in December 2010. However, the 8MW PPA was not executed until February 2011.  Furthermore, PUC did not approve the PPA until December 2011.  As the company was not authorized to sell energy at the time, Ormat placed the 8 MW plant in "long-term lay-up" while it awaited for PUC approval of the PPA.

219.   In late November 2011, based on assurances from legal counsel in Hawaii that the PUC planned to approve the 8 MW PPA by year end, Ormat made the decision to take the plant out of lay-up status and begin running the units full time to substantiate a Dec. 2011 in-service date.

220.   Despite the hold on the plant and while the PPA approval from PUC was still outstanding, Ormat began delivering energy produced by the 8 MW expansion to HELCO for free. It was believed by Ormat that, if the plant was operating and producing energy at this time, it could

claim December 2011 as the in service date for the expansion and thus, qualify the project for section 1603 funds.

221.    The decision to take the plant out of lay-up status is detailed in emails circulated among Ormat management (including, Co-Relators Tina Calilung) wherein Mr. Ohad Zimron, Senior Vice President of U.S. Operations, proposed to start running the 8 MW plant in anticipation of the December 2011 in-service date. By email, Mrs. Dita Bronicki responded by saying that it was a good idea. These emails were circulated during the Thanksgiving holiday break in 2011.

222.    December 2011 was a crucial in service date for the 8 MW expansion because Ormat had started construction on the expansion project's generating units in 2008, and therefore, to qualify for the section 1603 payment the expansion project had to be in service before the end of 2011.

223.    Ormat claimed December 2011 as the in service date of the 8 MW expansion to receive section 1603 funds despite the fact that the actual capacity demonstration for the Puna 8 MW expansion was not performed until March 2012.[3]

224.    During the section 1603 application drafting process, Ms. Calilung provided information relating to the PGV power purchase agreements and the operational history of the Puna complex. Additionally, Ms. Tsaniff and Ms. Calilung interviewed Paul Spielman, Ormat's Manager of Operations Support for Resource, regarding the configuration of the 8 MW Expansion Plant and its relation to the existing 30 MW Plant.

225.    Expansion Plant utilized resources gathered from a geothermal wellfield located on the Kapoho-State leasehold. The wellfield produces high temperature geothermal resource that consists of steam and brine. The resource is extracted from common production wells and flowed through a separator, where the steam is separated from the brine.

226.    Mr. Spielman confirmed that the 8 MW Expansion Plant, which consists of two OEC bottoming units, was designed to generate electricity by utilizing the geothermal brine that remains

---

[3] Compare this to the process that Ormat used to calculate the in service date for North Brawley. In that §1603 application, Ormat claimed the in service date of January 2010, even though the plant was delivering energy to SCE for a fee starting in December 2008. To calculate the in service date the Brawley project, Ormat used the date upon which it performed its capacity demonstration and achieved commercial operation under the PPA with SCE. Using, Ormat's Puna approach Brawley should have had an in service date of December 2008 because at that time the plant was "ready and available for its specific use."

after steam is separated and used to power the steam turbines of the 30 MW combined cycle plant. In the absence of the 8 MW Expansion Plant, the brine would have been re-injected into the wellfield, where it would eventually be re-circulated in the geothermal production cycle.

227.   Given that KS-14 contributed to the resource used by both the non-qualified 30 MW Plant and the qualified 8 MW Expansion, Ms. Tsaniff allocated the cost of the new production well between the older combined cycle plant and the new binary plant.  In the initial draft of the section 1603 grant application, KS-14's costs were allocated pro rata between the 30 MW and 8 MW plants based on the respective contributions of the steam and brine to the total output of the complex.  This approached was determined to be in line with the Treasury Department's Program Guidance.

228.   However, upon review by Defendants' management review the grant application was revised to reflect the allocation of 100% of the costs to the 8 MW Expansion Plant.

229.   The existence of the well maintenance reserve account and the use of said funds to drill KS-14 are indicative of Ormat's intent that KS-14 be used for the sole benefit of the original, unqualified 30 MW Plant. The use of KS-14 to supply resource for the 8 MW expansion exceeds the scope of consent by the investors to use reserve account funds to drill the expansion well.

230.   Additionally, any use of section 1603 funds to subsidize the entire expense of KS-14 when the intent of Ormat was primarily to expand an unqualified property would be a blatant misuse of the funds, as well as contrary to the goals and violation of the terms of the section 1603 program.

231.   On April 14, 2012, PGV was awarded $13,821,143 in a cash grant for a Specified Energy Project under section 1603 of the American Recovery and Reinvestment Act (ARRA). The award amount corresponds to estimated eligible project costs of $46,070,477 for the 8 MW Expansion Plant.  The estimated eligible project costs include the cost  of  the  generating  units, which consists of two Ormat Energy Converter (OEC) bottoming units, interconnection facility upgrades, separators and the total costs related to the drilling and connection of new production well KS-14.

232.   The $46,070,477 in reported eligible project costs falsely included the full cost of the KS-14 project, which was approximately $12.5 Million.   These costs should not have been recoverable as the costs were incurred to benefit the non-qualified 30 MW Plant.  Had these costs

1  been allocated on a pro-rata basis based on the energy production of the two plants, and the non-
2  qualified portion removed, the correct eligible costs should have been reduced by $9.86 Million
3  ($46,070,477 * 30/38) for a total cost of approximately $36 Million.  Ormat's false statements
4  regarding the eligible project costs resulted in an overpayment of at least $3,000,000.00.

5       233.   It must be noted that Ormat contracted the electricity generated by the 8 MW
6  Expansion for sale at fixed energy rates that are substantially below the market rates paid by HELCO
7  to other independent power producers.  Ormat provided deeply discounted energy rates to HELCO
8  based on the premise that the 8 MW Expansion would not require high start-up costs related to
9  developing a geothermal wellfield.  Thus KS-14, or any geothermal well for that matter, was never
10  contemplated by Ormat as a necessary element of the 8 MW Expansion Plant.

11       234.   To the contrary, in the discussion over the KS-14 project with Southern Company and
12  the other PGV investors, Ormat clearly explained that the KS-14 project would not be used to
13  generate any additional capacity, and would only bring the 30 MW Plant up to its expected capacity.
14  Therefore, the inclusion of 100% of these costs in the section 1603 grant application signifies a
15  misrepresentation of the project scope to the Treasury Department, and the cash grant was awarded to
16  PGV based on that false allocation of funds, as modified by Ormat CEO Dita Bronicki.

17                    **XIII.   APPLICATION OF THE FEDERAL FALSE CLAIMS ACT**

18       235.   Pursuant to the Terms and Conditions of the section 1603 Grant Program, the
19  Government may seek to collect any section 1603 funds obtained through fraud "by all available
20  means including enforcement by the Unites States Department of Justice against any assets of the
21  applicant entity,' including through the enforcement of the federal False Claims Act. See Terms and
22  Conditions Clause 6(c).

23       236.   Thus, this is an action under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as
24  amended ("FCA"), which concerns a fraudulent scheme by the Defendants to defraud the United
25  States by knowingly causing fraudulent applications, and certifications of compliance, to be
26  submitted to the federal Government under section 1603 of the American Recovery and
27  Reinvestment Tax Act of 2009 thereby resulting in hundreds of millions of dollars in payments to
28  sustain non-qualifying geothermal energy projects.

237.    The FCA provides liability for any person who knowingly submits a false claim to the Government or causes another to submit a false claim or knowingly makes a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A) and (B).

238.    IRC sections 45 and 48, along with section 1603 of ARRTA, set forth the definition of specific energy property that is qualified to receive section 1603 payments from the Treasury in lieu of tax credits.

239.    For the reasons set forth above, neither the North Brawley nor the Puna Geothermal Plants are qualified properties pursuant to IRC sections 45 and 48, or section 1603 of ARRTA.

240.    The submission of a fraudulent section 1603 grant application constitutes a false claim under the FCA and Defendants herein are liable for presenting, and causing to be presented, false or fraudulent claims for payment or approval to the U.S. Department of the Treasury.

241.    Additionally, the fraudulent scheme established by the facts set forth in this Disclosure Statement involves an ongoing conspiracy to violate the FCA amongst the Defendants, including the submission of false or fraudulent annual reports, and supporting materials to prevent the recapture or disallowance of the section 1603 funds already obtained due to fraud.

242.    The conduct of the Defendants described herein violates the Terms and Conditions of the section 1603 Treasury Grant Program that establish a duty and standard of care for particular conduct to which the Defendants subscribed and assumed.

243.    Defendants knew or should have known that the application materials that they submitted to the Treasury Department were false and inaccurate, and, at the very least, acted with deliberate ignorance and reckless disregard for the truth or falsity of the information they conveyed in order to obtain section 1603 funds.

244.    The inaccurate information pertaining to Defendants' geothermal property that was included in the section 1603 grant applications and any subsequent reports and filings was material to the Treasury Department's determination to remit funds to Defendants.

245.    Similarly, the information pertaining to Defendants' geothermal property that was omitted from the section 1603 grant applications and any subsequent reports and filings was material to the Treasury Department's determination to remit funds to the Defendants.

246. Thus far Defendants have received at least $122,116,769.00 in payments from the U.S. Treasury based upon false or fraudulent claims.

247. Defendants to this day continue to perpetrate this fraudulent scheme, and have applied to obtain additional section 1603 funds for other geothermal properties, as well as a second round of section 1603 grant funding for the North Brawley geothermal plant.

## XIV.   DAMAGES, DISGORGEMENT AND RECAPTURE

### A. Damages Under FCA §1329(c)

248. The Federal False Claims Act provides that a person or entity who violates the act:

...is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410) plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729.

249. The federal Government has sustained significant damages in the form of the depletion of the Federal Treasury of millions of dollars. The money fraudulently obtained by Ormat and allocated by the section 1603 Treasury Grant Program could have been used by the Treasury to support and sustain truly viable and qualified energy projects. Ormat prevented the investment of federal stimulus dollars from having the true and intended effect of the American Reinvestment Tax Act of 2009.

### B. Size of the Recovery

250. From 2009 to the present, Defendants' fraudulent scheme induced the U.S. Treasury to issue at least two section 1603 Program grants to unqualified geothermal properties. Consequently, the potential size of the recovery runs into the many millions of dollars, and at the least, the whole value of the crash grants awarded to Defendants.

251. To date, Ormat has fraudulently obtained at least two section 1603 grants for a total value of $122,116,769.00. Ormat has received an additional $58,431,073.00 for other geothermal projects and, as of November 2012, had three additional section 1603 applications pending, including a second grant request for North Brawley.

## XV.   DEMANDS FOR RELIEF

**WHEREFORE**, Relators, on behalf of the United States of America, demand judgment against Defendants, ordering that:

a.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b.    Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

c.    Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

d.    Relators be awarded such other and further relief as the Court may deem to be just and proper.

### TRIAL BY JURY

Relators hereby demand a trial by jury as to all issues.

Dated: February 1, 2013                                  Respectfully Submitted,

Christopher G. Paulos, Esq.
CA Bar #272750, FL Bar #0091579
cpaulos@levinlaw.com
Peter J. Mougey, Esq.
James L. Kauffman, Esq.
Erica A. Reed, Esq.
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR P.A.
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Office: 850-435-7067
Fax: 850-436-6066

John A. Yanchunis, Esq.
FL Bar# 324681
jyanchunis@forthepeople.com
MORGAN & MORGAN, P.A.
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Office: 813- 223-5505
Fax: 813- 223-5402

*Counsel for Plaintiffs/Relators*