1 | Christopher G. Paulos, Esq. (CA Bar #272750)
2 | Peter J. Mougey, Esq. (FL Bar # 0191825)
3 | Laura S. Dunning, Esq. (AL Bar # ASB-1540-U50S)
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
4 | RAFFERTY & PROCTOR P.A.
316 S. Baylen Street, Suite 600
5 | Pensacola, Florida 32502
6 | Office: 850-435-7067
Fax: 850-436-6066
7 |
8 | John A. Yanchunis, Esq. (FL Bar# 324681)
MORGAN & MORGAN COMPLEX LITIGATION GROUP
9 | 201 North Franklin Street, 7th Floor
Tampa, Florida  33602
10 | Office: 813-223-5505
11 | Fax: 813-223-5402

12 | Jeremy M. Evans, Esq. (CA Bar #283168)
CSLLEGAL
13 | 611 K Street, Suite B-242
14 | San Diego, CA 92101
Office: 619-886-8587
15 | Fax: 619-615-2047

16 |
17 | **UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

18 |
19 | UNITED STATES OF AMERICA
ex rels. TINA CALILUNG &
20 | JAMIE KELL,
21 |              Plaintiffs/Relators,
22 | v.
ORMAT INDUSTRIES, LTD., ORMAT
23 | TECHNOLOGIES, INC., ORMAT
NEVADA, INC.,   PUNA GEOTHERMAL
24 | VENTURE II, L.P., PUNA GEOTHERMAL
25 | VENTURE, G.P., ORNI 18, LLC. & FIRST
ISRAEL MEZZANINE INVESTORS
26 | LTD.
27 |              Defendants.
28 | _____/

**Hon. Roger T. Benitez**
**Case No. 13-CV-0261-BEN (DHB)**

FIRST AMENDED COMPLAINT
FOR DAMAGES AND OTHER
RELIEF UNDER THE FALSE
CLAIMS ACT (31 U.S.C. § 3729 *et
seq.*)

DEMAND FOR JURY TRIAL

---

I.      INTRODUCTION ............................................................................. 5

II.     JURISDICTION AND VENUE ........................................................ 8

III.    PARTIES ......................................................................................... 9

    A.   Co-Relator Ms. Tina Calilung ................................................ 9

    B.   Co-Relator Ms. Jamie Kell .................................................. 10

    C.   Defendant Ormat Industries, Ltd. ......................................... 13

    D.   Defendant Ormat Technologies, Inc. .................................... 13

    E.   Defendant Ormat Nevada, Inc. ............................................. 14

    F.   Defendant Puna Geothermal Venture II, L.P. ....................... 14

    G.   Defendant Puna Geothermal Venture, G.P. .......................... 15

    H.   Defendant ORNI 18, LLC. .................................................. 15

    I.    Defendant First Israel Mezzanine Investors, Ltd. ................ 16

    J.    Alter Egos ........................................................................... 16

IV.     GEOTHERMAL ENERGY OVERVIEW ...................................... 17

V.      § 1603 OF THE RECOVERY ACT: PAYMENTS IN LIEU OF TAX CREDITS TREASURY GRANT PROGRAM ............................... 19

    A.   Geothermal Property Eligibility Framework: ....................... 22

        1.   Geothermal Property as Defined by Internal Revenue Code §§ 45, 48 and 616 .......................................................... 22

        2.   Geothermal Property Eligibility Framework: the "Placed-in-Service" Date and Date of Construction .......................... 23

        3.   Geothermal Property Eligibility Framework: Expansions to Qualified Properties .......................................................... 25

        4.   Geothermal Property Eligibility Framework: Original Use ............... 26

        5.   Geothermal Property Eligibility Framework: Tangible Property ........ 26

        6.   Geothermal Property Eligibility Framework: Specified Energy Property ........................................................... 28

            (a)  Qualified Facility Property ....................................... 28

(b)   Geothermal "Energy Property" under IRC § 48(c) .................... 29

7.  Geothermal Property Eligibility Framework: Applicant Eligibility .... 30

(a)   Eligible Basis................................................................. 31

(b)   Application Procedure and Post-Application Requirements........ 34

i.   Required Documentation for §1603 Grant Applications ........ 34

ii.  Duty to Amend & Update Application Materials.................. 36

iii. Duty to Report.................................................................. 37

iv. Duty to Maintain and Provide Access................................... 38

(c)   Certification, Recapture and Disallowance ................................ 39

VI.    DEFENDANTS' NORTH BRAWLEY GEOTHERMAL PROPERTY ......... 41

A.    Description of Project ......................................................... 42

B.    The Southern California Edison PPA .................................... 42

C.    Construction....................................................................... 43

D.    North Brawley Begins to Sell Electricity under the PPA in December
2008 .................................................................................. 43

E.    Ormat Applies for and Receives its First of Two § 1603 Grants for North
Brawley............................................................................... 43

F.    Ormat Misrepresented the Placed-in-Service Date ................................ 44

G.    Ormat Artificially Inflated and Misrepresented the Eligible Basis......... 46

H.    Ormat Failed to Report Recapture Events ............................................ 46

I.    The Second North Brawley §1603 Grant............................................... 48

J.    Ormat Knew the North Brawley Plant Would Never Meet Its Contracted
Capacity ............................................................................................ 49

K.    North Brawley's Inefficiency, Operating Losses and Ormat's Israeli
Write-Offs Demonstrate the Falsity of the North Brawley Plant's
Declared Eligible Basis....................................................................... 50

L.    Ormat Continued its Deception Despite Adverse Developments in the
Commercial Life of the North Brawley Facility .................................... 52

M.   Defendants Violated the Federal False Claims Act By Applying For and Receiving § 1603 Grant Funds For The North Brawley Plant ............... 57

VII.   ORMAT'S PUNA PLANT.................................................................... 60

A.   Description of the Project.................................................... 61

B.   The 30 MW Plant................................................................. 61

C.   The KS-14 Well: Maintenance Work on an Unqualified Property......... 63

D.   The 8 MW Expansion .......................................................... 64

E.   The Puna § 1603 Grant ....................................................... 65

F.   Defendants Violated the Federal False Claims Act By Applying For and Receiving § 1603 Grant Funds For The Puna Geothermal Plant............ 70

VIII.   DEFENDANTS' CONDUCT IN APPLYING FOR, RECEIVING & RETAINING § 1603 GRANT FUNDS FOR THE NORTH BRAWLEY AND PUNA PLANTS DEMONSTRATES A BLATANT DISREGARD FOR THE GOALS AND AIMS OF THE § 1603 GRANT PROGRAM ........................ 71

IX.   APPLICATION OF THE FEDERAL FALSE CLAIMS ACT........................ 73

X.   CAUSES OF ACTION................................................................. 75

XI.   DAMAGES, DISGORGEMENT AND RECAPTURE ................................ 78

A.   Damages Under The Federal False Claims Act .................................... 78

B.   Size of the Recovery .......................................................... 79

XII.   DEMANDS FOR RELIEF .......................................................... 79

# I.    INTRODUCTION

1.    On behalf of the United States of America, Tina Calilung and Jamie Kell, Plaintiffs/Relators, file this First Amended *Qui Tam* Complaint against Defendants, Ormat Industries, Ltd. ("Ormat Industries"), Ormat Technologies, Inc. ("Ormat Technologies"), Ormat Nevada, LLC, Puna Geothermal Venture II, LP, ORNI 18, LLC, First Israel Mezzanine Investors, Ltd., and Puna Geothermal Venture, G.P., (hereinafter, collectively "Ormat") pursuant to United States Code § 3729 *et seq*. (the federal False Claims Act, "FCA") to recover all damages, penalties, and other remedies under the False Claims Act, including statutory damages, treble damages, recapture and disgorgement of all wrongfully obtained funds and allege as follows:

2.    In response to a deepening recession in the late 2000's, Congress passed the $831 billion American Recovery and Reinvestment Act of 2009 (hereinafter, the "Recovery Act") to stimulate the economy in the United States. See Pub. L. No. 111-5, 123 Stat. 115, 364 (2009). While the Recovery Act's primary objective was to save and create American jobs, included among its secondary objectives was the funding and development of "clean" or "green" energy.

3.    Defendants, as described herein, have knowingly and purposefully exploited the "green energy" provisions of the Recovery Act to improperly obtain over $130 million in government funds, and ultimately, perpetuate and sustain a financial fraud of unprecedented proportions.

4.    Defendants have engaged in a scheme to obtain federal grant money under § 1603 of the Recovery Act for geothermal energy projects which did not qualify for payment, and have misused and abused the federal funds they have received in order to falsely support geothermal energy projects that the Government never intended, or would allow, § 1603 grant funds to support.

5.    Through this ongoing scheme, Ormat has sought to decrease the carrying value of failing geothermal projects, and to artificially inflate the value of Ormat's

energy assets so as to maintain the appearance of viability of certain geothermal ventures, and thereby ultimately, giving the appearance of, on paper, profits.

6.     Ormat carried out this scheme by, among other actions, submitting false or fraudulent grant applications, certifications of compliance, reports, and claims to the federal Government under § 1603, thereby obtaining *hundreds of millions* of dollars in payments to which it was *never* entitled.

7.     Ormat's ongoing scheme violates the federal False Claims Act because Ormat knowingly submitted false information in order to obtain § 1603 grant payments from the United States Treasury. Specifically, Ormat misrepresented:

     a)    The dates upon which specific projects were placed in service,

     b)    The energy output capacity of specific projects,

     c)    The nature and purpose of expansion projects,

     d)    The long term viability of certain geothermal projects, and

     e)    The property value basis upon which the grant payments were based.

8.     In order to apply for, and receive, § 1603 payments, and otherwise perpetrate its on-going scheme, Ormat routinely submitted false information to the following federal agencies :

     a)    The United States Department of Treasury;

     b)    The United States Internal Revenue Service; and

     c)    The United States Securities and Exchange Commission.

9.     But for Ormat's purposeful misrepresentations, it would not have received § 1603 funds. Had Ormat not improperly obtained payment of these funds, the money could have been invested by the U.S. Treasury into viable geothermal projects actually qualified to receive the funds, pursuant to the congressionally-mandated goals of the § 1603 program.

10.    Not only did Ormat wrongfully obtain the § 1603 funds, but Ormat continues to file false certifications pertaining to the success, viability and operation of

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

the geothermal projects that received grant funds so as to prevent the funds' recapture. Ormat additionally continues to make false public statements claiming its use of funds obtained from the Government were appropriate.

11.     To date Ormat has received at least $136,791,964.00 in § 1603 payments through fraudulent and/or false § 1603 grant applications resulting in payments to the following non-qualifying geothermal properties:

        a)     The North Brawley Geothermal Power Plant, in Imperial County, California, and

        b)     The Puna Geothermal Power Plant, on the island of Hawaii.

12.     Ormat has also received § 1603 payments totaling an additional $105,370,958.00 for the following geothermal properties:

        a)     ORNI 15 LLC.

        b)     ORNI 42 LLC.

        c)     ORNI 39 LLC.

13.     Ormat's schemes are ongoing.  Not only has Ormat obtained § 1603 grants on the basis of false information, they have wrongfully retained and failed to return public money by their continued submission of false information, or omission of material information, in their claims submitted to the  Treasury in order to receive and maintain federal funding. At the time of the filing of the original *qui tam* Complaint, Ormat had two additional § 1603 applications pending.  Included in their efforts is an application for § 1603 grant funds related to the Don A. Campbell Geothermal Plant in Nevada, for which Ormat expects to receive another $23 million dollars.

14.     Ormat is liable for violating the False Claims Act by knowingly, or with a reckless disregard for the truth, causing the submission of false or fraudulent claims; for making, using or causing to be made or used false records or statements material to false or fraudulent claims; for making, using, or causing to be made or used false records or statements material to avoid obligations to pay or transmit money to the Government, and/or for knowingly concealing or knowingly and improperly avoiding

or decreasing obligations to pay or transmit money or property to the Government, including, but not limited to the submission of false or fraudulent grant applications, certifications of compliance, reports, and claims to the federal Government under § 1603 of the Recovery Act.

15.    Ormat further concealed its wrongful conduct by directing employees to omit, falsify, or otherwise materially alter information regarding the geothermal properties subject to this action, as well as falsely certify Ormat's compliance with federal law, and the Terms and Conditions of the U.S. Treasury's § 1603 Grant Program.

16.    Relators, Ms. Tina Calilung and Ms. Jamie Kell, are an Original Source within the meaning of 31 U.S.C. § 3730(e)(4)(B). Each Relator possesses direct, independent and personal knowledge of the information upon which the allegations herein are based.

## II.    JURISDICTION AND VENUE

17.   This Court has jurisdiction to entertain this *qui tam* action and has federal subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C.A. § 1331 and 28 U.S.C. § 1345. Jurisdiction and venue are proper in this Court pursuant to the False Claims Act because Relators' claims seek remedies on behalf of the United States for multiple violations of § 3729 of Title 31 of the United States Code which occurred in this District, and because Defendants transact business in this District.

18.   Venue is proper in this District because:

a.    Defendants transact significant business in the Southern District of California, including generating substantial revenues from California utilities within this District;

b.    Defendants own, operate and generate revenue from at least six distinct geothermal properties in the state of California that include five

individual geothermal power plants in this District, including the North Brawley plant at issue in this case;

c.   Defendants maintain an administrative office in this District; and

d.   The majority of public funds at issue in this cases were intended to support geothermal property and create additional jobs within this District, and upon information and belief, the funds improperly obtained by Defendants can be traced to property located in this District.

19.   Relators' claims and this Amended Complaint are not based upon allegations or transactions which are the subject of a civil suit or administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730 (e)(3).

20.   The causes of action alleged are timely brought because of the efforts of Ormat to conceal from the United States their wrongdoing in connection with the allegations herein.

21.   Relators made voluntary disclosures to the United States Government prior to the filing of the original Complaint and filed a confidential Disclosure Statement with the United States as required by 31 U.S.C. § 3739(b)(2).

## III.   PARTIES

### A.        Co-Relator Ms. Tina Calilung

22.   Ms. Tina Calilung is a citizen of the state of Nevada. Ms. Calilung graduated from the University of Pennsylvania in 2004 with a degree in Economics.

23.   In 2007, Ms. Calilung was specifically recruited by Ormat Technologies to serve as their Asset Manager, and was employed from November 2007 until June 30, 2012. In this role, Ms. Calilung's primary function was to manage the long-term Power Purchase Agreements (PPAs) for Ormat's U.S. operations and advise Ormat on how the company could best position itself to maximize the benefits under the various PPAs to which it was a party. During her time at Ormat, Ms. Calilung's job responsibilities included managing much of Ormat's financing and regulatory

operations including, negotiating terms of PPAs, providing due diligence on project financing, managing and developing investor relations, and testifying on behalf of Ormat before the Nevada Public Utilities Commission and various County Boards of Equalization.

24.    Ms. Calilung left Ormat Technologies on her own volition on June 30, 2012, in part due to the business practices which she felt were morally and ethically repugnant. Prior to her departure, Ms. Calilung had, on multiple occasions, internally voiced her opposition to the Defendants' business practices described herein. On the day of her departure from Ormat, Ms. Calilung's laptop computer was confiscated and her email account locked. She signed a waiver of employment-related claims and severance agreement on July 3, 2012.

25.    Ms. Calilung has direct, independent and personal knowledge of the aforementioned fraudulent scheme because, as Ormat's Asset Manager, she has knowledge of the internal processes developed by Ormat to apply for, receive, and retain § 1603 payments from the federal Government. Additionally, Ms. Calilung has in-depth knowledge regarding the § 1603 payment program, and, at the time Ormat was submitting applications for payment under § 1603, Ms. Calilung was aware of the actual value, feasibility and nature of Ormat's geothermal properties. Ms. Calilung participated in, and was privy to, the drafting of language used by Ormat in specific § 1603 applications and has personal knowledge that the CEO of the Ormat parent company, Ormat Industries, Ltd., Mrs. Yehudit "Dita" Bronicki, personally insisted on the inclusion of language that was false and purposefully inaccurate prior to the submission of at least one § 1603 application to the Government.

26.    Ms. Calilung is an original source of the information upon which the allegations herein are based. These allegations are not based upon publicly disclosed information.

**B.    Co-Relator Ms. Jamie Kell**

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

27.     Ms. Jamie Kell is a citizen of the state of Nevada. Ms. Kell was the Administrator to Ormat Technologies' Business Development Department from January 2008 until September 2011. In this role she personally assisted all seven directors of Business Development, including Vice President of Business Development, Mr. Robert "Bob" Sullivan, and Ormat's Manager of Public Policy, Mr. Paul Thomsen.

28.     Ms. Kell assisted the Business Development Department with reviewing new geothermal projects including contract negotiations with outside parties for project construction, pricing, PPA negotiations, and negotiations with various Public Utility Commissions (PUCs). Ms. Kell transferred from Business Development to Travel Coordinator in October 2011. In this role, Ms. Kell coordinated all U.S. and international travel for Ormat Technologies employees and officers.

29.     Ms. Kell terminated her employment with Ormat on September 24, 2012.[1]

30.     Ms. Kell has direct, independent and personal knowledge of the aforementioned fraudulent scheme. Ms. Kell viewed drafts of § 1603 application narratives on the computer of Ms. Cathy Tsaniff, Ormat Technologies' Tax Manager, during a meeting with Ms. Tsaniff on December 5, 2011,  and has knowledge of Ormat Executive Officers who were involved in the drafting process and who inserted false

---

[1] On April 3, 2010, Ms. Kell was diagnosed with breast cancer. She began to undergo treatment shortly thereafter. On April 18, 2012, Ms. Kell filed a formal United States Equal Employment Opportunity Commission (EEOC) complaint and an Employment Discrimination Claim with the state of Nevada Equal Rights Commission (NERC) regarding Ormat's actions toward her while she was undergoing cancer treatment. In May 2012, Ormat, having been notified of the pending EEOC and NERC complaints, sent a security team to Ms. Kell's residence and confiscated her work-issued laptop computer. Ormat also blocked her access to their servers and her work-related email accounts.  On August 23, 2012, when Ms. Kell attempted to return to work, Ormat told her she was not welcome on the premises due to her pending employment complaints. Ms. Kell settled her EEOC and other complaints on August 31, 2012 and signed a severance agreement on September 24, 2012.

1  information into and excluded relevant material information from Ormat's § 1603
2  grant applications.

3       31.    At the time Ms. Kell witnessed this conduct, she and Ms. Tsaniff
4  discussed the legality of Ormat submitting a § 1603 application that purposefully
5  excluded relevant material information and included material false information. In this
6  conversation, Ms. Tsaniff acknowledged that she knew the information was incorrect
7  and admitted that she was aware of the legal implications of submitting a false § 1603
8  application.  Despite her knowledge that the application was deliberately false and was
9  being improperly submitted, Ms. Tsaniff told Ms. Kell that Ormat Technologies's
10 CEO, Dita Bronicki, had made the changes herself and, accordingly, Ms. Tsaniff
11 feared retaliation if she were to raise the issue.

12      32.    Ms. Kell's concerns regarding the false application were ultimately
13 ignored and dismissed and accordingly remained unaddressed by Ms. Tsaniff, her
14 superiors or any other Ormat officer.

15      33.    In the process of investigating the basis for this *qui tam* action, Ms. Kell
16 submitted a FOIA request to the Department of the Treasury on September 19, 2012,
17 seeking to obtain copies of the § 1603 payment applications submitted by Ormat. As
18 per their protocol, the Department of the Treasury notified Ormat Technologies of the
19 FOIA request and Ms. Kell's identity, due to the possibility that the response might
20 contain proprietary information. On November 20, 2012, Ormat counsel contacted Ms.
21 Kell's employment counsel and threatened to revoke her health insurance (which
22 remained in place as part of her severance agreement) if the FOIA request was not
23 rescinded. Because Ms. Kell was being treated for cancer (and therefore required
24 health insurance), she had no choice but to rescind her FOIA request on November 20,
25 2012.

26      34.    Ms. Kell is an original source of the information upon which the
27 allegations herein are based. These allegations are not based upon publicly disclosed
28 information.

---

1

**C.**     **Defendant Ormat Industries, Ltd.**

2

35.    Defendant Ormat Industries, Ltd., is a foreign corporation organized and

3

existing under the laws of Israel. Its principal place of business is located at Dereh

4

Shidlovski 1, Ezor Hata'Asiya Hahadash, Yvne81100, Israel, ISR. At this time,

5

pursuant to the Hague Convention, the proper method of service is through the Central

6

Authority located at the Ministry of Justice, Department of International Affairs, 7

7

Mahal Street, Ma'alot Dafna, P.O. Box 94123, Jerusalem 97765, Israel. *See*

8

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil

9

and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163, C.T.S.

10

198912.

11

36.    Ormat Industries was founded in Israel in 1965 as "Ormat Turbines Ltd."

12

by Yehuda "Lucien" Bronicki (Chief Technology Officer) and his wife, Yehudit

13

"Dita" Bronicki (Director, Chief Executive Officer). Ormat Industries, is a publicly

14

traded company listed on the Tel Aviv Stock Exchange (TASE: ORMT) and is

15

considered one of the top twenty-five TASE companies for market capitalization on

16

that exchange.

17

37.    When this action was originally filed, Ormat Industries' largest

18

shareholders included the Bronicki family, owning approximately 17%, and First Israel

19

Mezzanine Investors (FIMI), owning approximately 24% of the company.

20

**D.**     **Defendant Ormat Technologies, Inc.**

21

38.    Defendant Ormat Technologies, Inc., is a wholly-owned subsidiary of

22

Ormat Industries, Ltd. (an Israeli company) and is a for-profit Delaware corporation

23

formed on September 15, 1994. Its principal place of business is located at 6225 Neil

24

Road, Reno, Nevada, 89511-1136.  Its registered agent for service of process in the

25

United States is TRAC – The Registered Agency Company, located at 800 North State

26

Street, Suite 402, Dover, Delaware 19901.

27

28

39.    Ormat Technologies is a publicly traded company on the New York Stock Exchange (NYSE: ORA). The company owns and operates geothermal power plants around the globe, including power plants in California, Nevada, and Hawaii.

### E.    Defendant Ormat Nevada, Inc.

40.    Ormat Nevada, Inc. is a Delaware corporation whose principal place of business is at 6225 Neil Road, Reno, Nevada 89511. Its registered agent for service of process in the United States is TRAC – The Registered Agency Company, located at 800 North State Street, Suite 402, Dover, Delaware 19901. Ormat Nevada, Inc. is a wholly owned subsidiary of Ormat Technologies, Inc. that constructs and operates geothermal power plants in the United States and internationally. Ormat Nevada, Inc. was responsible for the construction and operation of the North Brawley Geothermal Power Plant located in Imperial County, California (discussed below).  The company also operates the Puna Geothermal Power Plant on the Big Island of Hawaii, however, Ormat Nevada, Inc. is not specifically authorized to do business in the state of Hawaii, and therefore, all costs are paid through Puna Geothermal Venture II, L.P. The costs of constructing production well KS-14 and the 8 MW Expansion plant in Hawaii (as discussed below) were paid by Ormat Nevada, Inc. through subordinated loans to Puna Geothermal Venture.

### F.    Defendant Puna Geothermal Venture II, L.P.

41.    Defendant Puna Geothermal Venture II, L.P. is a wholly-owned subsidiary of Ormat Technologies and is a for-profit Delaware limited partnership.[2] Its principal place of business is located at 6225 Neil Road, Reno, Nevada, 89511-1136. Its registered agent for service of process in the United States is Corporation Service

---

[2] In the original Complaint, Plaintiffs/Relators named Puna Geothermal Venture II, L.P. as a party, and they have subsequently been notified by Defendants that the proper party is Puna Geothermal Venture, G.P. However, Plaintiffs/Relators have not yet obtained the requisite authorization from the United States to dismiss Puna Geothermal Venture II, L.P. from this Amended Complaint.

Company located at 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808-1660.

42.     Upon information and belief, Puna Geothermal Venture II, L.P., is a business entity involved with the management and operation of Puna Geothermal Complex, a geothermal power plant located in the in the Puna district on the Big Island in Hawaii at 14-3860 Kapoho Pahoa Road, Pahoa, Hawaii, 96778.

**G.     Defendant Puna Geothermal Venture, G.P.**

43.     Defendant Puna Geothermal Venture d/b/a Puna Geothermal Venture, G.P. is a wholly-owned subsidiary of Ormat Technologies and is a for-profit Hawaii general partnership. Its principal place of business is located at 6225 Neil Road, Reno, Nevada, 89511-1136. Its registered agent for service of process in the United States is TRAC – The Registered Agent Company located at 1188 Bishop Street, Suite 2212, Honolulu, Hawaii 96813.

44.     Upon information and belief, Puna Geothermal Venture G.P., is the business entity responsible for the management and operation of Puna Geothermal Venture ("PGV"), a geothermal power plant located in the Puna district on the Big Island in Hawaii at 14-3860 Kapoho Pahoa Road, Pahoa, Hawaii, 96778. Ormat Technologies, through this subsidiary partnership, has operated PGV since June 2004. Immediately after its acquisition of PGV, Puna Geothermal Venture II, LP, sold PGV to Southern Company who in turn leased PGV back to Puna Geothermal Venture II, LP in a sale leaseback transaction.

**H.     Defendant ORNI 18, LLC.**

45.     Defendant, ORNI 18, LLC, is a wholly-owned subsidiary of Ormat Nevada, and is a for-profit Delaware limited liability company. Its principal place of business is located at 6225 Neil Road, Reno, Nevada, 89511-1136. Its registered agent for service of process in the United States is TRAC – The Registered Agent Company located at 800 North State Suite, Suite 402, Dover, Delaware 19901.

1      46.    ORNI 18, LLC, is the business entity responsible for financing the North

2   Brawley Geothermal Power Plant located in Imperial County, California at 4982

3   Hovely Road, Brawley, California, 92227.

4   **I.**     **Defendant First Israel Mezzanine Investors, Ltd.**

5      47.    When this action was originally filed, Defendant First Israel Mezzanine

6   Investors Ltd. ("FIMI") owned approximately 24% of Ormat Industries making it one

7   of the largest shareholders of Ormat. FIMI was founded in 1996 and is located at 98

8   Yigal Alon St., Tel Aviv, Israel, 67891. Pursuant to the Hague Convention, the

9   registered agent for service of process is the Ministry of Justice, Department of

10  International Affairs, 7 Mahal Street, Ma'alot Dafna, P.O. Box 94123,

11  Jerusalem 97765.

12     48.    FIMI is a private equity firm specializing in mezzanine financing, mature

13  middle market growth capital, financing investments, mergers and acquisitions,

14  leveraged buyouts, bridge financing prior to IPO, turnarounds, and management

15  buyouts. It invests up to $25 million in companies with minimum revenues of $50

16  million. It seeks to acquire controlling stakes in companies and is a controlling

17  shareholder of Ormat Industries.

18     49.    To date, FIMI has invested $150,000,000.00 into Ormat and has an option

19  to purchase an additional 9.3 million shares.

20     50.    The Chief Executive Officer of FIMI, Mr. Ishay Davidi, is also the

21  Chairman of Ormat Industries.

22  **J.**     **Alter Egos**

23     51.    At all times relevant to the allegations herein, Defendants, Ormat

24  Industries, Ltd., Ormat Technologies, Inc., Ormat Nevada, Inc., Puna Geothermal

25  Venture II, L.P., Puna Geothermal Venture, G.P., and ORNI 18, LLC., were acting as

26  alter egos of each other and are jointly and severally liable in this action for each

27  others' conduct. Ormat Industries, Ltd. created these separate legal entities and used

28

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

1   them in connection with the purchase and development of the geothermal properties
2   subject to this qui tam action.

3       52.    Defendant Ormat Industries, Ltd., produced and sold geothermal power
4   within the United States through Ormat Technologies, Inc., Ormat Nevada, Inc., Puna
5   Geothermal Venture II, L.P., Puna Geothermal Venture, G.P. and ORNI 18, LLC.,
6   while dominating and controlling them, operating them in an integrated manner, and
7   disregarding their separate corporate form. On information and belief, Relators allege
8   that these entities shared common ownership, board membership and management, as
9   well as corporate, group and divisional resources to perform operational,
10  administrative, manufacturing, and financial functions. Ormat Industries, Ltd.
11  precluded these entities from conducting business other than that which was directed
12  by and in the interests of the ultimate owner, Ormat Industries, Ltd. Ormat Industries,
13  Ltd. operated these entities as mere shell corporations through which corporate
14  directives flowed from Ormat Industries, Ltd. to Ormat Nevada, Inc., Puna Geothermal
15  Venture II, L.P., Puna Geothermal Venture G.P. and ORNI 18, LLC, and profits and
16  other revenue flowed between Ormat Industries, Ltd. and Ormat Nevada, Inc., Puna
17  Geothermal Venture II, L.P., Puna Geothermal Venture G.P., and ORNI 18, LLC.

### IV.   GEOTHERMAL ENERGY OVERVIEW

19      53.    Geothermal power plants utilize production wells that draw up hot
20  geothermal fluid.  The geothermal fluid transfers energy to the power plant to generate
21  steam. The steam rotates a turbine, which in turn generates electricity. There are three
22  types of geothermal power plants. The type used at any specific facility depends on the
23  heat, consistency and size of the geothermal "resource".

24      54.    The three systems are i) dry; ii) flash or; iii) binary.

25          i. Dry steam systems are used when the resource is the hottest
26              (+150˚C); the steam from the geothermal well will naturally erupt
27              and drive an electrical turbine.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii.  Flash steam systems are used at sites where the resource is a lower temperature, but requires no pressure to travel upward and power the turbine

55.   In a binary geothermal system, after the steam is produced, the steam/hot water passes through another liquid with a lower boiling point than water. The secondary liquid then vaporizes, which also helps drive the turbine to generate electricity, as pictured in the image below.



56.   After being generated, the electricity generated by a geothermal energy plant is typically sold under contract (such as a Power Purchase Agreement, "PPA") to a power company or power grid for utilization by other public and private entity.

57.   In this case, Defendants owned and operated binary geothermal power plants. Defendants submitted applications for, and received, federal grant funds to support these geothermal properties for which they were never entitled.

## V.    § 1603 OF THE RECOVERY ACT: PAYMENTS IN LIEU OF TAX CREDITS TREASURY GRANT PROGRAM

58.    President Obama signed the Recovery Act into law on February 17, 2009. The Recovery Act's purpose was to invest government funds into critical infrastructure, health care services, education, and energy projects in order to reignite the faltering U.S. economy and create 3.5 million jobs. *See* 2009 U.S.C.C.A.N. S6, WL 395189 (Leg. Hist.) Statement by President Barack Obama.

59.    This action concerns Ormat's exploitation and abuse of § 1603 of the Recovery Act, "Grants for Specified Energy Property in Lieu of Tax Credits," which provides, as its title indicates, that the United States Treasury Department will issue cash grants for specified energy properties in lieu of tax credits, and further states, in relevant part:

(a) IN GENERAL.--Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). No grant shall be made under this section with respect to any property unless such property—

(1) is placed in service during 2009 or 2010, or

(2) is placed in service after 2010 and before the credit termination date with respect to such property, but only if the construction of such property began during 2009 or 2010.

(b) GRANT AMOUNT.—

(1) IN   GENERAL.--The   amount   of   the   grant   under subsection (a) with respect to any specified energy property shall be the applicable percentage of the basis of such property.

(2) APPLICABLE   PERCENTAGE.--For   purposes   of paragraph (1), the term "applicable percentage" means... (A) 30 percent [of the property's basis] in the case of any [energy property that is part of a qualified facility described in paragraph (4)  of Section 45(d) of the Internal Revenue Code of 1986.]

*See* Recovery Act, PL 111-5, February 17, 2009, 123 Stat 115. §1603.

60.     The Office of the Fiscal Assistant Secretary to the U.S. Department of the Treasury ("Treasury") oversees the payment of cash grants to applicants under § 1603.

61.     § 1603 payments were designed and expected to off-set or temporarily fill the gap created by the diminished investor demand for tax credits. As such, the payments would help achieve the Recovery Act's near-term goal of creating and retaining jobs. Furthermore, the § 1603 Program was intended to have the long-term benefit of expanding the use of clean and renewable energy and decreasing the United States' dependency on foreign energy resources and non-renewable energy sources. *Id* at 3.

62.     Because § 1603 payments were meant to take the place of tax credits, property owners who apply for and receive § 1603 payments become ineligible for Production or Investment Tax Credits (PTCs and ITCs) provided by § 45 and § 48 of the Internal Revenue Code for those same projects, both for the taxable year in which the § 1603 payments are received and for any subsequent years.

63.     § 1603 references various sections of the Internal Revenue Code ("IRC") to give meaning to its provisions. The Treasury utilizes the IRC, Income Tax Regulations, and the Treasury's own published "Program Guidance," to evaluate applications for § 1603 payments. *See* U.S. Treasury Department-Office of the Fiscal Assistant Secretary, "Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Tax Act of 2009," July 2009/Revised March 2010/Revised April 2011, Program Guidance (hereinafter "Program Guidance"). The Treasury materially relies on the information contained in a § 1603 applicant's submissions in determining whether to remit payment under the § 1603 Program.

64.     According to the Treasury's Fiscal Assistant Secretary's revised Program Guidelines of April 2011, "[t]he purpose of § 1603 payments by the Treasury is to

reimburse eligible participants for a portion of the expense of such property... [a]pplicants must agree to the terms and conditions applicable to the § 1603 program." Program Guidance at 2.

65.    The § 1603 Program was a temporary program. The window period to apply for § 1603 payments was originally set to expire on October 1, 2011 (*see* § 1603(j)), but was extended to October 1, 2012, by the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010. H.R. 4853, 11th Cong. § 707(b) (2010).  The grant program was later extended again to include projects for which construction had already begun and which would come online before the end of 2013.

66.    In order to apply for and receive payments under the § 1603 Treasury Grant Program, applicants must:

     i. Establish that the subject property is qualified to receive payments in lieu of tax credits;

     ii. Establish that the applicant is qualified to receive the payments;

     iii. Adhere to the application procedures, including providing the proper and accurate supporting documentation and subscribing to the Terms and Conditions of the §1603 program; and

     iv. After receipt of §1603 funds, provide reports, as required by the Treasury, including annual performance reports as set forth in the Terms and Conditions of the program.

67.    In order for a geothermal property to qualify for § 1603 grant money, it must meet certain eligibility requirements, including the following:

     i. The property must meet the definition of a geothermal property under IRC §§ 45, 48 and 616;

---

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

ii. If it is a newly constructed, stand-alone geothermal property, the property must have been "placed-in-service" within a specific time frame and/or must have been constructed within a specific time frame;

iii. If the geothermal property is an expansion to an existing geothermal property, the expansion must meet specific "placed-in-service" date requirements, and the existing property which it is expanding must meet additional requirements;

iv. The original use of the geothermal property must begin with the applicant;

v. The geothermal property must be "tangible" under the Income Tax Regulations;

vi. The geothermal property must be Specified Energy Property under § 1603, falling under either the Qualified Facility Property category, as defined by §1603 and by IRC §§ 45 and 48(a)(5)(D), or the Geothermal Property category, as defined by IRC §48(a)(3)(A); and

vii. The applicant must be the owner or lessee of the property, must have originally placed the property in service, and must not fall within a certain list of persons or entities who/which are excluded from being applicants.

A.      **Geothermal Property Eligibility Framework:**

1.      **Geothermal Property as Defined by Internal Revenue Code §§ 45, 48 and 616**

68.      The § 1603 Program relies upon various provisions of the IRC in order to help define the particular types of property that are eligible for payment under the program. *See* §1603(h).

69.    Pursuant to the IRC, only energy properties used in a trade, business, or held for the production of income are eligible for the § 1603 payments. *See* Program Guidance p. 2.

70.    Ormat has sought and obtained payments under § 1603 on the basis that it has certain properties that are constituted as "geothermal properties," under § 1603 (d)(5), and that those properties meet all other requirements of § 1603.

71.    The IRC defines Geothermal Energy Property as:

. . . equipment used to produce, distribute, or use energy derived from a geothermal deposit (within the meaning of section 613(e)(2)) (*see above*), but only, in the case of electricity generated by geothermal power, up to (but not including) the electrical transmission stage . . . .

26 U.S.C. § 48(a)(3)(A)(iii).

72.    The IRC further defines a geothermal deposit as:

. . . a geothermal reservoir consisting of natural heat which is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure). Such a deposit shall in no case be treated as a gas well for purposes of this section or section 613A, and this section shall not apply to a geothermal deposit which is located outside the United States or its possessions.

26 U.S.C. § 613(e)(2).

73.    The IRC further defines geothermal energy as "energy derived from a geothermal deposit (within the meaning of § 613(e)(2))." 26 U.S.C. § 45(c)(4).

### 2.    Geothermal Property Eligibility Framework: the "Placed-in-Service" Date and Date of Construction

74.    A material component of the § 1603 Grant Program is the placed-in-service date requirement. *See* § 1603(a)(1)-(2). "Placed in service" means that the property is "ready and available for its specific use." Program Guidance at p. 5. "Placed in service" is also further defined in IRC §§ 45 and 48, and terms used in § 1603 of the Recovery Act have the same meaning as used in IRC § 45 and § 48. *See* § 1603(h).  § 45 does not define "placed in service," but the term has been defined for purposes of the deduction for depreciation and the ITC. For these purposes, property is

considered to be placed in service in the taxable year that the property begins to be depreciated or is placed in a condition or state of readiness and available for a specifically assigned function. See §§ 1.46-3(d)(1) and 1.167(a)-11(e)(1)(i) of the Income Tax Regulations. The IRS has ruled that the following activities constitute a condition or state of readiness and availability for a specifically assigned function for a facility generating power:

    a. the necessary permits and licenses had been approved;

    b. the critical tests for the various components were complete;

    c. the unit was placed in the control of the taxpayer by the contractor;

    d. the unit was synchronized into the taxpayer's power grid for its function in the business of generating electric energy for the production of income; and

    e. daily operation of the generating unit began.

Revenue Ruling 76-256, 1976-2 C.B. 46.

75.    § 1603 contains a specific date range within which a property must have been placed in service in order to qualify for grant money.

76.    Thus, if a property is used for business, trade or profit, and is a geothermal property pursuant to IRC § 45, § 48 and/or § 613, in order to be eligible for § 1603 payments in lieu of receiving tax credits, the property must also have been placed in service by specific qualifying dates.  In order to qualify for § 1603 funds, an otherwise qualifying specified energy property must have been first placed in service during 2009, 2010, or 2011.[3]

77.    Certain properties may also be eligible if placed in service later than the specified dates, provided that property construction started within a certain time

---

[3] If the property was constructed prior to 2009 and was placed in service in 2009, 2010, or 2011, the placed-in-service date of the property will determine its eligibility, and the credit termination date is irrelevant.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

period. Properties placed in service after 2011 may be eligible to receive § 1603 funds, but only where (1) construction of the property began during 2009, 2010 or 2011 and (2) the property is placed in service by a specific date known as the "credit termination date." Depending on the properties' definition under IRC § 45 and § 48, the relevant credit termination dates for eligible properties will differ. For geothermal properties, the credit termination dates are either January 1, 2014 (for geothermal properties defined by IRC § 45 & IRC § 613) or January 1, 2017, (for geothermal properties defined by IRC § 48, as well as Geothermal Heat Pump properties).

78.  Pursuant to § 1603, grant money will only be paid to properties meeting the placed-in-service/construction date requirements.

79.  Qualified properties must be placed in service between January 1, 2009 and December 31, 2011 (regardless of when construction began), or placed in service after 2011 and before the credit termination date if construction began on the property between January 1, 2009 and December 31, 2011. Qualified properties include expansions of an existing property that is qualified property under §s 45 or 48 of the IRC.

80.  If a property was placed in service before January 1, 2009, it is not eligible for § 1603 payments under any circumstances.

### 3. Geothermal Property Eligibility Framework: Expansions to Qualified Properties

81.  Expansions to existing property may also be eligible to receive § 1603 grant money, even though the existing property was placed in service before 2009, provided that the expansion satisfies the requirements of § 1603, including the placed-in-service requirement.  Program Guidance at p. 11.

82.  Where a geothermal property constitutes an expansion to an existing geothermal facility, and that expansion property is placed in service during 2009 or 2010 (or meets the post 2010 placed-in-service construction requirements), the expansion property may qualify for § 1603 grant money where the facility which it

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

1  was expanding was itself placed in service after October 2004 and before January 2014

2  or 2017. *Id.*

### 4.      Geothermal Property Eligibility Framework: Original Use

83.      In addition to satisfying the placed-in-service requirements, in order to be eligible for § 1603 payments, the original use of the geothermal property must begin with the applicant. If the cost of used parts contained within the property is not more than twenty percent of the total cost of the property, an applicant will be considered an original user of the property despite the use of the used parts.  Program Frequently Asked Questions #31.

84.      If the new property is originally placed in service by a person and is sold to an applicant and leased back to the person by the applicant within three months after the date the property was originally placed in service by the person, unless the lessor and lessee elect otherwise, the applicant-lessor is considered the original user of the property and the property is considered to be placed in service not earlier than when it is used under the lease back.

### 5.      Geothermal Property Eligibility Framework: Tangible Property

85.      In order for property eligible to receive § 1603 payments, it must be tangible property. *See* Program Guidance at p. 11.

86.      Tangible property is defined by §1.48-1(c) and (d) of the Income Tax Regulations.

87.      In relevant part, §§ 1.48-1(c) and (d) of the Income Tax Regulations define tangible personal property as:

§1.48-1 (c): ... For purposes of this §, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than

---

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by § 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

(d) Other tangible property— (1) In general. In addition to tangible personal property, any other tangible property (but not including a building and its structural components) used as an integral part of manufacturing, production, or extraction, or as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service, or which constitutes a research or storage facility used in connection with any of the foregoing activities, may qualify as § 38 property.

26 C.F.R. § 1.48–1

88.    The term "tangible" is significant because in geothermal energy production there are certain intangible costs, namely the cost of drilling, such as the labor and services for the actual drilling of the wellfield. An example of tangible drilling costs would be the cost of the materials that make up the permanent part of the well, such as the lining, casing and wellhead. Other property that is tangible or integral to a geothermal facility includes equipment that transports geothermal steam or hot water from a geothermal deposit to the site of ultimate use. This includes components of a heating system, such as pipes and ductwork that distribute within a building the energy derived from the geothermal deposit and, if geothermal energy is used to generate electricity, includes equipment that transports hot water from the geothermal deposit to a power plant.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

89.   For qualified property that generates electricity, qualified property includes storage devices, power conditioning equipment, transfer equipment, and parts related to the functioning of those items, but does not include any electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical.  Program Guidance at p. 12.

### 6.   Geothermal Property Eligibility Framework: Specified Energy Property

90.   In addition to being tangible, in order for geothermal property to be eligible for § 1603 grant money (assuming it also meets other requirements, such as the placed-in-service requirements) the geothermal property must be a Specified Energy Property under § 1603, which for the subject Ormat geothermal properties, means the properties were required to fall within two broad categories set out by IRC §§ 45 and 48.

> i.   Property that is part of a facility described in IRC §§ 45(d)(4) and 48(a)(5)(D) as Property; or
>
> ii.   Geothermal  "Energy  Property"  described  by  IRC  § 48(a)(3)(A)(iii).

*See* § 1603(d).

### (a)   Qualified Facility Property

91.   In order for geothermal property to be a Qualified Facility Property under § 1603(d)(1), it must be property which is a part of a "Qualified Facility," described in IRC § 45(d)(4). This section of the IRC describes certain facilities which may be eligible for tax credits. Section 45(d)(4) provides, in relevant part:

> (d) Qualified facilities. For purposes of this section...
> (4) Geothermal or solar energy facility.--In the case of a facility using geothermal or solar energy to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which is originally placed in service after the date of the enactment of this paragraph and before January 1, 2014 (January 1, 2006, in the case of a facility using solar energy). Such term shall not include any property described in §

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

48(a)(3) the basis of which is taken into account by the taxpayer for purposes of determining the energy credit under § 48.

26 U.S.C. § 45(d)(4).

92.     Significantly, the above paragraph, IRC § 45(d)(4), was not enacted until October 2004, as part of the American Jobs Creation Act of 2004. *See* American Jobs Creation Act of 2004, PL 108-357, October 22, 2004, 118 Stat 1418, § 710 *et seq*. Geothermal property was not eligible for those specific tax credits until that date.

93.     Accordingly, for geothermal property which is placed in service during 2009 or 2010 (or which meets the post 2010 placed-in-service construction requirements) to constitute Qualified Facility Property, that property must be part of a facility which was placed in service after October 2004 and before January 2014. Where Qualified Facility Property is an addition or an expansion to a Qualified Facility which was already placed in service before 2009, that Qualified Facility Property may still qualify for § 1603 grant money where the Qualified Facility Property in and of itself satisfies the property placed-in-service / construction requirements of § 1603 and where the facility to which it is added meets the additional facility placed-in-service requirements of IRC § 45(d)(4). *See* Program Guide at 11.

94.     Further, Qualified Facility Property includes only tangible property that is an "integral part" of a Qualified Facility which meets the requirements of certain subsections of IRC § 45(d). Property will only be considered an integral part of a Qualified Facility if it is used directly in the Qualified Facility and is essential to the completeness of the activity performed in that facility. *Id*.

**(b)     Geothermal "Energy Property" under IRC § 48(c)**

95.     Specified Energy Property for purposes of § 1603 includes, in addition to Qualified Facility Property under IRC § 45, any other energy property described under IRC § 48. Such energy property must meet performance and quality standards that are prescribed either in IRC § 48 or in associated Treasury Regulations and that are in effect at the time of the acquisition of the property. *See* Program Guidance at p. 15.

96.     Geothermal Property is included among the "Energy Property" defined by IRC § 48(a)(3)(A)(iii), and is defined as:

> ...equipment used to produce, distribute, or use energy derived from a geothermal deposit (within the meaning of section 613 (e)(2)), but only, in the case of electricity generated by geothermal power, up to (but not including) the electrical transmission stage . . . .

97.     The Program Guidance further states that, for purposes of Geothermal Property, "[a] geothermal deposit is a geothermal reservoir consisting of natural heat that is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure)." Program Guidance at p. 15.

### 7.     Geothermal Property Eligibility Framework: Applicant Eligibility

98.     To be eligible for a § 1603 payment, the applicant must be the owner or lessee of the property and must have originally placed the property in service.

99.     Certain person/entities are not eligible to receive § 1603 payments, including:

> i.   Any federal, state or local government, including any political subdivision or instrumentality thereof;
> ii.  Any organization that is described in §501(c) of the IRC and is exempt from tax under §501(a) of the IRC;
> iii. Any entity referred to in paragraph (4) of §5(j) of the IRC; or
> iv.  Any partnership or other pass-thru entity, any direct or indirect partner (or other holder of an equity or profits interest) of which is an organization or entity described above, unless this person only owns an indirect interest in the applicant through a taxable C corporation.

100.   As long as each direct and indirect partner in the partnership, shareholder or similar interest holder in any pass-thru entity is eligible to receive § 1603 payments, the partnership or pass-thru entity is eligible to receive § 1603 payments.

101.   A foreign person or entity may be eligible for a §1603 payment if the person or entity qualifies for an exception in § 168(h)(2)(B) of the IRC, which reads in relevant part:

> (B) Exception for certain property subject to United States tax and used by foreign person or entity.--Clause (iii) of subparagraph (A) shall not apply with respect to any property if more than 50 percent of the gross income for the taxable year derived by the foreign person or entity from the use of such property is--
>> (i) subject to tax under this chapter, or
>> (ii) included under § 951 in the gross income of a United States shareholder for the taxable year with or within which ends the taxable year of the controlled foreign corporation in which such income was derived. For purposes of the preceding sentence, any exclusion or exemption shall not apply for purposes of determining the amount of the gross income so derived, but shall apply for purposes of determining the portion of such gross income subject to tax under this chapter.

26 U.S.C. § 168.

102.   An applicant's eligibility will be determined as of the time the application is received.

**(a)   Eligible Basis**

103.   Section 1603 grants are awarded based on percentages of the "eligible basis" for the subject energy property.

104.   "Eligible basis" refers to the tax basis of the property as defined by the IRC, the amount of which allows the Treasury Department to calculate the specific payment due to a qualified recipient of a § 1063 cash grant in lieu of tax credit.  The tax basis is generally the cost of acquiring the property.

105.   Geothermal properties may receive a payment of either 10% or 30% of the eligible basis value of the property, depending on whether the property is defined by § 45 or § 48 of the IRC, as discussed above.

106.   The amount of the § 1603 payment for specified energy property relating to geothermal energy production is determined under the following general framework, set out by § 1603:

    i.  Geothermal Property under IRC § 45 will receive a § 1603 payment equal to 30% the eligible cost basis.

    ii.  Geothermal Property under IRC § 48 will receive a § 1603 payment equal to 10% the eligible cost basis.

    iii.  Geothermal heat pump property will receive a § 1603 payment equal to 10% the eligible cost basis.

107.   Applicants must submit with their application for a § 1603 payment documentation to support the cost basis claimed for the property. Supporting documentation includes a detailed breakdown of all costs included in the basis. Other supporting documentation, such as contracts, copies of invoices, and proof of payment must be retained by the applicant and made available to the Treasury upon request.

108.   For applicants that claim an eligible property cost basis of $500,000.00 or more, a certification from an independent accountant must be submitted and attest to the accuracy of all costs claimed as part of the eligible basis of the property. Program Guidance at p. 17.

109.   The basis of property is determined in accordance with the general rules for determining the basis of property for federal income tax purposes. Thus, the basis of property generally is its cost unreduced by any other adjustment to basis, such as that for depreciation, and includes all items properly included by the taxpayer in the depreciable basis of the property, such as installation costs and the cost for freight incurred in construction of the specified energy property. *See* IRC § 1012.

110.   The Treasury has clearly defined several limitations on the eligible basis of a property. First, the eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a non-qualifying activity. In the case of

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

costs that relate to both a non-qualifying activity and a qualifying activity, the costs must be reasonably allocated between the non-qualifying and qualifying activities.

111.  If property is acquired in exchange for cash and other property in a transaction described in IRC § 1031, in which no gain or loss is recognized, the basis of the newly acquired property is equal to the adjusted basis of the other property plus the cash paid.

112.  Costs that will be deducted for federal income tax purposes in the year in which they are paid or incurred are not includible in the basis on which the payment is determined. For example, if the applicant will take the IRC § 179 deduction for all or part of the cost of the property, then no payment is allowed for the portion of the cost of the property for which the IRC § 179 deductions will be taken.  Because IRC § 179 costs are allowed to be expensed (*i.e.*, taken as a full deduction in the year the costs are paid or incurred), such costs are not added to the depreciable basis of the property, which is the measurement of eligible basis for the § 1603 grant.

113.  For geothermal property, if the intangible drilling and development expenses will be deducted by the applicant, no payment will be allowed on the costs that will be deducted as intangible drilling and development expenses. If the applicant capitalizes intangible drilling and development expenses, only those costs that may be recovered through depreciation can be included in the basis on which the § 1603 payment is allowed. However, if the applicant elects under IRC § 59(e) to deduct intangible drilling and development costs over sixty months, the payment is based on the amount for which the election under § 59(e) applies because the effect of the § 59(e) is to treat these costs as amortizable. Amortization is the corollary to depreciation for intangible property.  Intangible property that has a useful life in excess of one year has its basis deducted over a set period of years, just as tangible property does for depreciation purposes.  For any property for which an IRC § 59(e) election is made, a taxpayer is precluded from deducting that full cost the year it is paid or

incurred and a deduction is then allowed ratably over a 60-month period, similar to depreciation.

114.   Only the cost basis of property placed in service after 2008 is eligible for a § 1603 payment. Thus, if property is placed in service in 2009 at a Qualified Facility that was placed in service during an earlier year, only the basis of the portion of the property which was placed in service in 2009 is eligible for a § 1603 payment.

**(b)**   **Application Procedure and Post-Application Requirements**

115.   Applicants for § 1603 grants must submit certain mandatory information and forms to the Treasury.

116.   Upon submission of the application materials, the applicant, under penalty of perjury, declares that:

> "... I have examined this application, which includes any application submitted using the same Treasury Identification Number for the purpose of demonstrating that construction began on the property in 2009-2011. And to the best of my knowledge and belief, it is true, correct, and complete. I declare that I am the applicant or an authorized official for the applicant. Further, I agree the information in this application can be disclosed to the Internal Revenue Service."

117.   Once the Treasury approves an application, it sends notice to the applicant. This notice incorporates the information contained in the applicant's completed application form and the Terms and Conditions for the § 1603 program.

118.   Payment is made within five business days from the date of the Treasury notice, and is made by Electronic Funds Transfer based upon the banking information in the federal procurement System for Award Management ("SAM").

**i.**   **Required Documentation for §1603 Grant Applications**

119.   Applicants for grant money under the § 1603 program must complete an official Application Form. The Application Form requires that that the applicant accurately and truthfully, under the penalty of perjury, identify the property's owner,

the entity type, the location, the purpose, the value, the applicant's interest in the property, the number of jobs created/retained, and must provide a narrative summary about the property.

120. § 1603 applicants must also submit accurate and truthful supporting documentation demonstrating that the property is eligible property under the IRC and verifying that the property meets the placed-in-service and/or construction requirements of § 1603.

121. The required documentation specific to geothermal properties and relevant to this action specifically includes:

     i. Application (including Narrative Summary);
    ii. Design Plans;
   iii. Commissioning Report;
    iv. Cost Breakdown;
    v. Independent Accountant's Verification;
    vi. Notarized Authority to Represent;
   vii. Lease Waiver;
  viii. SAM Registration Confirmation; and
    ix. Signed Terms and Conditions of the §1603 Program.

122. To prove property eligibility, applicants must submit as-built, legible and accurate design plans by a professional engineer (PE). For energy property, the design plans must include a site layout showing the energy property in relation to infrastructure. If a PE seal was not required to install the property, the applicant also must submit a letter explaining why the seal was not required.

123. To prove in-service date eligibility, applicants must submit a signed and dated commissioning report. The commissioning report must contain a statement from the installer or engineer stating that the property has been placed in service. The statement should provide the specific date the energy property was placed in service and as built capacity. A local agency inspection is not acceptable as a commissioning report.

124.   To prove the cost basis upon which the § 1603 payments are based, the applicant must submit a detailed cost breakdown in table format. This table should include all costs and components related to the cost basis.

125.   If the claimed cost basis for the energy property is $500,000 or more, the applicant must submit an independent accountant's certification. This certification should include a detailed cost breakdown or cost segregation report for the Treasury Review Team to see both eligible and non-qualifying costs. Applicants must include the method of allocation for indirect costs allocated between eligible and ineligible costs.

126.   If the § 1603 application is being prepared by someone other than the property owner, the application must include a notarized authorization from the owner granting permission to the preparer to represent the owner for purposes of the §1603 Program.

127.   If the § 1603 payment is to be received by the lessee of a property, the Lessor and Lessee must agree that the lessor waives all right to the § 1603 payment. The applicant must include an executed written agreement between the lessor and the lessee of the energy property.

128.   Upon completion and submission of the application, all applicants must, under the penalty of perjury, declare that they have examined the Terms and Conditions of the §1603 Program and agree that said terms and conditions will be followed. The signatory of the Terms and Conditions further declares that they are an authorized official of the applicant entity and are authorized to bind the applicant to the Terms and Conditions. *See* Terms and Conditions.

### ii.   Duty to Amend & Update Application Materials

129.   Applicants have a strict duty to amend and update application materials if the information contained therein changes or is discovered to be materially inaccurate or incorrect.

130.   Clause 3(a) and (b)  of the Terms and Conditions provide:

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

> The applicant understands that Treasury is relying on the accuracy of the information contained in the application in making determinations with respect to the applicant's eligibility for a § 1603 payment. If the applicant determines that any information included on or with the application was materially inaccurate or incorrect, the applicant must immediately inform Treasury. If Treasury determines, as a result of this information, that the applicant does not qualify for funds or that the applicant received funds in excess of the amount to which the applicant was entitled, the applicant must immediately return the funds to Treasury... [t]he applicant understands that none of the applicant's obligations herein terminate upon the sale or other disposition of the property to an eligible entity.

131.   Failure to amend or update the information conveyed in the application process as required by Treasury is a material breach of the Terms and Conditions of the 1603 Program.

### iii.   Duty to Report

132.   Recipients of § 1603 grant payments are obligated to routinely report to the Treasury.

133.   Pursuant to the Program Guidance, "[a]pplicants are required to provide reports, as required by the Treasury, including an annual performance report as set forth in the Terms and Conditions."

134.   Treasury can request reports as it deems necessary to ensure compliance with Recovery Act guidance.

135.   At a minimum, recipients must provide project performance reports on an annual basis for a period of five years after the property was placed in service. Annual performance reports are due no later than twenty-one days following the end of the reporting period. The first reporting period begins on the date the property is placed in service.

136.   Per the Terms and Conditions, the annual project performance report must include all of the following elements:

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

      i.   Name of Applicant;
     ii.   Current owner of property;
    iii.   Treasury application number;
    iv.   Name of project;
     v.   Location of project: city/county, State, zip code;
    vi.   Number of jobs retained;
   vii.   Annual production in (in kilowatt hours, MMBTUs, or horsepower as applicable);
  viii.   Installed nameplate capacity (in kilowatts, MMBTUs, or horsepower as applicable.

137.   Pursuant to the Terms and Conditions, "[t]he applicant must immediately report any indication of fraud, waste, abuse, or potentially criminal activity pertaining to § 1603 funds to Treasury and the cognizant Treasury inspector general."  The annual project report must also disclose any unit of property that has been replaced or permanently ceased to produce electricity.

138.   Failure to timely submit truthful and accurate reports as required by the Treasury, or to report fraud, waste, abuse, or potentially criminal activity pertaining to § 1603 funds, is a material breach of the Terms and Conditions of the § 1603 Program.

### iv.   Duty to Maintain and Provide Access

139.   A § 1603 applicant has a duty to maintain proper accounting procedures and provide access to the Treasury for the purposes of auditing and evaluating the use of the § 1603 funds.

140.   Clause 7(a) of the Terms and Conditions provides:

"The applicant must maintain project, financial, and accounting records sufficient to demonstrate that §1603 funds were properly obtained in accordance with the §1603 program and the Terms and Conditions. The Treasury, as the awarding office, the cognizant Treasury inspector general, and the Comptroller General of the United States, or any of their authorized representatives, shall have the right of physical access to the applicant's facilities and to any pertinent books, documents, papers, or other records (electronic and otherwise) of the applicant and each partnership and pass-thru entity that directly or indirectly owns an interest in the applicant

---

38

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

which are pertinent to the § 1603 payment, in order to conduct audits, examinations, and evaluations."

141.   Failure to maintain proper accounting procedures and provide access to the Treasury, or its representatives, is a material breach of the Terms and Conditions of the § 1603 Program.

### (c)   Certification, Recapture and Disallowance

142.   The § 1603 Grant Program is not meant to permanently or unconditionally award public funds simply based on the completion of a few initial forms.   To the contrary, the program has built-in safeguards to allow for recapture of funds in the event of changing circumstances, or in the event that the applicant misrepresents information to Treasury in order to obtain the funds. These safeguards provide for routine certification and the recapture of any funds inappropriately allocated, used or obtained.

143.   Clause 3 of the Terms and Conditions provides

> If Treasury determines . . . that the applicant does not qualify for funds or that the applicant received funds in excess of the amount to which the applicant was entitled, the applicant must immediately return the funds to Treasury.

(Emphasis added). Applicants are, quite obviously, not permitted to retain government funds to which they were never entitled.

144.   Further, pursuant to Terms and Conditions Clause 6(a), "[t]he applicant shall certify to Treasury on an annual basis for a period of five years from the date the property was placed in service that the property has not been disposed of to a disqualified person and that the property continues to qualify as specified energy property (as that term is used in § 1603)."   The annual certifications are due at the same time as the performance report described above.

145.   If the property ceases to qualify as Specified Energy Property or is transferred to an unqualified person, the Treasury considers this a "disqualifying

event." ("DQE"). A DQE will result in recapture of the funds paid to the disqualified recipient.

146.   Treasury outlines several examples of events which might constitute DQE's requiring repayment of § 1603 funds.  Included among those is "permanent cessation of production," meaning that if a fund recipient ceases production for a subject property within a specified time period after receipt, the recipient must return a certain percentage of the received § 1603 funds. Program Guidance p. 19.

147.   If a DQE occurs within five years from the date the property is placed in service the applicant must repay the § 1603 funds to the Treasury as follows:

  i.   100% of the funds if DQE occurs within one year of in service date.
 ii.   80% of the funds if DQE occurs after one year but within two years of in service date.
iii.   60% of the funds if DQE occurs after two years but within three years of in service date.
 iv.   40% of the funds if DQE occurs after three years but within four of in service date.
  v.   20% of the funds if DQE occurs after four years but within five of in service date.

148.   Additionally, pursuant to Terms and Conditions Clause 8(a), "[i]f the applicant materially fails to comply with any term of the award [of § 1603 funds], whether stated in a Federal statute or regulation, program guidance, these Terms and Conditions, or a notice of award, Treasury may take any remedial action that is legally available including disallowing all or a part of the § 1603 payment." (emphasis added). Any disallowed payment must be immediately returned to the Treasury.

149.   Any funds subject to § 1603's recapture, remittance or disallowance provisions become debts owed to the General Fund of the Treasury. The collection of such debts is enforceable by all available means including enforcement by the United States Department of Justice against any assets of the applicant entity. Debts arising under the § 1603 recapture provisions are not considered tax liabilities.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.   DEFENDANTS' NORTH BRAWLEY GEOTHERMAL PROPERTY

150.   Ormat, to date, has received over $130 million in § 1603 grant money from the government for its North Brawley Geothermal Power Plant (the "North Brawley Plant").  All of this money was wrongly obtained and retained.

151.   From the beginning, Ormat falsified information in order to obtain grant money to which it was not entitled. Furthermore, Ormat continued to provide false information to the Government in an effort to wrongly possess and obtain additional § 1603 funds.

152.   Ormat knew before commencing the North Brawley Plant's construction that its operation would be difficult and expensive.  However, Ormat exploited the resources of the United States Government in order to finance one of the most expensive geothermal boondoggles in history, utilizing government money in an attempt to create a false appearance of function and profitability.

153.   The North Brawley Plant has operated at a loss for twenty straight quarters. The plant began generating revenue in December 2008 and Ormat started depreciating the value of project in early 2009.

154.   The 2010 capital infusion of $108 million in the form of a Treasury cash grant was treated as a checking account by the Defendants, to give an insolvent and failed geothermal project the appearance of success. Even in the best of economic times, North Brawley would be a failed geothermal venture.

155.   Ormat has continued its wrongful activity by failing to report material changes to the cost basis for the North Brawley Plant, and even applied for and received a second grant of over $14 million in 2013 for an "expansion" which has never materialized.

156.   Ormat's wrongful activity under § 1603 concerning the North Brawley Plant includes the following:

i. Ormat misrepresented the placed-in-service date on its 2010 § 1603 grant application. Ormat represented that the North Brawley Plant was not placed in service until January 2010, when Ormat had been operating the plant and selling electricity under its contract for over a year, since December 2008.

ii. Ormat has consistently misrepresented the Eligible Basis for the North Brawley Plant. The costs for the North Brawley Plant in relation to its energy output far exceed reasonable levels and industry standards. Ormat further took massive write offs on the North Brawley Plant in Israel, totaling hundreds of millions of dollars, while continuing to represent a high Eligible Basis to the United State Government.

iii. Ormat applied for and received a second § 1603 grant in 2013 on the basis of false information regarding "expansion" of the North Brawley Plant.

**A.    Description of Project**

157.   The North Brawley Plant is a geothermal plant located in Imperial County, California. It is managed and operated by Ormat subsidiary, ORNI 18, LLC.

158.   The North Brawley Plant operates on a binary system that consists of five Ormat Energy Converter (OEC) units, which utilize water-cooled condensers.

**B.    The Southern California Edison PPA**

159.   ORNI 18 sells the North Brawley Plant's electrical output to Southern California Edison (SCE) under a twenty-year PPA, entered into in 2007.

160.    The PPA requires North Brawley to produce 50 MW of energy.

161.    Under the PPA, Ormat was also required to demonstrate North Brawley's contract capacity (50 MW) within six to nine months after the first unit at North Brawley was initially synchronized to the power grid.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

### C.   Construction

162.   Drilling activities for the North Brawley Plant commenced in February 2007.  In its 2007 Annual Report, Ormat first indicated that it was in the final stages of constructing the "50 MW North Brawley Plant". By June 2007, ORNI 18's PPA with SCE was finalized, and key power plant equipment had arrived on site.

163.   The North Brawley Plant was expected to be online by the end of 2008, and construction of the North Brawley Plant was substantially complete and ready for its intended use by December 2008.

### D.   North Brawley Begins to Sell Electricity under the PPA in December 2008

164.   By December 2008, all five electricity generating units for the North Brawley Plant were synchronized to the power grid. At this time, the North Brawley Plant began generating revenue from energy sales to SCE paid at the full contract rate provided by the PPA.

165.   Accordingly, in December 2008, the North Brawley property was ready and available for its specific use, to wit; providing energy to SCE in return for payment per the terms of the 2007 PPA.

166.   Though the North Brawley Plant has never generated anywhere close to 50 MW of energy, Ormat has consistently sold energy from the North Brawley Plant to SCE under the PPA since December 2008. During the first year of sales, starting in December 2008, Ormat generated revenues of $2,454,363 from energy sales to SCE from the North Brawley Plant.

167.   Ormat began to depreciate the North Brawley Plant for tax purposes as early as 2009.

### E.   Ormat Applies for and Receives its First of Two § 1603 Grants for North Brawley

168.   On or about June 18, 2010, Ormat filed through ORNI 18 its first application for a § 1603 grant with the Treasury.

169.   On August 17, 2010, on the basis of Ormat's application, Treasury awarded ORNI 18 a § 1603 cash grant in the amount of $108,285,626.

170.   To date, the grant awarded to ORNI 18 for North Brawley is the largest cash award distributed to a geothermal project developer under the § 1603 Program.

171.   Ormat was only able to receive this grant by misrepresenting two material pieces of information: the placed-in-service date and the Eligible Basis for the property.

### F.   Ormat Misrepresented the Placed-in-Service Date

172.   In order to obtain the § 1603 cash grant, Ormat falsely concocted a placed-in-service date for the North Brawley Plant of January 15, 2010.  As stated above, by this date, the North Brawley Plant had already been generating and selling electricity to SCE for over a year (since December 2008), generating revenues of approximately $2.5 million.

173.   The IRS has ruled that the following activities constitute a condition or state of readiness and availability for a specifically assigned function for a facility generating power (i.e. cause a placed-in-service date to be met):

    a.  the necessary permits and licenses have been approved;

    b.  the critical tests for the various components are complete;

    c.  the unit has been placed in the control of the taxpayer by the contractor;

    d.  the unit  has been synchronized into the taxpayer's power grid for its function in the business of generating electric energy for the production of income; and

    e.  daily operation of the generating  has begun.

Revenue Ruling 76-256, 1976-2 C.B. 46.

174.   By December 2008, the Ormat North Brawley plant had satisfied each and every one of the applicable factors.  The plant had been fully permitted and licensed, all critical component tests had been completed, the plant was fully synchronized to the power grid, and daily operation and the selling of energy had begun.

175.   Further, Treasury and the IRS have made it clear that property is deemed to be placed-in-service when it is operational, even though the property may be undergoing additional testing to eliminate any defects.  Treas. Reg. § 1.46-3(d)(2)(iii); Rev. Rul. 76-256.

176.   Because the North Brawley Plant had been placed in service before 2009, Ormat would have been only been entitled to seek a § 1603 grant for post-2009 expansions to that facility.  *See* Program Guidance at p. 11.

177.   The January 15, 2010 "in-service" date eventually used by Ormat bore no milestone significance in terms of North Brawley's ability to produce energy. While Ormat had gradually been able to increase output over the preceding year, in January 2010 output remained at around 17 MW, a level at which it had been for several months and would remain for many months more. Ormat had been operating the plant on a daily basis, and producing and selling energy, since December 2008.

178.   As noted above, Ormat has been depreciating the North Brawley Plant for tax purposes since at least 2009, further disproving the claimed 2010 placed-in-service date.

179.   Ormat has admitted that it deliberately delayed submitting its § 1603 application and intentionally post-dated its placed-in-service date.  In a press release regarding the North Brawley Plant on February 9, 2010, Ormat stated: "[b]ecause the Company expects to incur additional capital expenditures to fully resolve the operational issues . . . [at North Brawley], it has temporarily deferred submitting an application for the ITC [income tax credit] cash grant for the project. The cash grant is expected to be more than $100 million." Ormat intentionally delayed both the in-service date as well as the grant application date in order to qualify for the §1603 grant and to maximize the amount that Ormat would receive in its § 1603 grant.

**G.     Ormat Artificially Inflated and Misrepresented the Eligible Basis**

180.    As shown in the above press release, in addition to post-dating the placed-in-service date, Ormat deliberately delayed submitting its §1603 application in order to incur additional costs on its failing project so that it could claim a larger cost basis

181.    Based upon the Treasury guidance for calculating cost basis, in order to receive a grant of $108,285,626, Ormat would have had to report a cost basis of $360,953,087.

182.    Utilizing this cost basis coupled with an estimated historical average generating capacity of approximately 20 MW, the North Brawley Plant cost almost $20 million for every megawatt of installed net capacity or $20,000/kW, making the project the most expensive geothermal power plant ever constructed.[4]

183.    While Ormat reported an Eligible Basis in excess of $360 million to the United States government, Ormat's Israeli parent entity was writing down Ormat's value to a mere fraction of that amount.

**H.     Ormat Failed to Report Recapture Events**

184.    The recapture provisions of the § 1603 program are meant to function as safeguards to allow for recapture of funds in the event of changing circumstances, or in

_____

[4] In 2010, the year in which Ormat falsely claimed the North Brawley Plant was placed in service for cash grant purposes, the International Energy Agency, Energy Technology Systems Analysis Program (IEA ETSAP) published "Technology Brief E07: Geothermal Heat and Power." In this brief, the IEA reported that the investment cost of conventional geothermal power ranged from $3,400/kW to $4,000/kW (in US$ 2008). Further, the investment cost, including interest during construction, in 2010 for binary systems specifically was projected to be $4,000/kW. While these figures represent indicative average costs with considerable variation, it is implausible, if not completely impossible, to attribute the staggering disparity between the North Brawley Plant investment cost rate and industry averages solely to North Brawley's resource attributes. Mismanagement, poor planning, and inefficient execution by Ormat were the major contributing factors in the utter, and publicly concealed, failure of the North Brawley Plant project development.

1   the event that the applicant misrepresents information to Treasury in order to obtain the

2   funds.

3       185.   Included among these safeguards is Clause 3 of the Terms and

4   Conditions, which provides:

5           <u>If Treasury determines . . . that the applicant does not qualify for

6           funds or that the applicant received funds in excess of the amount to

            which the applicant was entitled, the applicant must immediately

7           return the funds to Treasury.</u>

8   (Emphasis added). Applicants are, quite obviously, not permitted to retain government

9   funds to which they were never entitled.

10      186.   Further, Treasury outlines several "disqualifying events" ("DQE"), which

11  will result in recapture of the funds paid to the disqualified recipient.  Included among

12  the DQE's is "permanent cessation of production," meaning that if a fund recipient

13  ceases production for a subject property within a specified time period after receipt, the

14  recipient must return a certain percentage of the received § 1603 funds. Program

15  Guidance p. 19.

16      187.   In order to obtain more than $100 million in § 1603 grant money from the

17  government, Ormat represented that the North Brawley Plant would have an output of

18  50 MW.  In all the time Ormat has operated the plant (since 2008), Ormat has barely

19  achieved half of that. Ormat has further acknowledged through contract adjustments

20  and other disclosures that it will never meet 50 MW in production. The facts which led

21  to Ormat's failure to meet the 50MW production level have been known to Ormat

22  since it first applied for the § 1603 grant.

23      188.   The effect of Ormat only producing half of the 50 MW output is the same

24  as if Ormat had closed down half of a functioning 50 MW plant.  In either case, half of

25  the represented production has permanently failed to exist.  Both cases constitute

26  recapture events under § 1603, or at the very lease demonstrate that Ormat was never

27  entitled to the full grant money received.

28

1    **I.    The Second North Brawley §1603 Grant**

2    189.   Incredibly, despite Ormat's clear knowledge that the North Brawley Plant

3    was not going to succeed, in or around 2012, Ormat Technologies applied for a second

4    § 1603 grant for the North Brawley Plant through its subsidiary, ORNI 18.

5    190.   As a result, during the last week of June 2013, Ormat received an

6    additional $14.67 million in § 1603 grant funds for the "expansion" of the North

7    Brawley Plant.  Based on Ormat's 2013 valuation of the North Brawley Plant in Israel

8    at $23 million, the new grant award compensates Ormat for over 50% of the plant's

9    stated reduced value at the time of the award and thus represents an award amount

10   that is 20% above the maximum award amount provided for under § 1603. Absurdly,

11   based on Treasury guidance, the represented Eligible Basis for the $15 million award

12   would have to be approximately $50 million, which is $27 million more than the

13   plant's fair value as determined by Ormat on its Israeli books as of November 2013.

14   191.   Furthermore, the plant was operating at less than the 27 MW output level

15   that CEO Dita Bronicki represented in or around January 2013 the plant would

16   operate at without additional investment. The low output level shows that no new

17   expansion had occurred at the time of or prior to the award of the second § 1603 grant.

18   192.   Not only have Ormat's false representations and certifications from their

19   initial receipt of North Brawley grant funds infected this second receipt of funds,

20   Ormat perpetuated its fraud in the second North Brawley § 1603 grant application.

21   Ormat's representation that it had "expanded" the North Brawley Plant is

22   demonstrably false, as production has not appreciably increased.

23   193.   The award of additional § 1603 funds to the North Brawley Plant further

24   demonstrates Ormat's ongoing efforts to defraud the United States. As of July 2, 2013,

25   the Treasury's updated list of awards shows that Ormat has received approximately

26   $122,970,821 for the North Brawley Plant.

27   194.   Furthermore, North Brawley's operating levels continue to decrease,

28   despite the so-called expansion.

---

48

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

**J.      Ormat Knew the North Brawley Plant Would Never Meet Its Contracted Capacity**

195.    Before beginning work on the North Brawley Plant, Ormat knew that its operation would be fraught with difficulty. The primary geothermal resource pervasive in that area was too deep and too hot for Ormat to access using its existing technology. Ormat decided to drill to a shallower depth, at which cooler geothermal resource existed, but was heavily mixed with sand. Geothermal resources that are located in sandy areas are difficult to extract because the sand typically clogs the wells and the pumps.

196.    Despite knowledge of the certain difficulties, Ormat entered into a contract that required it to produce a high volume of energy – 50MW.

197.    As expected, when Ormat began operation, significant amounts of sand were drawn up along with production fluids. The sand clogged the production pumps' injection pumps making continuous operation slow and difficult.

198.    Ormat management provided a brief discussion of the resource issues at North Brawley in the company's 2009 Annual Report. In addition to the issues relating to sand build-up, Ormat also advised that the system's injection capacity was "disappointing," meaning that the plant's ability to increase its generating capacity was limited.

199.    As a result, Ormat subsequently obtained an extension from SCE for the time within which it had to meet production capacity, contractually stated as the "Firm Operation Date." Ormat received a deferral of the capacity demonstration test and Firm Operation Date from SCE until March 31, 2011. Despite this delay in production capacity testing under the PPA, daily operation and energy sales had been ongoing since December 2008.

200.    Ormat knew the North Brawley Plant was doomed to fail before applying for the 2010 § 1603 grant. Ormat had sought to obtain private capital; however, because investor due diligence revealed that the project was unable to generate

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

sufficient revenue to cover operating costs, Ormat was unable to obtain North Brawley specific financing.[5] To this day, despite the receipt of § 1603 funds, ORNI 18 has failed to find private investors willing to participate solely in their North Brawley venture.

201.   Ormat sought federal § 1603 funds to keep afloat a geothermal project that was known, internally, to be a failed and unsalvageable geothermal project.

**K.   North Brawley's Inefficiency, Operating Losses and Ormat's Israeli Write-Offs Demonstrate the Falsity of the North Brawley Plant's Declared Eligible Basis**

202.   Ormat has never come close to meeting its contracted 50 MW production levels.  Ormat's annual production averages in 2009, 2010, 2011 and 2012, have been 4 MW, 22 MW, 23 MW, and 20 MW, respectively – not even half of the 50 MW PPA requirement.

203.   Despite its low production, Ormat utilizes extremely high levels of resources at a staggering cost.  Its operating costs far exceed its revenues: the North Brawley Plant has operated at a loss for twenty straight quarters.

204.   The North Brawley Plant utilizes sixteen production wells (with additional producers in development) and twenty-one injection wells to deliver less than 30 MW of net generation. In comparison with other operating geothermal projects, the high amount of resources devoted to such a low output makes the North Brawley Plant the most inefficient geothermal power plant presently operating on the planet Earth.

205.   The cost of operating the North Brawley Plant is enormous.  For example, in 2010 and 2011, the North Brawley Plant generated $15.3 million and $15.9 million of revenues. The plant's operating costs for the same periods were $39.6 million and

---

[5] Internal Ormat memoranda regarding the North Brawley financing negotiations were handled by Dita Bronicki and the Project Finance Department in Israel.

$41.8 million, respectively. Simple arithmetic shows that North Brawley's operating losses were $24.3 million in 2010 and $25.9 million in 2011.

206.   During these years, despite management's false public statements to the contrary, Ormat had no realistic prospects for an economic turnaround in light of the actual plant performance and *realistic* outlooks on future market conditions.

207.   Indeed, Ormat Industries, Ltd., the Ormat parent company in Israel, wrote off approximately $128 million for the North Brawley Plant in March 2011 and August 2012. And while the continuing net operating losses at the North Brawley Plant should have justified a contemporaneous write-off by United States subsidiary Ormat Technologies as well, no such measure was taken until January 2013.

208.   On January 23, 2013, Ormat Technologies finally announced that it would recognize an impairment charge of up to $230 million of the asset value of North Brawley. The impairment reduced the carrying value of the plant to approximately $30 million.

209.   Ormat Technologies was forced to finally write down the plant when SCE, the counterparty in North Brawley's PPA, notified Ormat it had retracted its permission to allow Ormat to market North Brawley energy output to other off-takers in search of higher energy pricing.  Given the plant's low output sold at the fixed PPA energy price, Ormat could no longer maintain the public façade regarding the possibility of recovering the project's high capital cost through a better priced energy deal, and an impairment charge was required.[6]

---

[6] North Brawley is not the only energy plant for which Ormat has altered and misrepresented its carrying value.  In May 2012, Ormat received a $34.6 million § 1603 cash grant for its Jersey Valley plant.  To receive this level of funding, Ormat would have had to represent an approximate total Eligible Basis of $115.3 million in its § 1603 grant application.  However, during the course of 2012, Jersey Valley went from a cost basis of $115.3 million to a carrying value of $65 million. That same year, parent company Ormat Industries, Ltd. in Israel wrote down Jersey Valley to a fair value of only $31.3 million after disposal costs. Thus, for fiscal year 2012, Ormat Industries, Ltd. and Ormat Technologies claimed three different values for the Jersey

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

210.   In November 2013, Ormat Industries, Ltd. booked an additional write-down in Israel related to the North Brawley Plant, reducing the plant's value to $23 million.

211.   Under normal circumstances, without the § 1603 cash infusion, the North Brawley Plant project would be rendered bankrupt.  It is only through the wrongfully obtained §1603 funding that Ormat has been able to keep the project going.

212.   Despite these ongoing write downs in Israel and the United States, and Ormat's knowledge that the North Brawley Plant was impaired, Ormat never updated, amended, or otherwise notified Treasury of the change in value of the plant, even though it materially affected the cost basis upon which the § 1603 grant was based. Ormat's failure is in direct violation of the Terms & Conditions of the § 1603 Program, which require prompt notification of any change in the grounds on which the grant was awarded.  Further, cessation in production is a recapture event under § 1603.  Ormat's failure to meet the production capacity it represented for the purposes of obtaining the grant money, particularly coupled with the fact that Ormat knew it would never be able to reach these production goals, has the same practical effect as if Ormat had, during the grant recapture period, cut its production in half.

**L.   Ormat Continued its Deception Despite Adverse Developments in the Commercial Life of the North Brawley Facility**

213.   As shown above, despite the North Brawley Plant's extraordinarily high capital basis of approximately $400 million coupled with its reduced earning potential, Ormat management, from 2009 to 2013, continuously falsely affirmed the recoverability of the North Brawley Plant and did not make a determination of impairment in the United States until January 23, 2013.

214.   For auditing purposes, Ormat Technologies recorded the $108 million cash grant received in 2010 for the North Brawley Plant as a "reduction" in the

Valley project. Impairments are consistently being treated differently in Ormat's Israeli financial accountings as compared to the financial accountings in the United States.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

carrying value of the plant. Assuming a depreciable life of thirty years, the grant would significantly reduce the annual depreciation expense by approximately $3.6 million a year. Despite the reduction in future costs, the North Brawley Plant was tested for impairment in 2010 due to the low output and high operating costs. At that time Ormat Technologies, stated:

> The estimated undiscounted cash flows exceed the carrying value of the plant ($245 million as of December 31, 2010) by approximately $46 million and therefore, no impairment occurred. …If actual cash flows differ from the Company's current estimates due to factors that include, among others, if the plant's generating capacity is less than approximately 45 MW, or if the capital expenditures required to complete development of the plant and/or future operating costs exceed the level of our current projections, a material impairment write-down may be required in the future.

215.    In its 2010 Annual Report, Ormat Technologies reported:

> We refinanced a portion of the equity invested in the North Brawley power plant with the [§ 1603] cash grant …. We expect that once we bring the plant closer to its original design capacity, we will able to refinance a portion of the remainder with long-term debt.

However, Ormat knew then that it would not likely be able to increase its capacity beyond current levels of approximately 22 MW, and certainly not near the stated "original design capacity" of 50 MW. Accordingly, Ormat knew in 2010 that generating capacity would certainly be "less than … 45 MW" and that a material impairment write down would certainly be required.

216.    While Ormat was telling the United States that its plan looked to be financially viable, and thus did not require any impairment, Ormat significantly impaired the plant in its Israeli books, The North Brawley plant's actual impairment in Israel should have been disclosed to Treasury because the basis of the grant award had changed.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

217.   In 2011, Ormat finally allowed the North Brawley Plant to undergo Capacity Demonstration and thereby achieve, as defined by the PPA, a "Firm Operation Date" of April 1, 2011. At this time, the plant had been consistently operating and selling energy to SCE for over *three* years, beginning in December 2008.

218.   By April 2011, the North Brawley Plant had still not met its contractually required output, but was generating levels of approximately 17MW – 23MW through implementation of various filtration methods and by cannibalizing the resources intended for other plants.

219.   During the third quarter earnings call for Fiscal Year 2010 held on November 3, 2010, Yoram Bronicki, Ormat Technologies President and Chief Operating Officer, reported:

> The generation in North Brawley was steady with the average net output in September being a little over 25 megawatts. This improvement has been achieved in part by the improvement in solids removal which allowed safeguarding the operating injection wells, and partially by rebalancing the flow in the western field, which was done by converting production (wells into injectors). Our next substantial step will be opening up a new injection area to the east of the existing field. Although we started work on this in the third quarter, the bulk of the construction is taking place in the fourth quarter. As of today, we've completed most of the pipeline and expect to commission the injection lines in the second half of December. We anticipate that this will improve our injection capability and allow further increase in generation. The next step will be to complete the additional production. We expect this program to improve the financial performance of North Brawley and the whole Electricity segment.

220.   As of February 28, 2011, in the company's Annual Report for Fiscal Year 2010, Ormat management reported that the North Brawley Plant was utilizing sixteen production wells and twenty-one injection wells. Ormat had increased North Brawley

injection capacity by utilizing resources from the East Brawley injection area.[7] Ormat reported that the addition of the four new East Brawley injection wells increased the North Brawley Plant generating capacity to 30 MW net. This estimate was false and misleading, because Ormat knew the plant could not sustain 30 MW.

221.   At a September 26, 2011 evidentiary hearing in response to a complaint by the California Unions for Reliable Energy (CURE) held before the California Energy Resources Conservation and Development Commission (CEC), Tom Buchanan, Ormat Technologies Senior Engineer, testified that the North Brawley facility had performed a capacity demonstration test on March 31, 2011, and that the generating capacity was determined to be 33MW, but the plant's actual average net generating capacity was "in the range of 25 MW."

222.   When questioned, Mr. Buchanan testified that with the current state of the resource, the generating capacity of the project could not be increased beyond production levels (as of that date) by drilling additional production wells. Mr. Buchanan cited diminishing plant efficiencies as well as diminishing return on investment as the basis for his opinion.

223.   Five months later, in direct contradiction to the previous public statements presented to the CEC, Ormat published the following statement in its 2011 Annual Report filed on February 29, 2012:

> The ramp up of the field has been slow and expensive. While we believe that the reservoir is large enough to support the designed generation capacity of 50 MW, the operation of production wells, injection wells and the handling of the geothermal field has been a challenge.

--------

[7] In 2008, Ormat Technologies, Inc. announced that the company planned to construct and had in fact begun manufacturing equipment for an additional 50 MW plant, designated as the East Brawley project, which would be situated two miles east of the North Brawley plant, on the other side of the New River.

On March 31, 2011, Southern California Edison set the demonstrated capacity of the power plant at 33 MW. Southern California Edison also agreed to modify the PPA to allow us the option of performing an additional capacity demonstration until March 31, 2012.

There is ongoing work to increase the generation of the power plant. We have set new targets for production wells and identified improvements we can make to the injection wells, all in parallel with our effort to reduce the operating expenses, mostly through modifications that would extend the service time of the production pumps.

224.   In fact, the failure of the North Brawley Plant to demonstrate the original contract capacity of 50 MW resulted in a de-rating of the ORNI 18 PPA with SCE to 33 MW. Ormat subsequently paid SCE approximately $340,000 in damages as a penalty for the deficient capacity.  Even in the manifestly improbable event that North Brawley is someday able to generate 50 MW of net capacity, SCE would have no obligation to purchase the incremental output, defined in the PPA as "Unincluded Capacity." Moreover, the PPA prohibits ORNI 18 from marketing the Unincluded Capacity to third parties for two years.

225.   Given the plant's reduced earning potential and operating costs, it would seem that the ability to increase the PPA contract capacity through a second capacity demonstration would be critical to the plant's future financial viability. However, Ormat purposefully chose not to exercise the option to perform a second 2012 capacity demonstration test because it knew the plant could not show any appreciable increase in capacity and would fail the test.

226.   Because Ormat was unable to achieve any appreciable improvement in the plant's performance despite additional capital expenditures, the North Brawley Plant's future revenue stream is limited to a maximum sale of 33 MW based on the de-rated ORNI 18 PPA with SCE.

227.   On November 6, 2013, Ormat Technologies, Inc. held its 2013 Q3 Earnings Call. During the call, Mr. Yoram Bronicki stated that North Brawley did not achieve positive EBITDA (earnings before interest, taxes, depreciation and amortization) in the third quarter. Accordingly, North Brawley had operated at a loss for twenty straight quarters. The plant began generating revenue in December 2008 and Ormat started depreciating the value of project in early 2009.

228.   After the write-off in January 2013, Ormat announced that it will no longer invest additional capital to increase North Brawley's capacity. Based on Yoram Bronicki's deft avoidance of any updates regarding North Brawley's operations, there exists no reason to believe that the plant is meeting its targets.

229.   On November 13, 2013, Ormat Industries, Ltd. filed a report with the Israeli Securities Authority and the Tel Aviv Stock Exchange relating to the asset impairment of North Brawley. This report demonstrates that Ormat Industries, Ltd. wrote down the fair value of North Brawley down to $23.7 million from the $31.6 million value that was calculated in March 2013. It should be noted that, in Israel, Ormat Industries, Ltd. is also using the § 1603 grants to reduce the impairment charges of the property. Not only is this practice misleading, such use of the stimulus grants is contrary to the purpose of the § 1603 Grant Program.

230.   In addition to requiring immediate return of all § 1603 grant money obtained on a false basis, the recapture provisions of § 1603 require a grant recipient to return certain percentages of received funds if the production ceases within five years of receipt of funds.  2014 is now the fourth year of the recapture period for the bulk of the funds Ormat received for North Brawley.

**M.   Defendants Violated the Federal False Claims Act By Applying For and Receiving § 1603 Grant Funds For The North Brawley Plant**

231.   Ormat's primary violation of the Federal False Claims Act is directly related to the fraudulent calculation of the in-service date of the North Brawley Plant.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

232.   In the North Brawley § 1603 application materials, Ormat falsely claimed that the plant was placed in service in January 2010 when, in fact, the plant had been synchronized with the gird, delivering energy, and generating revenue by December 2008. As such, the plant was ready for specific purpose prior to January 2009 and therefore, should never have qualified for § 1603 payments.

233.   The methodology employed by Ormat to calculate and justify the in-service date of January 2010 directly contradicts the process used by Ormat in other § 1603 grant applications for which they have relied upon and received payments (discussed below).

234.   Additionally, Ormat misled and continues to deceive the U.S. Treasury by falsely attesting to the plant's viability and value as a geothermal project.

235.   Ormat continues to wrongfully retain government funds that were paid based on materially false information and omissions in their § 1603 grant applications as well as the requisite certifications of compliance. Ormat has further failed to update the Government with information, as required, that would result in recapture of the § 1603 funds provided to the North Brawley property.

236.   In 2010, the same year in which ORNI 18 secured $108 million in a § 1603 grant for the North Brawley facility, the plant itself suffered a net loss of $24.6 million. That loss grew the following year to $26.5 million. On the whole, Ormat could have made an extra $51.1 million during those two years if it had simply ceased operations at the North Brawley Plant in 2010, but if it had done so, it would have had to return the grant money. Instead, Ormat management wrongfully obtained a taxpayer subsidy of $108 million for an ineligible geothermal plant that had more value as scrap metal than as an electricity generating asset.

237.   Ormat received the cash grant for the North Brawley Plant in August 2010. Seven months later, Ormat Industries, Ltd. wrote down $128 million of the plant's value, while in the U.S., Ormat Technologies insisted that the plant's future cash flows exceeded its carrying value.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

238.   The North Brawley project as a stand-alone entity was insolvent at the time Ormat, through its subsidiary ORNI 18, applied for the Treasury cash grant. In the absence of the Government subsidy, the North Brawley Plant project would not have sustained its operations with such massive losses.

239.   The PPA between ORNI 18 and SCE is a "must-take" contract. This means that, so long as the plant operates, SCE is obligated to purchase all of the energy that North Brawley was capable of delivering. Therefore, North Brawley's insolvency was wholly unrelated to a decline in energy sales resulting from reduced demand, or an increase in supply for competing sources (all factors potentially related to economic market conditions), but solely due to its high operating costs and failure to achieve unrealistic output goals.

240.   Without the government subsidy, the project would have been shut down and Ormat would have been forced to forfeit its $17 million performance security to SCE for breaching the North Brawley Plant contract. Even still, paying this penalty to SCE would have cost the company less than the plant's operating losses in 2010 alone.

241.   Given that the grant was awarded, Ormat's end game has become abundantly clear. Even as management in the U.S. continued, until January 23, 2012, to claim that the plant will somehow miraculously generate enough revenue to cover the $360 million of capital cost, in Israel the same management team has been writing down the asset's value for nearly three years. The Israeli parent company will continue to write down the asset until management can justify shutting down the plant based on the claim that it has no book value.

242.   All the while, in the U.S., Ormat delayed write-downs and has avoided shutting down the failing project to escape the 5-year grant recapture period provided by § 1603. Once Ormat Technologies is no longer in danger of being required to return the $108 million cash grant, rather than operating the North Brawley Plant at a loss for 30 years, Ormat will likely shut the plant down.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

243.   After five years of operating at less than 50% of its purported original design capacity, it is clear that the North Brawley Plant is a failed project. In normal market conditions without the availability of Government subsidies, a responsible management team would have shut down the plant rather than operate at a loss for this long.

244.   Not only did Ormat falsely seek, obtain and retain grant moneys from the original grant, but Ormat further sought, obtained and retained additional grant money from a second § 1603 grant for the North Brawley plant, all the while knowing that the plant was failing.

245.   Rather than taking responsibility for its mistakes and cutting its losses on the North Brawley Plant project, Ormat management perpetrated a fraud on the Government in order to obtain and keep over $122,970,821.00 of U.S. taxpayer money that was intended to stimulate the economy through investments in qualified renewable energy property.

246.   § 1603 funds were intended for enterprises that, if the stimulus funds could support them through the recent economic recession, would ultimately prosper and succeed once the economic tides had shifted.

247.   Ormat considers the North Brawley project a failed venture, and yet, Ormat has routinely failed to inform the Government of the true value of the project so as to avoid recapture of the § 1603 funds, thereby unjustly retaining the funds and enriching itself.

248.   The North Brawley Project represents just one geothermal property by which the Defendants have fraudulently obtained § 1603 funds in violation of the federal False Claims Act.

## VII.   ORMAT'S PUNA PLANT

249.   Ormat improperly sought and obtained § 1603 grant money for an expansion to the Puna property which did not meet the requirements of § 1603. Additionally, even if Ormat had been entitled to seek § 1603 money for the expansion,

it falsely included costs which were meant to service the existing 30 MW plant in the stated Eligible Basis for the claimed expansion.

### A.    Description of the Project

250.   Puna Geothermal Venture, G.P. ("PGV") is a wholly-owned subsidiary of Ormat that Ormat acquired from Constellation Energy in 2004[8]. PGV owns and operates two geothermal power plants located in the Puna district of the island of Hawaii, known as the "Puna Complex." PGV sells electrical output generated at the Puna Complex to Hawaii Electric and Light Company ("HELCO") pursuant to three separate long-term power purchase agreements.

251.   There are three relevant components of the Puna Complex: (1) a geothermal combined cycle system with an alleged net capacity of 30 megawatts (the"30 MW plant"); (2) the "KS-14 Production Well" which was added to the 30 MW plant in 2010; and (3) a binary system with a net capacity of 8 MW (the "8 MW Expansion").

### B.    The 30 MW Plant

252.   The 30 MW plant was placed in service by its original owner, Constellation Energy, in 1993. Ormat acquired the 30 MW plant in 2004, *eleven years after* the original owner placed the 30 MW plant in service.

253.   In May 2005, *more than three months after* the purchase of the 30 MW plant by Ormat, the 30 MW plant was sold to Southern Company as an equity investor, who then leased the 30 MW plant back to PGV in a sale-leaseback transaction. The sale-leaseback transaction allowed Southern Company to account for all depreciation in the 30 MW plant, but PGV still retained all rights in the resources generated from the 30 MW plant.

---

[8] In the original Complaint, Plaintiffs/Relators named Puna Geothermal Venture II, L.P. as a party, and they have subsequently been notified by Defendants that the proper party is Puna Geothermal Venture, G.P. However, Plaintiffs/Relators have not yet obtained the requisite authorization from the United States to dismiss Puna Geothermal Venture II, L.P. from this Amended Complaint.

254.   The 30 MW plant is itself "unqualified" for purposes of the §1603 Program for the following reasons:

    i.   The 30 MW plant was placed in service by its original owner in 1993, sixteen years prior to the earliest allowable in service date of the § 1603 program,

    ii.   Neither PGV or Southern Company qualify as "original owners" per § 1603,

    iii.   The 30 MW plant does not qualify under IRC § 45 because, due to its age, it does not generate Production Tax Credits that could be offset by the § 1603 program;

    iv.   The 30 MW plant does not qualify under IRC § 48 because the system was not constructed by PGV at a time when PGV was the "taxpayer" as defined by the IRC.

255.   Not only is the 30 MW plant itself not qualified to receive grant money under the § 1603 program, but because the 30 MW plant was placed in service before 2004, it is not a Qualified Facility under § 1603 and the IRC, and, accordingly, any expansion to the 30 MW plant cannot constitute Qualified Facility Property and cannot qualify for § 1603 grant money.

256.   Under the sale leaseback transaction, PGV maintains a well maintenance reserve account, which set aside funds annually for continued maintenance on the Puna wellfield.  The use of this account was to be solely for future drilling of production wells and to work-over existing production wells at the plant. In her interactions with investors and Ormat, Relator Tina Calilung was told that the reserve account was supposed to generate $17 Million in cash reserves for maintenance over the life of the 30 MW plant.  Adding additional wells to the existing 30 MW plant has always been part of the planned ongoing "maintenance" for the plant.

257.   Although the 30 MW plant was supposed to be generating 30 megawatts of electricity, by February of 2010, the 30 MW plant was reduced to only generating

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

approximately 17 MW. This shortfall was problematic for PGGP and Ormat because the contracts with HELCO required energy production to be at least 30 MW. On February 8, 2010, Israeli newspaper Haaretz reported that Ormat had announced that its revenues would decline by $1 million per month as a result of the drop in steam production from the geothermal reservoir feeding the 30 MW plant.

258.   PGV attempted to stimulate the well field with chemical and mechanical cleanouts of the blocked production wells, but such measures ultimately proved unsuccessful.

### C.   The KS-14 Well: Maintenance Work on an Unqualified Property

259.   In order to restore the 30 MW plant to full capacity, as part of the planned site maintenance, PGV began drilling a new production well, KS-14, in early 2010.

260.   The Participation Agreement and Project Lease Agreement under the sale leaseback transaction required PGV, as Lessee, to obtain investor approval in order to drill KS-14. The work plan submitted to the investors by Ormat outlined the KS-14 well's need and justification, drilling targets, project schedule and budget.

261.   Southern Company and Ormat agreed that the sole purpose of the KS-14 Well was to bring the 30 MW plant back to capacity.[9]

_____

[9]   Southern Company was concerned that if Ormat invested significant financial resources in the leased property that the IRS would perform a compulsion test and find that Ormat, not Southern Company, was the true owner of the 30 MW plant. A consequence of such a finding by the IRS would be that Southern Company would lose the tax benefits for claiming depreciation on the 30 MW plant. Southern Company agreed to the KS-14 well when it learned that the project would only bring the 30 MW plant back to full capacity, and would not generate additional capacity. Based on this understanding, Judy Rosenberg, Southern Company's finance manager and Southern Company's Vice President of Tax, determined that the KS-14 would not result in a compulsion test and Southern Company signed off on the KS-14 well.  PGV was also required to obtain a certification from Geothermex, a geothermal resource consulting firm, verifying that the KS-14 well would not materially adversely affect Southern Company's rights as Equity Investor and Owner/Lessor under the Sublease of the Resource and that the proposed Optional Modification as defined in the Project Lease

262.   In order to pay for the KS-14 production well, PGGP asked the investors in the 30 MW plant Project to approve the use of the funds in the reserve account, which at the time held approximately $4 Million.  Relator Calilung was involved in getting investor approval and consent to tap the reserve account for the project. The total cost of KS-14 exceeded the reserve account and was between $12 and $13 Million.

263.   PGGP submitted the KS-14 work plan for approval via electronic and certified mail to Southern Company, AIG Investment Group (Noteholder), Allstate Investments, LLC (Noteholder) and Union Bank (Indenture Trustee) in early 2010.

264.   The KS-14 well was initially very successful and, at first, added about 14 MW of net capacity, bringing the 30 MW plant back up to its 30 MW production capacity. However, as the resource stabilized in 2011, the production reduced slightly. The 30 MW plant was generating about 28 MW at the time the 8 MW Expansion was placed in service.

**D.     The 8 MW Expansion**

265.   Ormat added the 8 MW Expansion to the Puna Complex in late 2011. Ormat completed and, using funds from the well maintenance reserve account, financed the construction of the expansion.

266.   The 8 MW Expansion utilizes a binary system to generate electricity. In the binary system of the Puna facility, the 30 MW plant draws the resources from its production wells, including KS-14, and uses those resources to generate steam.  That steam generates electricity, and constitutes the 30 MW plant's output.  The by-product of the 30 MW plant – a condensed hot water from the 30 MW plant, also termed geothermal injection fluid - then passes to the 8 MW Expansion. The fluid heats a motive fluid with a lower boiling point than water, which in turn vaporizes and turns a turbine to generate electricity.

---

Agreement would not cause the 30 MW plant to become a limited use property under IRS regulations.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

267.   The 8 MW Expansion thus allows the byproduct injection fluid from the 30 MW plant to pass to the new binary generating units, allowing for a second phase of electrical generation before the spent fluid is re-injected into the well field's injection wells. Ormat describes this configuration of the Puna Complex as "Integrated Combined Cycle Units Geothermal Power Plants."

268.   When Ormat sought investor approval from Southern Company, AIG and Allstate for the 8 MW Expansion PPA, it expressly represented to the investors that the expansion project would not require the addition of plant staff. This representation is also supported by a pro-forma financial model that was provided to PGGP investors that demonstrated only a marginal increase in total plant operating cost after the expansion was placed in service. The impacts of the costs of the expansion were detailed in a memorandum Ms. Calilung sent to investors to kick off the review of the 8 MW PPA.

269.   Additionally, around this same time, Ormat confirmed in emails between Ormat and the PGV investors that the expansion would result in marginal cost increases because the current staff was capable of operating the new 8 MW Expansion in conjunction with the 30 MW plant.

270.   Accordingly, because the 8 MW Expansion operates exclusively from byproduct of the 30 MW plant and is operated by the same staff, the 8 MW Expansion can be viewed as nothing other than an expansion to the 30 MW plant.  It is, quite simply, not a standalone facility.

### E.   The Puna § 1603 Grant

271.   Ormat substantially completed construction of the 8 MW Expansion in December 2010. However, the 8MW PPA was not executed until February 2011. Furthermore, the Hawaii Public Utilities Commission ("PUC") did not approve the PPA until December 2011. Because it was not authorized to sell energy at the time, Ormat placed the 8 MW Expansion in "long-term lay-up" while it awaited for PUC approval of the PPA.

272.   Though Ormat could not sell energy yet, it wanted to obtain a § 1603 grant for the 8 MW Expansion. Accordingly, though plant operation was "on hold" and PPA approval from PUC was still outstanding, Ormat began delivering energy produced by the 8 MW Expansion to HELCO for free.  Ormat believed that if the plant was operating and producing energy it could claim December 2011 as the placed-in-service date for the expansion and thereby qualify the 8 MW Expansion project for § 1603 funds.

273.   In late November 2011, Ormat made the decision to take the plant out of lay-up status and began running the units full time. In December 2011, Cathy Tsaniff, Ormat's Tax Manager, began drafting PGV's application for a § 1603 grant for the 8 MW Expansion, citing a December 2011 placed-in-service date. Ormat believed a December 2011 placed-in-service date would ensure that the 8 MW expansion project would meet the § 1603 Program's placed-in-service requirements.

274.   Ormat's calculation of the placed-in-service date for the 8 MW Expansion starkly contrasts with its calculation of the placed-in-service date for the North Brawley Plant, discussed above. Ormat did not declare a placed-in-service date for North Brawley until the plant had been under a PPA for several years and had been generating and selling energy for well over a year.  Here, Ormat declared that the 8 MW Expansion was "placed-in-service" before its PPA was finalized and when Ormat was receiving no revenue for the energy distribution.

275.   The decision to take the 8 MW Expansion out of lay-up status is detailed in emails circulated among Ormat management (including, Co-Relator Tina Calilung) wherein Mr. Ohad Zimron, Senior Vice President of U.S. Operations, proposed to start running the 8 MW plant in anticipation of the December 2011 placed-in-service date. By email, Mrs. Dita Bronicki responded by saying that it was a good idea.  These emails were circulated during the Thanksgiving holiday break in 2011.

276.   During the § 1603 application drafting process, Ms. Calilung provided information relating to the PGV power purchase agreements and the operational

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

history of the Puna complex. Additionally, Ms. Tsaniff and Ms. Calilung interviewed Paul Spielman, Ormat's Manager of Operations Support for Resources, regarding the configuration of the 8 MW Expansion plant and its relation to the existing 30 MW plant.

277.   Mr. Spielman confirmed that the 8 MW Expansion was designed to generate electricity by utilizing the 30 MW plant's byproduct, a geothermal brine that remains after steam is separated and used to power the steam turbines of the 30 MW combined cycle plant. In the absence of the 8 MW Expansion, the byproduct brine would have been re-injected into the well field, where it would eventually be re-circulated in the geothermal production cycle. The 8 MW Expansion depended on the 30 MW plant's byproduct to operate.

278.   In its § 1603 application, Ormat misrepresented the 8 MW Expansion's true status as an expansion to the 30 MW plant and treated the 8 MW Expansion as a stand-alone new Geothermal Property; a gross misrepresentation. Because the 8 MW Expansion was an expansion of a nonqualified property – the 30 MW plant – it could not qualify for a § 1603 grant.

279.   Ormat thus knowingly misrepresented the Eligible Basis for the 8 MW Expansion and KS-14 in order to obtain § 1603 funds.

280.   Ms. Tsaniff initially allocated the cost of the KS-14 production well between the 30 MW plant and the 8 MW Expansion. In the initial draft of Ormat's § 1603 grant application, KS-14's costs were allocated pro rata between the 30 MW and 8 MW plants based on the respective contributions of the steam and brine to the total output of the complex. However, Ormat management insisted that the grant application be revised to allocate 100% of KS-14's costs to the 8 MW Expansion.

281.   Ms. Kell and Ms. Tsaniff discussed the legality of submitting an Ormat § 1603 application that purposefully excluded relevant material information and included material false information. Ms. Tsaniff acknowledged that she knew the information was incorrect and admitted that she was aware of the legal implications of submitting a

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

false § 1603 application, but told Ms. Kell that Ormat Technologies's CEO, Dita Bronicki, had made the changes herself and, accordingly, Ms. Tsaniff feared retaliation if she were to raise the issue.

282.  The use of the well maintenance reserve account funds to drill KS-14 indicates Ormat's intent that KS-14 be used for the sole benefit of the original, unqualified 30 MW plant. The use of KS-14 to supply resource for the 8 MW Expansion exceeds the scope of consent by the investors to use reserve account funds to drill the expansion well.

283.  On April 14, 2012, Ormat owned PGV was awarded a § 1603 cash grant of $13,821,143.[10]   The award amount corresponds to a stated Eligible Basis of $46,070,477. The estimated eligible project costs include the cost of the 8 MW Expansion's generating  units (including two Ormat  Energy  Converter  (OEC) bottoming  units, interconnection facility upgrades, and separators) and the full costs for drilling and connecting production well KS-14.

284.  Ormat falsely included the full cost of the KS-14 project, approximately $12.5 million. Not only was the 8 MW Expansion not eligible for § 1603 grant money because it was an expansion to an unqualified facility, but even if it had been eligible, the full cost of the KS-14 well should not have been included in the stated Eligible Basis. Because the KS-14 well was constructed and intended solely to bring the

---

[10]  On October 30, 2012, Ormat conducted a town hall meeting to address public concerns over the Puna plant. During that meeting, Paul Thomson, who at that time was Ormat's Director of Public Policy, was directly questioned by a member of the audience regarding the receipt of "$200 million in federal grants." In response, Mr. Thomson denied that Ormat had ever received any federal grants for the Puna plant, despite the fact that Puna had indeed received funds for the 8MW expansion plant. Specifically, Mr. Thomson stated, "we never took a dime from the federal government." In light of Mr. Thomsen's comments it is obvious that Ormat has misled, and continues to mislead, outside parties and the public as to their receipt, use, and purpose of the § 1603 funds.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

existing 30 MW plant back to capacity, none of its costs should have been allocated to the 8 MW Expansion. If Ormat had allocated KS-14's costs on a pro-rata basis based on the energy production of the 30 MW plant and the 8 MW Expansion, the stated Eligible Basis for the 8 MW Expansion should have been reduced by $9.86 million. Ormat's improper allocation of the full costs of the KS-14 well to the 8 MW Expansion alone resulted in an overpayment of at least $3,000,000.

285. Ormat never contemplated that KS-14, or any new geothermal well for that matter, was a necessary element of the 8 MW Expansion, which depended on byproduct from the 30 MW plant to function. Ormat provided deeply discounted energy rates to HELCO for the electricity generated by the 8 MW Expansion, rates which are well below market, based on the premise that the 8 MW Expansion would not require high start-up costs related to developing a geothermal well field.

286. In discussing the KS-14 project with Southern Company and the other investors, Ormat clearly explained that the KS-14 project would not be used to generate any additional capacity, and would only bring the 30 MW plant up to its expected capacity. Therefore, the inclusion of 100% of these costs in the § 1603 grant application signifies a misrepresentation of the project's scope to Treasury, and the cash grant was awarded to PGV based on the false allocation of funds, as modified by Ormat CEO Dita Bronicki.

287. After receiving the stimulus funds, rather than increasing the number of jobs provided by the Puna plant, Ormat systematically cut jobs at the Puna plant by eliminating previous positions and failing to replace them. Ormat also cut back on the benefits that the remaining Puna employees received.[11]

---

[11] In light of the downsizing and cutbacks, on May 14, 2012, the operations staff of Puna voted to unionize because of concerns about their job and benefit security. After the union organization was approved by the Puna staff, executive management reassigned the plant manager, Michael Kalekini; a move widely to be considered retaliation for his failure to prevent the unionization of the Puna staff.

288.   Ormat knew when it applied for § 1603 funds, a significant portion of the funds would be used to refinance a portion of the equity investment in the 8 MW plant. Construction on the plant had been completed by primarily Israeli engineers who were temporary hires, and thus, the §1603 grant funds provided to the Puna project had little, if any, stimulating effect on local jobs or the economy.

**F.**   **Defendants Violated the Federal False Claims Act By Applying For and Receiving § 1603 Grant Funds For The Puna Geothermal Plant**

289.   By submitting a grant application for the 8 MW Expansion, which does not qualify for the § 1603 program, and receiving and retaining $13,821,143 in government money to which it is not entitled, Ormat has violated the FCA.

290.   Ormat falsely represented that the 8 MW Expansion qualified for the § 1603 program when the 8 MW Expansion could not qualify as an expansion to a qualified plant, as the existing 30 MW Puna plant fell well outside of the criteria for qualification under § 1603, and could not qualify as a stand-alone plant because it required the existing Puna plant's byproduct to operate. Further, the 8 MW Expansion was operated as part of the existing Puna plant using the same personnel.

291.   Even if the 8 MW Expansion was found to be eligible for the § 1603 program (which it is not, by the program's terms) Ormat falsely inflated the stated Eligible Basis of the 8 MW Expansion by including the full costs for the KS-14 Well. The KS-14 Well was constructed to service the non-qualifying 30 MW Plant and should not have been included in the cost basis for the 8 MW plant.

292.   Ormat continues to wrongfully retain Government funds that were paid based on materially false information and omissions in their § 1603 grant applications as well as the requisite certifications of compliance. Ormat has further failed to update the Government with information that would result in recapture of the § 1603 funds provided to the North Brawley property.

## VIII.  DEFENDANTS' CONDUCT IN APPLYING FOR, RECEIVING & RETAINING § 1603 GRANT FUNDS FOR THE NORTH BRAWLEY AND PUNA PLANTS DEMONSTRATES A BLATANT DISREGARD FOR THE GOALS AND AIMS OF THE § 1603 GRANT PROGRAM

293.   Despite receiving hundreds of millions of dollars in Government stimulus funds, Ormat has shown a systemic inability and disinterest to create or retain U.S. jobs.

294.   On January 29, 2013, Ormat terminated 18 employees from its Reno, Nevada office. The Terminated employees include, but are not limited to, the following people:

    i.   Keith Sheridan, Quality Environmental Health and Safety (QEHS) Manager;

    ii.   John Manguray, Supply Chain Manager;

    iii.   Michael Weiss, IT Administrator; and

    iv.    Multiple members of the Resource Department.

295.   In April 2013, Relators obtained information regarding additional terminations that were scheduled to imminently occur within Ormat, including positions and entire crews within the Ormat's in-house drilling subsidiary, GeoDrill.

296.   GeoDrill was utilized in Ormat's U.S. project developments *only*.

297.   The Ormat terminations within the United States followed Ormat's February 2013 earnings call in which Mr. Yoram Bronicki stated that the company would begin focusing on developing projects in international markets like Central and South America.

298.   The elimination of jobs within Ormat's corporate offices, geothermal project sites, and their subsidiary business entities, such as GeoDrill, demonstrates that Ormat planned to reduce its energy development efforts in the U.S. after receiving funds to stimulate jobs and the economy *within* the United States.

299.   To implement such a plan after receiving massive amounts of U.S. tax payer money that was intended to create and sustain jobs in the United States is a

blatant abuse of the § 1603 Grant Program and is indicative of Ormat's disregard for the goals and aims of the grant program.

300.   In June 2013, Relators confirmed that Ormat had closed the Brawley, California office of GeoDrill and that all positions were eliminated except for eight people, who were allowed to relocate to the Reno, Nevada headquarters.

301.   Defendants have failed to create or retain jobs with the stimulus funds received from the § 1603 grants.

302.   According to Ormat's 2010 Annual Report, Ormat employed 499 workers in the United States. By the end of 2012, after receiving over $200 million in stimulus grants, Ormat reported employing 543 workers in the U.S.  However, by the end of 2013, Ormat only reported 481 United States jobs.

303.   Based on these statistics, despite Ormat's receipt and retention of hundreds of millions of dollars in stimulus funds, Ormat has only temporarily increased their employment by just 26 permanent workers.  A few short years later, those jobs and others have now eroded, and Ormat employs fewer permanent workers now than it did prior to receipt of the § 1603 grant money.

304.   Ormat has now focused its efforts to develop geothermal power outside of the United States and is using § 1603 funds to further their efforts abroad.

305.   Because the stimulus funds that Ormat received were intended to promote job creation, employment preservation, and the development of renewable energy projects in the United States, the Treasury would not have awarded Ormat § 1603 funds to be used in contradiction of the Program's intended purpose.

306.   Even as Ormat turns its attention to renewable energy opportunities outside of the United States, it continues to seek and utilize § 1603 funds to prop up the financial fugazi that is the Defendants' geothermal business.

307. On February 27, 2013, Ormat Technologies held a conference call to report its 2012 fourth quarter and year-end results. During this call, Ormat reported that it had

received $119 million in § 1603 cash grants relating to McGinness Hill, Puna, Jersey Valley and Tuscarora geothermal power plants.

308. Additionally, Ormat still expects to receive $23 million in § 1603 cash grants for its Don Campbell (formerly Wild Rose) geothermal plant and Heber Solar project, which are under construction and scheduled to come online by the end of the year. The estimated award assumes construction costs of $4.5 million per MW.

309. In the question and answer session of the August 7, 2013 earnings call, CEO Mrs. Dita Bronicki discussed other U.S. government programs that Ormat intended to exploit for future subsidies. The company is looking to take advantage of President Obama's Power Africa initiative, which will provide $7 billion of funding for projects in sub-Saharan Africa.  They also seek to avail themselves of the U.S.-Asia Pacific Comprehensive Partnership, to which the U.S. will contribute $6 billion in funds.

## IX.   APPLICATION OF THE FEDERAL FALSE CLAIMS ACT

310.   Pursuant to the Terms and Conditions of the § 1603 Grant Program, the Government may seek to collect any § 1603 funds obtained through fraud "by all available means including enforcement by the Unites States Department of Justice against any assets of the applicant entity," including through the enforcement of the federal False Claims Act. *See* Terms and Conditions Clause 6(c).

311.   Thus, this is an action under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended ("FCA"), which concerns a fraudulent scheme by the Defendants to defraud the United States by knowingly causing false and/or fraudulent applications, supporting documentation, certifications of compliance, annual reports to be submitted to the federal Government under § 1603 of the Recovery Act, thereby resulting in hundreds of millions of dollars in payments to sustain non-qualifying geothermal energy projects.

312.   The FCA provides liability for any person who knowingly submits a false claim for payment to the Government, or causes another to submit a false claim, or

knowingly makes a false record or statement material to a false or fraudulent claim for payment from the Government. 31 U.S.C. § 3729(a)(1)(A) and (B).

313.   IRC §s 45 and 48, along with § 1603 of the Recovery Act, set forth the definition of specific energy property that is qualified to receive § 1603 payments from the Treasury in lieu of tax credits.

314.   For the reasons set forth above, neither the North Brawley nor the Puna Geothermal Plants are qualified properties pursuant to IRC §s 45 and 48, or §s 1603 of the Recovery Act.

315.   The submission of a fraudulent § 1603 grant application constitutes a false claim under the FCA and Defendants herein are liable for presenting, and causing to be presented, false or fraudulent claims for payment or approval to the U.S. Department of the Treasury.

316.   Additionally, the fraudulent scheme established by the facts set forth in this Amended Complaint involves an ongoing conspiracy to violate the FCA amongst the Defendants, including the submission of false or fraudulent annual reports, and supporting materials to prevent the recapture or disallowance of the § 1603 funds already obtained due to fraud and/or the reckless disregard for the truth of the information conveyed to the Treasury.

317.   The conduct of the Defendants described herein violates the Terms and Conditions of the § 1603 Treasury Grant Program that establish a duty and standard of care for particular conduct and which the Defendants subscribed and assumed when applying for § 1603 funds.

318.   Defendants knew or should have known that the applications and supporting material that they submitted to the Treasury Department were false and inaccurate, and, at the very least, acted with deliberate ignorance and reckless disregard for the truth or falsity of the information they conveyed in order to be paid § 1603 funds.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

319.   The false and inaccurate information pertaining to Defendants' geothermal property that was included in the § 1603 grant applications and any subsequent reports and filings was material to the Treasury Department's determination to remit funds to Defendants, as well as material to the Treasury's decision to not recapture or disallow any improperly obtained funds from the Defendants.

320.   Similarly, the information pertaining to Defendants' geothermal property that was omitted from the § 1603 grant applications and any subsequent reports and filings was material to the Treasury Department's determination to remit funds to the Defendants, as well as material to the Treasury's decision to not recapture or disallow any improperly obtained funds from the Defendants.

321.   Thus far Defendants have received at least $136,791,964.00 in payments from the U.S. Treasury based upon false or fraudulent claims.

322.   Defendants to this day continue to perpetrate this fraudulent scheme, and have applied to obtain additional § 1603 funds for other geothermal properties. Their fraudulent conduct has infected all subsequent attempts, whether successful or not, to obtain § 1603 grants funds to be used by any of Defendants' energy projects.

## X.     CAUSES OF ACTION
### COUNT I: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)

323.   Plaintiffs/Relators reallege and incorporate by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.

324.   Through the acts described above, Defendants and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and are still presenting or causing to be presented, to the United States Government false and fraudulent claims, records, and statements

in order to obtain § 1603 payments, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

325.   As a result of Defendants' actions, as set forth above, the United States of America and has been, and may continue to be, severely damaged.

## COUNT II: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)

326.   Plaintiffs/Relators reallege and incorporate by reference the preceding paragraphs of this Amended Complaint as though fully set forth herein.

327.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

328.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(4); 31 U.S.C. § 3729 (a)(1)(D)

329.   Plaintiffs/Relators reallege and incorporate by reference the preceding paragraphs of this Amended Complaint as though fully set forth herein.

330.   Defendants, by committing the acts described in this Amended Complaint and otherwise, obtained possession, custody, and/or control of property or money used, or to be used, by the Government.

331.   Defendants knowingly failed to return or deliver the Government's property or money, and have caused to be delivered less than all of the money or property belonging to the Government.

332.   By wrongfully obtaining and failing to return § 1603 payments, Defendants intentionally exercised dominion and control over the Government's

money and property and seriously interfered with the Government's ability and right, to use those specific funds to effectuate the purpose and goal of the § 1603 Program.

333.   Defendants have maintained exclusive dominion and control over the Government's money or property for over three years resulting severe interference, inconvenience and expense to the United States.

334.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G)

335.   Plaintiffs/Relators reallege and incorporate by reference the preceding paragraphs of this Amended Complaint as though fully set forth herein.

336.   Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records and statements material to obligations to pay or transmit money to the Government, or knowingly concealed, improperly avoided or decreased Defendants' obligations to pay money to the United States Government that Defendants improperly or fraudulently received. Defendants also failed to disclose to the Government material facts that would have resulted in substantial repayments by them to the Government in violation of 31 U.S.C § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G).

337.   Defendants, at all relevant times to this action, had an ongoing legal obligation to report and disclose overpayments to the Government pursuant to the Terms & Conditions of the § 1603 Program, and failed to do so.

338.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT V: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729 (a)(1)(C)

339.   Plaintiffs/Relators reallege and incorporate by reference the preceding paragraphs of this Amended Complaint as though fully set forth herein.

340.   Through the acts described above and otherwise, Defendants and their agents and employees agreed and conspired to violate the federal False Claims Act, specifically §§:

    i.   31 U.S.C. § 3729(a)(1)/31 U.S.C. § 3729(a)(1)(A);

    ii.   31 U.S.C. § 3729(a)(2)/31 U.S.C. § 3729(a)(1)(B);

    iii.   31 U.S.C. § 3729(a)(4)/31 U.S.C. § 3729 (a)(1)(D); and

    iv.   31 U.S.C. § 3729(a)(7)/31 U.S.C. § 3729(a)(1)(G).

341.   Defendants and their co-conspirators committed overt acts in furtherance of the conspiracy described above.

342.   Therefore Defendants are liable for violating 31 U.S.C § 3729(a)(3)/31 U.S.C. § 3729(a)(1)(C).

343.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## XI.   DAMAGES, DISGORGEMENT AND RECAPTURE

### A.   Damages Under The Federal False Claims Act

344.   The Federal False Claims Act provides that a person or entity who violates the Act:

> ...is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410) plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729(a)(1).

345.   The federal Government has sustained significant damages in the form of the depletion of the federal Treasury of hundreds millions of dollars. The money fraudulently obtained by Defendants and improperly drained from the § 1603 Treasury

Grant Program would have been used by the Treasury to support and sustain truly eligible, viable and qualified energy projects.

346.   Defendants prevented the use of federal stimulus dollars from having the true and intended effect of the American Reinvestment Tax Act of 2009 and the § 1603 Program.

## B.   Size of the Recovery

347.   From 2009 to the present, Defendants' fraudulent scheme induced the U.S. Treasury to issue, at least, three § 1603 Program grants to unqualified geothermal properties. Consequently, the potential size of the recovery runs into the many millions of dollars, and at the very least, the whole value of the crash grants awarded to Defendants.

348.   To date, Ormat has fraudulently obtained at least three § 1603 grants for a total value of $136,791,964.00. Ormat has also received approximately an additional $127,200,000.00 for other geothermal projects.

## XII.   DEMANDS FOR RELIEF

**WHEREFORE**, Relators, on behalf of the United States of America, demand judgment against Defendants, ordering that:

a.   That Defendants be ordered to cease and desist from submitting or causing to be submitted any more false claims, or further violating 31 U.S.C. § 3729 et seq.

b.   That judgment be entered in favor of the United States and Relators against Defendants in the amount of each and every false or fraudulent claim multiplied as provided by 31 U.S.C. §3729(a), plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per claim, as provided by 31 U.S.C. §3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by

Defendants, together with penalties for specific claims to be identified at trial after full discovery.

c.     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

d.     That Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law;

e.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

f.     That Relators reserve and maintain their right to participate and share in the proceeds of any alternative remedy designed to settle any claim involving any of the allegations or conduct alleged herein, and;

g.     That Relators be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relators hereby demand a trial by jury as to all issues.

Dated: May  14, 2014                    Respectfully submitted,


                                        /s/ Christopher G. Paulos

                                        Christopher G. Paulos, Esq.
                                        CA Bar #272750
                                        cpaulos@levinlaw.com
                                        Peter J. Mougey, Esq.
                                        FL Bar # 0191825
                                        pmougey@levinlaw.com
                                        Laura S. Dunning, Esq.
                                        AL Bar # ASB-1540-U50S
                                        ldunning@levinlaw.com
                                        LEVIN, PAPANTONIO, THOMAS, MITCHELL,
                                        RAFFERTY & PROCTOR P.A.

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)

316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Office: 850-435-7067
Fax: 850-436-6066

John A. Yanchunis, Esq.
FL Bar# 324681
jyanchunis@forthepeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
Office: 813-223-5505
Fax: 813-223-5402

Jeremy M. Evans, Esq.
CA Bar #283168
Jeremy@csllegal.com
CSLLEGAL
611 K Street, Suite B-242
San Diego, CA 92101
Office: 619-886-8587
Fax: 619-615-2047

*Counsel for Plaintiffs/Relators*

First Amended *Qui Tam* Complaint for Damages and Other Relief (13cv0261)