1

2

3

4

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

5

6
7
8
9
10
11

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rels.* TINA CALILUNG, *et al.*, | |
| Plaintiffs, | 3:14-cv-00325-RCJ-VPC |
| vs. | **ORDER** |
| ORMAT INDUSTRIES, LTD., *et al.*, | |
| Defendants. | |

12           This *qui tam* action, brought under the False Claims Act ("FCA"), arises from Ormat's

13   allegedly fraudulent actions whereby they received approximately $136,800,000 in grant money

14   from the United States pursuant to Section 1603 of the American Recovery and Reinvestment

15   Act of 2009 ("ARRA").  Currently before the Court is Ormat's Motion to Dismiss (ECF No. 59)

16   the first amended complaint ("FAC").  A Response (ECF No. 92) and a Reply (ECF No. 97)

17   have been filed.  The United States has also filed a Statement of Interest (ECF No. 91) in the

18   matter.

19           Accompanying Ormat's Motion to Dismiss is a Request for the Court to take Judicial

20   Notice of a number of documents attached to the Motion.  (ECF No. 62).  Tina Calilung and

21   Jamie Kell ("Relators") opposed this request (ECF No. 93) and Ormat replied (ECF No. 98).

22           Also before the Court is Relators' Motion for Leave to File a Surreply (ECF No. 99) to

23   Ormat's Motion to Dismiss.  Defendants filed a Response (ECF No. 100) in opposition.

24

1    Also pending is Relators' Motion to Extend Time for Service on Foreign Defendants

2    (ECF No. 102) and Ormat's Motion to Extend Time (ECF No. 104).

3    **I.    BACKGROUND**

4    Relators initially named seven defendants in this lawsuit.  On December 19, 2014, the

5    parties stipulated to a voluntary dismissal without prejudice of Defendants Ormat Industries, Ltd.

6    ("OIL") and First Israel Mezzanine Investors, Ltd. (ECF Nos. 105, 106).  The remaining

7    Defendants are Ormat Technologies, Inc. ("OTI"), Ormat Nevada, Inc. ("ONI"), ORNI 18, LLC

8    ("ORNI"), Puna Geothermal Venture II, LP, and Puna Geothermal Venture, GP ("PGV")

9    (collectively "Ormat").

10    Relators allege the following.  OTI is a wholly-owned subsidiary of OIL and is a

11    Delaware corporation with its principal place of business located in Reno, Nevada. (FAC ¶ 38,

12    ECF No. 27).  OTI owns and operates geothermal power plants around the globe, including

13    plants in California, Nevada, and Hawaii. (*Id.* ¶ 39).  ONI is a wholly-owned subsidiary of OTI

14    and is a Delaware corporation also with its principal place of business in Reno, Nevada. (*Id.*

15    ¶ 40).  ONI constructs and operates geothermal power plants in the United States and

16    internationally. (*Id.*).  ONI constructed and operates the North Brawley Geothermal Power Plant

17    in Imperial County, California ("the Brawley plant"), and it also operates the Puna Geothermal

18    Power Plant in Hawaii ("the Puna Complex"). (*Id.*).  PGV is another wholly-owned subsidiary of

19    OTI and is a Hawaii general partnership that assists in the management and operation of the Puna

20    Complex. (*Id.* ¶¶ 43–44).  Relators allege that ONI pays all costs related to the Puna power plant

21    through PGV since ONI is not licensed to do business in Hawaii. (*Id.* ¶ 40).  As with the other

22    Ormat Defendants, ORNI is a wholly-owned subsidiary of OTI with its principal place of

23

24

1    business in Reno, Nevada.  Relators claim that ORNI was responsible for financing the Brawley

2    plant. (*Id.* ¶ 46).

3          Relators are former employees of OTI.  Tina Calilung served as OTI's Asset Manager

4    from November 2007 until June 2012.  Her primary function was to manage the long-term power

5    purchase agreements ("PPAs") for Ormat's operations within the United States. (*Id.* ¶ 23).

6    Calilung also provided due diligence on project financing, developed and managed investor

7    relations, and testified on Ormat's behalf before the Nevada Public Utilities Commission. (*Id.*).

8    Calilung claims to have left OTI of "her own volition" in 2012, "in part due to the business

9    practices which she felt were morally and ethically repugnant." (*Id.* ¶ 24).  She claims to have

10   voiced her opinions multiple times prior to leaving and alleges that she signed a waiver of

11   employment-related claims and severance in July 2012. (*Id.*).

12         Jamie Kell was the Administrator for OTI's Business Development Department from

13   January 2008 until September 2012. (*Id.* ¶ 27).  In this role, she personally assisted the directors

14   in charge of business development including OTI's Vice-President of Business Development and

15   OTI's Manager of Public Policy. (*Id.*).  Kell assisted her department with reviewing new

16   geothermal projects, which involved contract negotiations with outside parties, pricing, PPA

17   negotiations, and negotiations with public utility commissions. (*Id.* ¶ 28).  Kell terminated her

18   employment with OTI in September 2012. (*Id.* ¶ 29).

19         Both Calilung and Kell claim to have "direct, independent, and personal knowledge" of

20   Ormat's alleged scheme to defraud the United States by submitting false information to the

21   Secretary of the Treasury in order to obtain grants under Section 1603 of the ARRA. (*Id.* ¶ 57).

22   ///

23   ///

24

**A.  Section 1603 of the ARRA**

The ARRA was signed into law on February 17, 2009 for the purpose of preserving and creating jobs, as well as to "spur[] technological advances in science and health" and to "invest in . . . environmental protection, and other infrastructure that will provide long-term economic benefits." ARRA § 3(a), PL 111-5, 123 Stat. 115, 116.  It sought to lay the groundwork for new green energy economies that would double the amount of renewable energy produced between 2009 and 2013. 2009 U.S.C.C.A.N. S6, 2009 WL 395189.  To accomplish this goal, the ARRA temporarily provided for grants to be paid to persons engaged in developing renewable energy. *See* ARRA § 1603.  The grants provided under Section 1603 of the ARRA were intended to replace the tax credits that would usually be offered to qualifying entities under Section 48 of the Internal Revenue Code of 1986 ("IRC"). *See* 26 U.S.C. § 48(d)(1) (stating that "[n]o credit shall be determined under this section . . . for the taxable year in which such grant [pursuant to Section 1603 of the ARRA] is made").  It was expected that the Section 1603 program would "fill the gap created by the diminished investor demand for tax credits."[1]  Indeed, Section 1603 is titled "Grants for Specified Energy Property in Lieu of Tax Credits. ARRA § 1603.  Entities that receive a grant for renewable energy cannot also seek an energy tax credit under the IRC. 26 U.S.C. § 48(d).  The Secretary of the Department of the Treasury ("the Secretary") was tasked with administrating the Section 1603 program. ARRA § 1603(f).

To qualify for receiving grant money under Section 1603, certain conditions must be met. First, the individual or entity applying for the grant must be eligible. *See* ARRA § 1603(g). Second, the property must be a "specified energy property." *Id.* § 1603(a).  Under Section 1603, a specified energy property "consists of two broad categories of property—certain property that

---

[1] U.S. Dep't of the Treasury, *Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009 Program Guidance* 2 (Apr. 2011), *available at* http://www.treasury.gov/initiatives/recovery/Documents/GUIDANCE.pdf [hereinafter *Program Guidance*].

is part of a facility described in IRC [S]ection 45 (Qualified Facility Property) and certain other property described in IRC [S]ection 48."[2]  Section 45 of the IRC includes a geothermal energy facility as a "qualified facility" if it uses geothermal energy to produce electricity. 26 U.S.C. § 45(d)(4).  "Specified energy property," as used in Section 1603, further includes "geothermal property," as described in Section 48(a)(3)(A) of the IRC, and "geothermal heat pump property," as described in Section 48(a)(3)(A) of the IRC.  The Secretary has explained that these encompass "[e]quipment used to produce, distribute, or use energy derived from a geothermal deposit . . . ."[3]  Third, the qualified property must be "placed in service" in 2009, 2010, or 2011 (or construction must begin during one of those years). ARRA § 1603(a).[4]

If these three requirements are met, then the ARRA provides a reimbursement of 30% of the basis of the property. *Id.* § 1603(b)(2)(A).

> The basis of property is determined in accordance with the general rules for determining the basis of property for federal income tax purposes.  Thus, the basis of property generally is its cost (IRC [S]ection 1012), unreduced by any other adjustment to basis, such as that for deprecation, and includes all items properly included by the taxpayer in the depreciable basis of the property, such as installation costs and the cost for freight incurred in the construction of the specified energy property.[5]

Section 1603 instructs that "the Secretary of the Treasury shall provide for the recapture of the appropriate percentage of the grant amount in such manner as the Secretary of the Treasury determines appropriate if the property is disposed of or otherwise ceases to be a specified energy property." *Id.* § 1603(f).  Applicants under the Section 1603 program are also required to provide reports as required by the Secretary.[6]

---

[2] *Program Guidance* at 12.
[3] *Id.* at 15.
[4] The Section 1603 program was temporary and was set to terminate in October 2011. ARRA § 1603(j).  However, that date was extended to October 2012 by the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010. PL 111-312, 124 Stat. 3296, 3312.
[5] *Program Guidance* at 16.
[6] *Id.* at 21.

**B.  Ormat's Brawley Plant**

Relators allege that Ormat received $130 million in Section 1603 grant money for the Brawley plant that was obtained using false information. (FAC ¶¶ 150–51).  Construction on the Brawley plant began in February 2007 and the plant was expected to be operating by the end of 2008. (*Id.* ¶¶ 162–63).  Based on these projections, ORNI entered into a PPA with Southern California Edison based on the representation that the plant would produce 50 MW of energy. (*Id.* ¶¶ 159–61).  Relators claim that by December 2008, the Brawley plant was operational and began generating revenue, and Ormat began to depreciate the plant for tax purposes as early as 2009. (*Id.* ¶¶ 164–67).

In June 2010, Relators claim that Ormat filed, through ORNI, its first application for a Section 1603 grant with the Treasury. (*Id.* ¶ 168).  On August 17, 2010, the Treasury awarded ORNI a grant of $108,285,626. (*Id.* ¶ 169).  Relators allege that Ormat secured this grant by misrepresenting two key pieces of information to the Secretary.  Relators believe that Ormat "falsely concocted a placed-in-service date for [the Brawley plant] of January 15, 2010." (*Id.* ¶ 172).  Relators allege that this date is inaccurate given that the Brawley plant had been running since the end of 2008 and had generated approximately $2.5 million in revenue. (*Id.*).  Relators further allege that the proper placed-in-service date is sometime in December 2008, which would disqualify the Brawley plant from receiving grants under the ARRA's Section 1603 program. *See* ARRA § 1603(a) (requiring the placed-in-service date to be in 2009, 2010, or 2011).  Relators claim that January 15, 2010 marked no special significance as to the energy output since at that time it was producing around 17 MW, "a level at which it had been for several months and would remain for many months more." (*Id.* ¶ 177).  Relators also allege that Ormat artificially inflated and misrepresented the eligible basis of the Brawley plant in order to qualify for a larger

1    grant by purposefully delaying its Section 1603 application while incurring additional costs. (*Id.*

2    ¶ 180).

3    In 2012 sometime, Relators claim that Ormat applied for a second Section 1603 grant

4    based on an expansion of the Brawley plant, which the Treasury granted in June 2013 in the

5    amount of $14.67 million. (*Id.* ¶ 189–90).  Relators allege that the grant must have been based on

6    false information since OIL itself only valued the expansion at $23 million and the Brawley plant

7    was operating at less than 27 MW, which fails to demonstrate that production had appreciably

8    increased. (*Id.* ¶ 191).  Relators also claim that Ormat has failed to update, amend, or notify the

9    Treasury, as required by the Terms and Conditions of the Section 1603 program,[7] of the change

10   in the Brawley plant's value based on its inability to reach the projected energy outputs. (*Id.*

11   ¶ 212).  Despite the Brawley plant's alleged steady depreciation, Relators claim that Ormat is

12   delaying the write downs so it can avoid terminating the failing project in order to escape the

13   5-year grant recapture period provided by the Secretary.[8] (*Id.* ¶ 242).

14   **C.  Ormat's Puna Complex**

15   Relators also allege that Ormat improperly sought and received Section 1603 grant

16   money for an expansion to its plant in Puna, Hawaii.  There are two energy producing

17   geothermal plants at the Puna Complex.  The first power plant ("the 30-MW plant") was placed

18   in service by its original owner in 1993.  (*Id.* ¶ 252).  Ormat acquired the 30-MW plant in 2004

19   after which it sold the 30-WM plant to a third party who then leased the plant back to Ormat. (*Id.*

20   ¶ 253).  Relators note that the 30-MW plant is clearly unqualified for any Section 1603 grants as

21   it was placed in service well before 2009. (*Id.* ¶ 254).  Although the 30-MW plant was advertised

22   [7] U.S. Dep't of the Treasury, *Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009: Terms and Conditions* 2, *available at*

23   http://www.treasury.gov/initiatives/recovery/Documents/energy-terms-and-conditions.pdf [hereinafter *Terms and Conditions*].  To receive a Section 1603 grant, the applicant must agree to and sign the Terms and Conditions established by the Secretary. *See Program Guidance* at 3.

24   [8] *Terms and Conditions* at 2.

1    as generating 30 MW of electricity, Relators claim that it actually produced no more than 17

2    MW and that this inhibited production was causing Ormat's revenues to decline by $1 million

3    per month.  Due to this loss, Relators allege that Ormat planned to drill a new production well,

4    known as "KS-14," in order to boost the plant's productivity. (*Id.* ¶¶ 257–59).  However, under

5    the leaseback agreement that governed the Puna Complex, Ormat was required to receive

6    investor approval prior to drilling KS-14.  KS-14 successfully added about 14 MW of net

7    capacity. (*Id.* ¶ 264).

8            Ormat added an 8 MW expansion ("the Expansion") to the Puna plant in late 2011. (*Id.* ¶

9    265).  The Expansion was substantially completed by December of 2010, but Ormat was still

10   waiting on the Hawaii Public Utilities Commission to approve a PPA at that time. (*Id.* ¶ 271).

11   Relators allege that in an effort to qualify for a Section 1603 grant, Ormat began producing

12   energy for free so that it could claim December 2011 as the placed-in-service date for the

13   Expansion. (*Id.* ¶ 272).  In November 2011, Cathy Tsaniff, Ormat's Tax Manager, began drafting

14   PGV's application for a Section 1603 grant for the Expansion project. (*Id.* ¶ 273).  In that

15   application, Tsaniff cited December 2011 as the placed-in-service date so that the Expansion

16   would fall within the Section 1603 program's requirements. (*Id.* ¶ 274).

17           Relator Calilung participated in drafting the Section 1603 grant application for the

18   Expansion.  As part of that process she spoke with a Paul Spielman, Ormat's Manager of

19   Operations Support for Resources, who confirmed that the Expansion was designed to generate

20   electricity by utilizing the 30-MW plant's byproduct and that the Expansion depended upon the

21   original plant's byproduct to operate. (*Id.* ¶ 276–77).  Relators allege that Ormat misrepresented

22   the Expansion's true status in its Section 1603 application because it claimed that the Expansion

23   was a stand-alone new Geothermal Property. (*Id.* ¶ 278).

24

8

Relators further allege that Ormat knowingly misrepresented the eligible basis for the Expansion in order to obtain additional Section 1603 funds. (*Id.* ¶ 279).  Relators claim that Tsaniff initially allocated the cost of the KS-14 well pro rata between the 30-MW plant and the Expansion, but that she was later instructed to allocate the full cost of KS-14 to the Expansion in order to increase the cost basis. (*Id.* ¶ 280).  Relator Kell claims that she and Tsaniff discussed the legality of submitting a Section 1603 application that intentionally excluded relevant facts and included material false information. (*Id.* ¶ 281).  Relator Kell alleges that Tsaniff acknowledged that the information was incorrect, but told Kell that OTI's CEO, Dita Bronicki, made the changes herself. (*Id.*).  On April 14, 2012, PGV was awarded a Section 1603 cash grant of $13,821,143, which corresponded to Ormat's stated eligible basis of $46,070,477.  This reported eligible basis, Relators allege, includes the full amount of drilling and connecting the KS-14 well, which Relators allege cost Ormat approximately $12.5 million. (*Id.* ¶ 283).

**D.  Ormat's Alleged Violation of the FCA**

Relators claim that these facts demonstrate that Ormat violated the FCA by reporting false or misleading information or by omitting material information in its various Section 1603 grant applications to the Treasury.  Specifically, Relators contend that Ormat (1) misrepresented the put-in-service date for the Brawley plant, (2) inflated the eligible basis of the Brawley plant by intentionally driving up costs, (3) misrepresented the viability of the Brawley plant in order to qualify for additional Section 1603 funds, (4) falsely represented the Puna Expansion as a stand-alone facility, and (5) fraudulently allocated the full cost of the KS-14 production well to the Expansion rather than representing that an ineligible property was the real beneficiary of the expense.  Relators also allege that Ormat violated the Terms and Conditions of the Section 1603

1   program by submitting false or fraudulent annual reports for the Brawley plant in order to

2   prevent the recapture or disallowance of the Section 1603 funds already obtained. (*Id.* ¶ 316).

3       Relators argue that these misrepresentations and omissions were made to the Treasury in

4   violation of the FCA.  Relators include five counts of FCA violations arising from Ormat's

5   alleged conducted.  The first count alleges that Ormat and its agents knowingly presented false

6   records or statements material to their fraudulent claims for Section 1603 funds in violation of 31

7   U.S.C. Section 3729(a)(1)(A).  The second count alleges that Ormat knowingly made and used a

8   false record to perpetuate the fraud in violation of 31 U.S.C. Section 3729(a)(1)(B).  The third

9   count alleges that Ormat is in possession of Section 1603 funds that should rightfully be returned

10  to the Treasury, a violation of 31 U.S.C. Section 3729(a)(1)(D).  The fourth count alleges that

11  Ormat has knowingly made false records or statements to the Treasury in order to avoid its

12  obligation to transmit improperly received Section 1603 funds back to the Government, a

13  violation of 31 U.S.C. Section 3729(a)(1)(G).  Finally, the fifth count alleges that Ormat and its

14  agents have conspired to defraud the Government by falsely obtaining $136,791,964 in Section

15  1603 grant money.

16      This case was originally filed under seal in the Southern District of California.  The case

17  remained under seal while the Government decided whether to intervene.  Once the Government

18  elected not to intervene (ECF No. 11), the relevant documents were unsealed and service was

19  completed.  Ormat moved to transfer the case to this District, which the court granted.  Prior to

20  transfer, however, Relators submitted the FAC.  Ormat now moves for dismissal of the FAC for

21  lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).  Alternatively, Ormat argues that

22  the case should be dismissed for Relators' failure to adequately plead fraud under Rule 9(b) and

23  for their failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  In its

24

1    Motion, Ormat relies not only on the information allege in the FAC, but also on the information

2    contained in various other documents, and it requests that the Court take judicial notice of those

3    documents.  Relators oppose this request.  Further, Relators contend that Ormat raises new

4    arguments in its Reply that they will be unable to address unless the Court grants them leave to

5    file a surreply.

6    **II.    DISCUSSION**

7            **A.  Motion for Leave to File a Surreply**

8            As an initial matter, the Court must address the docketing issue of whether Relators

9    should be granted leave to file a surreply.  Local Rule 7-2 allows for litigants to file a motion, a

10   response, and a reply. *See* LR 7-2(a)–(c). It does not provide for a surreply.  However, the Court

11   may grant leave to a party to file a surreply if new matters are raised for the first time in the reply

12   to which a party would otherwise be unable to respond. *See Spartalian v. Citibank, N.A.*, No.

13   2:12-cv-00742-MMD-PAL, 2013 WL 593350, at *2 (D. Nev. Feb. 13, 2013) (Du, J.).  Relators

14   contend that Ormat "mischaracterized much of the law" and "raised new arguments not

15   previously raised" in its Reply to Relators' Response. (Mot. to File Surreply 2, ECF No. 99).

16   Relators argue that the Court should therefore grant them leave to file a surreply.  The Court

17   disagrees.  Relators do not identify any specific argument in Ormat's Reply that is "new" and an

18   alleged mischaracterization of the law alone surely cannot be a sufficient basis for a surreply;

19   otherwise, litigants would constantly seek to have the last word in brief filing by claiming that

20   the other side presented the law in an unfavorable manner.[9]  Thus, Relators' Motion is DENIED.

---

22   [9] To the extent that Relators are concerned with Ormat's characterization of the law regarding the United States'
     right to file a Statement of Interest in this case despite not intervening, the Court finds that 28 U.S.C. Section 517
     provides sufficient authority for it to make such a filing here.  This is particularly true given that the United States

23   may choose to intervene at any time in a *qui tam* action brought under the FCA.  *See* 31 U.S.C. § 3729(c)(3) (stating
     that the Government may elect to intervene in the suit at a later date upon a showing of good cause).  Moreover, the
     United States addresses a single issue raised in the Motion, whether the Tax Bar applies to Relators' claims.  Ormat

24   has not moved to strike the Statement of Interest and objects to it only in a footnote of its Reply.  The Court,

1

### B.  Motion for Judicial Notice

2          Before reaching the merits of Ormat's Motion to Dismiss, the Court must also address

3   Ormat's Request for Judicial Notice.  Generally, the scope of review on a motion to dismiss is

4   limited to the contents of the complaint. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

5   Otherwise, the motion to dismiss is converted into a motion for summary judgment and the court

6   must give the non-moving party an opportunity to respond. *See United States v. Ritchie*, 342 F.3d

7   903, 907–08 (9th Cir. 2003).  There are two exceptions to this rule, however.

8          First, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1)

9   the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3)

10  no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Id.*  Further,

11  "[w]hen reading a complaint that incorporates or summarizes documents, [the court] may also

12  consider the documents thus incorporated or summarized." *Rosales-Martinez v. Palmer*, 753

13  F.3d 890, 897 (9th Cir. 2014).  Second, facts that are judicially noticeable pursuant to Federal

14  Rule of Evidence 201 may also be considered by the court when ruling on a motion to dismiss.

15  *See Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001).  Rule 201 states that a court "may

16  judicially notice a fact that is not subject to a reasonable dispute because it is generally known

17  within the trial court's territorial jurisdiction; or can be accurately and readily determined from

18  sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

19          In this case, Ormat requests that the Court take judicial notice of nine sets of documents

20  because either the FAC references the particular document or because the document falls under

21  Rule 201.  These documents include the Section 1603 applications for the Brawley plant and the

22  Puna Expansion, the Brawley plant's annual performance reports, various Securities and

23

24  therefore, will consider the United States' arguments, but only to the extent that they are persuasive, since it finds
that the Statement is not entitled to any particular deference in this matter.

1    Exchange Commission ("SEC") filings in Forms 10-K, 10-Q, and 8-K, and publicly filed

2    pleadings in a prior lawsuit against OTI related to the Brawley plant.  Ormat also requests

3    judicial notice of the Section 1603 grant program itself, agency action regarding the Section

4    1603 program, and certain legislative history related the Section 1603 program.

5           Relators' oppose Ormat's Request in its entirety as it relates to the Court taking notice of

6    the truth of the matters asserted in Ormat's documents.  Relators specifically oppose Ormat's

7    Request as to the Section 1603 applications and as to the annual performance reports for the

8    Brawley plant because they contend that these documents are uncertified, redacted, and

9    incomplete. (Relators' Opp'n to Request 2–3, ECF No. 93).  Relators further oppose the Request

10   as to the SEC filings since these documents are incomplete and are also uncertified.

11          The Court finds that the documents for which Ormat seeks judicial notice are either

12   specifically referenced in Relators' FAC or subject to judicial notice pursuant to Rule 201, and

13   therefore, they may be considered along with Ormat's Motion.  First, the Court grants Ormat's

14   Request as to the Section 1603 applications for the Brawley plant and the Puna Expansion.

15   Relators reference these applications numerous times in their FAC, (*See, e.g.*, FAC ¶¶ 168, 172,

16   192, 209, 232, 278, 284, 289), indicating that the applications are central to Relators' allegations.

17   *See Ritchie*, 342 F.3d at 907–08.  Relators make a general objection that the applications are

18   uncertified and redacted, but fail to direct the Court to any specific issue regarding the

19   applications' authenticity.  The Court acknowledges, however, that the truthfulness of the

20   statements contained in these applications is the very focus of this litigation.  Thus, the Court

21   will not accept any of the statements as true, but will consider the applications only for the fact

22   that the statements they contain were made to the Department of the Treasury.  Accordingly,

23

24

1   Ormat's Request is granted as to Exhibits 1–3, 8–12, and 13–16 of the Hen Declaration (ECF

2   No. 61).

3         Next, the Court finds that Relators' FAC necessarily relies on the Brawley annual

4   performance reports as it references multiple times the alleged false or omitted information

5   contained in or missing from the reports. (*See, e.g.*, FAC ¶¶ 187–88, 202, 316).  Relators'

6   allegations that Ormat failed to provide the Treasury with information that would require

7   recapturing the Section 1603 funds are based on the information contained in these reports.  And

8   although Relators again raise a general objection that the reports are uncertified, they fail to point

9   to anything specific that would allow the Court to find a legitimate question of authenticity.

10  Relators allege that the information contained in these reports is false, and accordingly the Court

11  will not accept the statements contained therein as true. *See Walker v. Woodford*, 454 F. Supp. 2d

12  1007, 1022 (S.D. Cal. 2006) (noting that a court may not take judicial notice of disputed

13  matters).  The Court will, however, consider the annual reports for the fact that the statements

14  contained in the reports were made to the Treasury.  Ormat's Request is granted as to Exhibits 4–

15  7 of the Hen Declaration.

16        The Court further finds that the SEC filings qualify for judicial review. *See, e.g.*, *In re*

17  *MGM Mirage Sec. Litig.*, No. 2:09-cv-01558-GMN-VCF, 2013 WL 5435832, at *4 (D. Nev.

18  Sept. 26, 2013) (Navarro, J.) (recognizing that SEC filings qualify as judicially noticeable); *In re*

19  *Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008) (citing *Dreiling v. Am. Exp.*

20  *Co.*, 458 F.3d 942, 946 (9th Cir. 2006)).  Relators cite various Ormat SEC filings in the FAC to

21  establish a number of facts including when construction of the Brawley plant commenced, (FAC

22  ¶ 162), that the Brawly plant had resource issues, (FAC ¶ 198), and that the Brawley plant was

23  not reaching a 50-WM production rate, (FAC ¶ 223).  Indeed, the FAC specifically cites to

24

14

1    Ormat's 2007 Annual Report (FAC ¶ 162), 2009 Annual Report (FAC ¶ 198), 2010 Annual

2    Report (FAC ¶ 215), and 2011 Annual Report (FAC ¶ 223), as well as multiple quarter-earning

3    calls (FAC ¶¶ 219, 227, 307) that addressed the progress of the Brawley plant.  Accordingly, the

4    Court is willing to take judicial notice of the statements contained in the SEC filings as they

5    relate to Relators' FAC.  Ormat's Request is therefore granted as to those Exhibits.

6         The Court also finds that the pleadings filed in the prior litigation involving the Brawley

7    plant may be judicially noticed.  A court may take judicial notice of its own records in other

8    cases pursuant to Rule 201. *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).  The

9    pleadings at issue here were filed with this Court and are readily accessible. (*See Szymborski v.*

10   *Ormat Techs., Inc. et al.*, Case No. 3:10-cv-00132-RCJ-WGC).  Therefore, the Court grants the

11   Request as to Exhibits V–W of the Zelichov Declaration (ECF No. 60).

12        Finally, the Court determines that the remaining documents are also subject to judicial

13   notice under Rule 201.  As a necessity in ruling in this case, the Court would obviously need to

14   review the Section 1603 grant program whether through a copy provided by Ormat or elsewhere.

15   Thus, the Request is granted as to Exhibit A of the Zelichov Declaration.  Likewise, the agency

16   reports on the Section 1603 program are subject to judicial notice since there is no reasonable

17   dispute as to their content. *See* Fed. R. Evid. 201(b)(2); *Interstate Nat'l Gas Co. v. S. Cal. Gas*

18   *Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (stating that judicial notice may be taken of records and

19   reports of administrative bodies); *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 246 (C.D.

20   Cal. 2006) ("The content of records and reports of administrative bodies are proper subjects for

21   judicial notice under Rule 201[].");  *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968,

22   972 (W.D. Mich. 2003) (stating that "[p]ublic records and government documents are generally

23   considered 'not to be subject to reasonable dispute,'" including "public records and documents

24

1    available from reliable sources on the Internet").  Although Relators contend that the documents

2    provided by Ormat are not properly certified, the Court sees no indication that the documents

3    provided here are anything other than what Ormat claims them to be—a copy of a report by the

4    Treasury Inspector General and a memorandum from the Office of Chief Counsel of the Internal

5    Revenue Service.  The Request is therefore granted as to Exhibits V and W of the Zelichov

6    Declaration.  The Court also finds that "[l]egislative history is properly a subject of judicial

7    notice." *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012).  Accordingly, the Court is

8    willing to take notice of the Senate Finance Committee Description of the ARRA bill that Ormat

9    provides as Exhibit AB to the Zelichov Declaration.

10          Therefore, the Court GRANTS Ormat's Request for Judicial Notice with the caveat that

11   the information contained in the various Section 1603 applications, annual reports, and SEC

12   filings will be noticed only as to the fact that the statements were made and not that they are

13   necessarily the truth.  Moreover, the Court emphasizes that its notice of these facts is solely for

14   the purpose of ruling on Ormat's Motion to Dismiss, lest the taking of judicial notice have

15   "unforeseen consequences later in the litigation." *Metro. Creditors' Trust v.*

16   *Pricewaterhousecoopers, LLP*, 463 F. Supp. 2d 1193, 1197 (E.D. Wash. 2006).

17          **C.  Motion to Dismiss**

18                 **1.  Legal Standards**

19          The FCA, 31 U.S.C. § 3729(a), imposes liability on all those who submit false or

20   fraudulent claims for payment to the United States Government. *Campbell v. Redding Med. Ctr.*,

21   421 F.3d 817, 820 (9th Cir. 2005).  The *qui tam* provisions of the FCA allow private parties

22   aware of fraud against the government to sue on behalf of the Government with the incentive that

23   such parties may share in up to 30% of the recovery. 31 U.S.C. §§ 3730(b)(1), 3730(d)(2);

24

16

1    *Campbell*, 421 F.3d at 820.  The private party, referred to as the "relator," files the complaint

2    alleging a violation of the FCA under seal. 31 U.S.C. § 3730(b)(2).  The complaint remains

3    under seal for at least sixty days and is served on the defendant only after the court so orders. *Id.*

4    During this time, the Government elects whether to intervene or not, and notifies the court

5    accordingly. *Id.*  If the Government does not choose to intervene, then the private party who

6    initiated the lawsuit has the right to conduct the action. *Id.* § 3730(c)(3); *Wang v. FMC Corp.*,

7    975 F.2d 1412, 1415 (9th Cir. 1992).  However, the FCA also includes bars to certain actions

8    brought by *qui tam* relators, two of which are relevant to this litigation: the Tax Bar and the

9    Public Disclosure Bar. 31 U.S.C. §§ 3729(d), 3730(e)(4)(A).

10          Ormat's Motion to Dismiss is brought under Rule 12(b)(1) for lack of subject-matter

11   jurisdiction, based on the Tax Bar and Public Disclosure Bar, as well as under Rule 12(b)(6) for

12   failure to state a claim and failure to adequately plead fraud as required by Rule 9(b).

13          Rule 12(b)(1) provides a procedural mechanism whereby a party may challenge a court's

14   subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  A motion to dismiss for lack of

15   subject-matter jurisdiction pursuant to Rule 12(b)(1) may take one of two forms. *Thornhill*

16   *Publ'g Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  It may be a "facial"

17   challenge or it may be a "factual" challenge. *Id.*  In a facial attack, the court considers only the

18   allegations contained in the complaint and must construe them in the light most favorable to the

19   plaintiff. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *Nevada ex rel.*

20   *Colo. River Comm'n of Nev. v. Pioneer Cos.*, 245 F. Supp. 2d 1120, 1124 (D. Nev. 2003) (citing

21   *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989)).  In a factual attack, the challenger

22   disputes the truth of the allegations in the complaint that, by themselves, would otherwise invoke

23   jurisdiction. *Safe Air for Everyone*, 373 F.3d at 1039.  In resolving a factual attack on

24

jurisdiction, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*  In this case, Ormat makes a facial challenge to the Court's jurisdiction under the Tax Bar.

The Court acknowledges Relators' argument that the Public Disclosure Bar is no longer jurisdictional after the 2010 amendments to the FCA that removed the unambiguous jurisdiction-stripping language and replaced it with less direct language.[10]  However, for the purposes of this case, the Court finds that there is not a significant difference.  The post-2010 language mandates that the "court shall dismiss" an action if the Public Disclosure Bar is found to apply. 31 U.S.C. § 3730(e)(4)(A).  Thus, whether the Bar applies to a particular case remains a threshold issue that must be addressed before a court may reach the merits of a FCA case.  Here, the Court has already granted Ormat's Request for Judicial Notice of the documents that would likely be submitted as part of a factual attack on subject-matter jurisdiction.  Since this is the type of evidence that the Court would likely consider in determining jurisdiction, the amended statute does not impact Relators' case on this issue.  Accordingly, the Court will still consider Ormat's arguments pertaining to the Public Disclosure Bar as arising under Rule 12(b)(1).

The remaining arguments in Ormat's Motion are governed by the standards of Rule 12(b)(6) and Rule 9(b).  The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quotations omitted).  To avoid a Rule 12(b)(6) dismissal, a complaint does not need detailed factual allegations, but it must plead "enough facts to state a claim to relief that is

---

[10] Prior to the 2010 amendment, the statute stated that "[n]o court shall have jurisdiction . . . ." *See U.S. ex rel. Casady v. Am. Int'l Grp., Inc.*, No. 10CV0431-GPC-(MDD), 2014 WL 1286552, at *4 (S.D. Cal. 2014) (noting that the statute read this way before it was amended in 2010).

18

plausible on its face." *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (stating that a "claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged").  Even though a complaint does not need "detailed factual allegations" to

pass Rule 12(b)(6) muster, the factual allegations "must be enough to raise a right to relief above

the speculative level . . . on the assumption that all the allegations in the complaint are true (even

if doubtful in fact)." *Twombly*, 550 U.S. at 555.  "A pleading that offers 'labels and conclusions'

or 'a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at

678. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

enhancements.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Additionally, the FCA is an anti-fraud statute and a complaint brought thereunder must

fulfill the heightened pleading requirements of Rule 9(b). *Bly-Magee v. California*, 236 F.3d

1014, 1018 (9th Cir. 2001).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake.  Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally." Fed. R.

Civ. P. 9(b).  Under Rule 9(b), a plaintiff must be specific enough to give defendants notice of

the particular misconduct so that they can defend against the charge and not just deny that they

have done anything wrong. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

"Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the

misconduct charged." *Id.*  A "plaintiff must set forth *more* than the neutral facts necessary to

identify the transaction.  The plaintiff must set forth what is false or misleading about a

statement, and why it is false." *Id.*

1

2. **Analysis**

2

a. **The FCA's Tax Bar**

3

The Tax Bar states that the FCA "does not apply to claims, records, or statements made

4

under the Internal Revenue Code of 1986." 31 U.S.C. § 3729(d).  The type of *qui tam* action that

5

is typically precluded by the Tax Bar is one involving federal income tax matters. *See Almeida v.*

6

*United Steelworkers of Am. Int'l Union, AFL-CIO*, 50 F. Supp. 2d 115, 126 (D.R.I. 1999).

7

Indeed, Congress's intent behind Section 3729(d) was to codify caselaw that "reserved discretion

8

to prosecute tax violations to the IRS." *U.S. ex rel. Lissack v. Sakura Global Capital Markets,*

9

*Inc.*, 377 F.3d 145, 152–53 (2d Cir. 2004); *see also* 26 U.S.C. § 7401 (stating that "[n]o civil

10

action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be

11

commenced unless the Secretary authorizes or sanctions the proceedings"); S. Rep. 99-345, at

12

18, 1986 U.S.C.C.A.N. 5266 (stating that "it is now apparent that the False Claims Act does not

13

apply to income taxes cases, and the Committee does not intend that it should be so used").

14

Ormat argues that the Tax Bar also extends to actions involving grants received in lieu of

15

tax credits.  Ormat asserts that the plain language of the statute compels this conclusion since the

16

FCA does not apply to claims or statements made under the IRC. (Defs.' Mot. to Dismiss 11,

17

ECF No. 59).  Relators argue that Section 1603 is not a tax program, but a financing program for

18

clean energy projects and that it has no impact on the tax liability of grant recipients. (Relators'

19

Resp. 6, ECF No. 92).  Relators also argue that their allegations do not depend upon a violation

20

of the Tax Code and that the IRS lacks authority to recover Section 1603 grant money. (*Id.* at

21

10).  The United States, in its Statement of Interest on the matter, agrees with Relators on both

22

these points. (Statement of Interest 4, 6, ECF No. 91).

23

24

20

It is clear that Ormat's Section 1603 applications fall within the FCA's definition of "claim," which is "any request or demand . . . for money . . . that is presented to an officer, employee, or agent of the United States . . . ." 31 U.S.C. § 3729(b)(2).  By submitting the applications at issue in this case, Ormat clearly made a request for grant money that was based on information it presented to the Treasury.  The information provided in those applications, as well as the data Ormat subsequently provided in its annual reports, certainly qualify under a common definition of "statements."[11] The question, then, is whether Ormat's claims and statements were "made under" the IRC.  The Court finds that they were not.

The interpretation of a statute always begins with the plain language of the text, "and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004).  Applying that standard here, it is clear that the claims and statements at issue in this case were not "made under" the Tax Code.  Quite simply, Ormat's claims for grant money were made under Section 1603 of the ARRA and not the IRC.  The Court's analysis should end there. *Id.* However, Ormat argues that Section 1603 is part of the Tax Code since it is included as a note to Section 48 of the IRC and because it specifically incorporates definitions from the IRC. (Mot. to Dismiss 12).  Ormat cites to *U.S. ex rel. Lissack v. Sakura Global Capital Markets, Inc.*, a case from the Second Circuit, to support its proposition that although Relators' claims do not involve tax matters, they are nonetheless precluded by the Tax Bar.

In *Lissack*, the court held that Relator Lissack's claims that the defendant employed a complex "yield-burning" scheme in order to receive extra interest payments from the Government on certain bonds fell "within the heartland of the Tax Bar provision." 377 F.3d at 157.  While the claims did not involve income tax matters, the court stated that they would be

---

[11] "Statement" is defined as "the act or process of stating, reciting, or presenting orally or on paper." *Webster's Third New Int'l Dictionary* 2229 (4th ed. 1976).

1   barred nonetheless if they came "within the language and evident intent of the Tax Bar." *Id.* at

2   153.  The court determined that Lissack's FCA claims were barred for two reasons.  First,

3   Lissack's case depended entirely on a purported violation of the Tax Code. *Id.* at 153.  The very

4   basis of his claims arose solely from the Tax Code, such as the tax-exempt status of the bonds at

5   issue and the detailed yield restrictions for escrow accounts. *Id.* at 154.  Second, the IRS

6   possessed authority to recover the precise amounts Lissack sought in his action. *Id.*  The

7   violations that Lissack alleged were subject to suit by the IRS, and thus the IRS itself could

8   remedy all the damage caused by the alleged scheme. *Id.* at 155.  The court explained that these

9   two factors implicated the evident purpose of the Tax Bar, "which is to prevent private litigants

10  from interfering with the IRS's efforts to enforce the tax laws." *Id.* at 156.

11          The *Lissack* court was clear that it did not seek "to set forth the outer boundaries" of the

12  Tax Bar. *Id.* at 153.  However, courts examining the FCA's Tax Bar post-*Lissack* have

13  considered the two factors established therein as a framework for determining whether a

14  particular FCA claimant's case is barred by the Tax Bar. *See, e.g.*, *U.S. ex rel. Barber v.*

15  *Paychex, Inc.*, No. 09-20990-CIV, 2010 WL 2836333, at *7 (S.D. Fla. July 15, 2010), *aff'd* 439

16  F. App'x 841 (11th Cir. 2011) (applying the *Lissack* factors and finding that the Tax Bar

17  precluded the relator's claims); *Patriot Tax Int'l, LLC v. Diaz*, No. CIVA 07-262-JBC, 2008 WL

18  2705450, at *4 (E.D. Ky. July 3, 2008) (applying the *Lissack* factors and dismissing the relator's

19  claims, but finding that satisfaction of both conditions is not necessary before the Tax Bar is

20  triggered); *Greene v. IRS*, No. 1:08CV0280LEKDRH, 2008 WL 5378120, at *6 (N.D.N.Y. Dec.

21  23, 2008), *aff'd* 348 F. App'x 625 (2d Cir. 2009) (stating that the Tax Bar applies to "claims that

22  depend on a violation of the Tax Code in addition to claims seeking to recover federal taxes").

23

24

1    The Court notes that *Lissack* is not controlling here. *See Gunther v. Wash. Cnty.*, 623

2    F.2d 1303, 1319–20 (9th Cir. 1979) (stating that the reasoning of other circuits may be

3    persuasive but only Ninth Circuit decisions are binding within the Ninth Circuit).  Its reasoning,

4    however, is helpful in determining whether the FCA's Tax Bar applies in close cases. *Id*.  This is

5    not a close case given that the ARRA itself establishes the Section 1603 program such that

6    Relators' claims are made under the ARRA and not the Tax Code.  Nevertheless, even applying

7    the Second Circuit's factors—(1) whether Relators' claims depend on a violation of the Tax

8    Code, and (2) whether the IRS can bring an action against Ormat to collect the money Relators

9    are seeking, *Barber*, 2010 WL 2836333, at *7 (citing *Lissack*, 377 F.3d at 154, 155–56)—this

10   case does not fall within *Lissack*'s expanded view of the FCA's Tax Bar.

11   First, the Court finds that Relators' FCA claims do not depend on a violation of the Tax

12   Code.  This case is quite distinguishable from *Lissack*.  The claims in *Lissack* depended entirely

13   on the Tax Code for substance.  The basis of the claims turned on the provisions of the Tax Code

14   related to municipal bonds and yield restrictions; no other congressional act was relied upon or

15   cited by Lissack to act as a basis for his claims. *Lissack*, 377 F.3d at 154.  Lissack even

16   acknowledged that in the absence of Tax Code violations, he could not prevail in *any* of his

17   claims. *Id*.  The court, therefore, necessarily concluded that his claims arose under the Tax Code

18   and were barred by the FCA.

19   Here, Relators' claims are alleged solely under the provisions of the ARRA's Section

20   1603.  The FAC clearly alleges that Ormat violated the purpose and provisions of Section 1603,

21   not the Tax Code.  And the ARRA makes clear that grant applications are made "subject to the

22   requirements of [Section 1603]," ARRA § 1603(a), not the Tax Code.  Unlike the claims in

23   *Lissack* that relied on the Tax Code for substance, the claims at issue here arise under a separate

24

23

1    statutory scheme.  The false or misleading information that Relators allege Ormat knowingly

2    presented to the Treasury involve material provisions of Section 1603, including the placed-in-

3    service requirement, ARRA § 1603(a), the grant amount as determined by the cost basis of the

4    property, *id.* § 1603(b), and the nature of a specified energy property, *id.* § 1603(d).

5           Moreover, the name of Section 1603 indicates that it is outside the realm of the Tax Code

6    since qualifying persons seek a Section 1603 grant *in lieu of tax credits*. ARRA § 1603.  Section

7    48 of the IRC expressly prohibits those who receive grants under Section 1603 of the ARRA

8    from also receiving an energy tax credit. 26 U.S.C. § 48(d).  No credit is available under the Tax

9    Code if a Section 1603 grant has been received under the ARRA.  Thus, the Tax Code itself

10   recognizes that the ARRA provides a separate and independent means whereby an entity can

11   receive a form of governmental subsidy for engaging in clean energy.  And in this case, Ormat

12   chose to obtain cash payments under Section 1603 rather than claiming tax credits under the Tax

13   Code.

14          Furthermore, the Department of the Treasury has issued regulations pertaining to the

15   Section 1603 program that are completely irrespective of the Tax Code.  The best example of

16   such may be the requirement that grant applicants and recipients submit annual reports to the

17   Treasury as part of the Terms and Conditions for receiving grant money.[12]  If the information

18   contained in those reports is intentionally misleading, as Relators allege in this case, then that

19   would constitute a violation of Section 1603, but it would likely not implicate provisions of the

20   Tax Code.

21          The Court also finds that Section 1603's incorporation of definitions contained in the IRC

22   does not necessarily mean that Relators' claims are made under the Tax Code.  Since an

23   _____

24   [12] The Treasury requires that "[a]pplicants must agree to the terms and conditions applicable to the Section 1603 program." *Program Guidance* at 2.  The Terms and Conditions in turn require that applicants "provide periodic reports as required by [the] Treasury." *Terms and Conditions* at 2.

1    applicant must choose between accepting grant money or a tax credit, it makes sense that the

2    qualifications under either Section 1603 of the ARRA or Section 48 of the IRC would be similar

3    if not identical.  Indeed, Section 1603 references the IRC because the program was designed to

4    incentivize individuals who might otherwise invest in infrastructure because of the tax benefits to

5    continue to make such investments despite the diminished demand for tax credits during the

6    recession.[13]

7        Because Relators' claims do not "rise[] or fall[] on finding a violation of the Tax Code,"

8    *Lissack*, 377 F.3d at 154, the Court finds that the first *Lissack* factor is not met here.  Likewise,

9    evaluation of the second *Lissack* factor in this case fails to convince the Court that Relators'

10   claims are precluded by the Tax Bar.

11       The FCA's Tax Bar was codified to prevent plaintiffs from seeking enforcement of "the

12   tax laws through an improper vehicle—the False Claims Act." *U.S. ex rel. U.S.-Namibia (Sw.*

13   *Africa) Trade & Cultural Council, Inc. v. Africa Fund*, 588 F. Supp. 1350, 1351 (S.D.N.Y 1984).

14   Indeed, the Tax Code provides its own whistleblower statute whereby parties can provide

15   information directly to the IRS if a tax-related violation is known or suspected. *See* 26 U.S.C.

16   § 7623(b).  However, that statute applies only if there is an issue of underpayment of taxes or a

17   violation of internal revenue laws. *Id.* § 7623(a).  At issue here is a purported violation of the

18   ARRA.  The Section 1603 program is not administered by the IRS; rather, it is overseen by the

19   Department of the Treasury's Office of the Fiscal Assistant Secretary. (*See* Audit Report 1 n.1,

20   ECF No. 60-5, Ex. X).  The applications that Relators' allege contain misleading information

21   were submitted to the Treasury and not to the IRS.   Moreover, the Secretary vested the Office of

22   Inspector General of the Treasury with the right to declare excess grants, not the IRS. (*See id*).

23

24   _____
[13] *Program Guidance* at 1 ("It is expected that the Section 1603 program will temporarily fill the gap created by the diminished investor demand for tax credits.").

The Court agrees with the United States that the IRS is involved with the Section 1603 program only to the extent that it impacts the IRC. The IRS is concerned with the tax implications of receiving Section 1603 grant monies. This is evidenced by the audit report created by the Treasury Inspector General for Tax Administration, in which the IRS was encouraged to develop a process for identifying taxpayers that had received Section 1603 funds, (Memorandum for Deputy Commissioner for Services and Enforcement 2, ECF No. 60-6, Ex. AA), and by the memorandum from the IRS Chief Counsel that deals with whether excess payments under Section 1603 should be claimed as "gross income" in a company's tax filing, (Memorandum of Office of Chief Counsel of the IRS 2–3, ECF No. 60-6, Ex. Y). In both documents, the IRS's concern is not whether the Section 1603 program is properly enforced, but how grants awarded under Section 1603 should be dealt with for tax purposes. The Court finds that these documents do not necessarily demonstrate that the IRS has even coterminous authority to recapture funds paid under Section 1603 as Ormat asserts.

Finally, unlike the claims at issue in *Lissack* over which the court found the IRS to have "complete jurisdiction," *Lissack*, 377 F.3d at 157, Relators claims involve allegations over which the IRS might have no jurisdiction because they are completely unrelated to the IRC. For instance, the Terms and Conditions of the Section 1603 program were developed by the Treasury and impose certain requirements on applicants, such as submitting annual reports as discussed above.[14] If Ormat included false or misleading information in one of those reports, there is no indication that the IRS would have any jurisdiction to investigate and determine whether the statements were true, as the matter would not relate to the payment of taxes or the receipt of tax credits. *C.f.* 26 U.S.C. § 7401 ("No civil action for the collection or recover of taxes, or any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the

---

[14] *Terms and Conditions* at 2.

1   proceedings . . . .").  Thus, the second *Lissack* factor does not apply here since the IRS alone

2   would likely be unable to recover the Section 1603 funds Ormat received.

3       Therefore, the Court finds that the FCA's Tax Bar does not prohibit Relators' claims.

4   The claims are not "made under" the Tax Code as prohibited by the plain language of the FCA,

5   nor are they precluded by the Second Circuit's *Lissack* factors.  Accordingly, the Court must

6   now determine whether the FCA's Public Disclosure Bar requires that the case be dismissed.

7       **b.  The FCA's Public Disclosure Bar**

8       The FCA's Public Disclosure Bar is designed to preclude "*qui tam* suits when the

9   relevant information has already entered the public domain through certain channels." *Graham*

10  *Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 285 (2010).  The Bar

11  states that:

12        The court shall dismiss an action or claim under [the FCA], unless opposed by the
      Government, if substantially the same allegations or transactions as alleged in the

13        action or claim were publicly disclosed [1] in a Federal criminal, civil, or
      administrative hearing in which the Government or its agent is a party; [2] in a

14        congressional, Government Accountability Office, or other Federal report,
      hearing, audit, or investigation; or [3] from the news media, unless the action is

15        brought by the Attorney General or the person brining the action is an original
      source of the information.

16  31 U.S.C. § 3730(e)(4)(A).  The Public Disclosure Bar, thus, requires a two-step inquiry.  First,

17  the court determines whether there has been a prior public disclosure of the allegations or

18  transactions underlying the *qui tam* suit through one of the sources enumerated in the statute.

19  *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009); *see also*

20  *Malhotra v. Steinberg*, 770 F.3d 853, 858 (9th Cir. 2014).  If there has been a public disclosure,

21  the court must then inquire whether the relator is an "original source" within the meaning of

22  Section 3730(e)(4)(B). *Meyer*, 565 F.3d at 1199.  The statute defines "original source" as:

23

24

1
2
3
4

[A]n individual who either [1] prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).

### (i)  Public Disclosure

Ormat contends that Relators' claims are based on a number of SEC filings that were submitted before Relators filed their initial complaint in February 2013.  And indeed, the FAC references information contained in Ormat's 2007 Annual Report, (FAC ¶ 162), 2009 Annual Report (FAC ¶ 198), 2010 Annual Report, (FAC ¶ 215), 2011 Annual Report, (FAC ¶ 223), and other press releases and conference calls, (FAC ¶¶ 179–80, 219).  The Court, therefore, will focus on these filings to determine whether the allegations or transactions as alleged in this action were publicly disclosed prior to Relators bringing this action.[15]

The Court first finds that the SEC filings qualify as public disclosures under the statute. While not specifically listed in Section 3730(e)(4)(A), SEC filings seem to be a type of federal report.  Although it is not a governmental agency that created the filings themselves, the Form-10Ks, Form-10Qs, and Form-8Ks at issue here were required by the SEC and the information contained therein was made readily available to the public on easily navigable websites by the SEC. *See U.S. ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014) (accepting SEC filings as public disclosures); *see also Graham Cnty.*, 559 U.S. at 300 (reiterating that the "statutory touchstone" is whether the allegations have been publicly

---

[15] Ormat also cites to previously filed pleadings in another action before this Court as a source of publicly disclosed information.  The Court finds that the information in those pleadings, including an amended complaint and a motion to dismiss, is somewhat duplicative of the information contained in the relevant SEC filings.  Therefore, the Court does not find it necessary to address whether the *Szymborski* pleadings constitute an additional public disclosure since a single disclosure is enough to trigger the Bar. *See Malhotra v. Steinberg*, 770 F.3d 853, 858 (9th Cir. 2014) (recognizing that the Bar can be triggered by a single disclosure).

28

1    disclosed).  The next question is whether the SEC filings in this case contain "substantially the

2    same allegations or transactions as alleged" in Relators' claims. 31 U.S.C. § 3730(e)(4)(A).

3         Relators' first claim is that Ormat misrepresented the actual date the Brawley plant was

4    placed in service since the plant was operational in December 2008. (Compl. ¶ 165–66).

5    Ormat's 2007 Annual Report states that construction on the Brawley plant was "substantially

6    completed in December 2008" and that due to "larger quantities of sand in the geothermal

7    reservoir than initially expected," Ormat anticipated reaching "commercial operation of the

8    power plant and sale of power in . . . 2009." (2007 Annual Report, ECF No. 60-1, at 35–36, Ex.

9    E).  The 2009 Annual Report adds that the Brawley plant was placed in service on January 15,

10   2010, but that Ormat made progress in managing the large quantities of sand in the reservoir and

11   that a stable generation of power was maintained at 17 MW during 2009. (2009 Annual Report,

12   ECF No. 60-1, at 42, 46, Ex. F).

13        The Court finds that this publicly disclosed information is not substantially similar to

14   Relators' allegations regarding the Brawley plant's placed-in-service date.  Regardless of the

15   date that Ormat reported to the Secretary and that appears in the SEC filings, Relators claim that

16   the January 15, 2010 date is false and misleading.  Thus, the fact that the 2007 and 2009 Form

17   10-Ks make it clear that Ormat considered the Brawley plant substantially complete in December

18   2008 and that it was producing energy from that point on does not mean that Relators claims are

19   barred.  That information would not necessarily lead the Government to the conclusion that this

20   placed-in-service date was chosen with the intent to defraud the United States.  The additional

21   information available to the public likewise does not indicate that January 15, 2010 was not the

22   actual date the Brawley plant was placed in service. (2009 Annual Report, ECF No. 60-1, at 46).

23

24

1    Relators' second and third claims are that Ormat misrepresented the eligible basis for the

2    Brawley plant and intentionally incurred extra costs prior to submitting its second Section 1603

3    application.  The Court finds that the information contained in the SEC filings is substantially

4    similar to the allegations that Relators make in the FAC on these claims.  The increasing costs of

5    the Brawley plant are well documented in the various filings.  The 50-MW target production rate

6    was never reached despite Ormat's multiple attempts to remedy the problems with the

7    geothermal resources.

8    In its 2010 Annual Report, Ormat stated that the operating costs of the Brawley plant had

9    exceeded revenues and that the exceptionally high costs were attributed to the filtration pumps

10   required due to the amount of sand that was extracted from the geothermal reservoir. (2010

11   Annual Report, ECF No. 60-1, at 56, Ex. G).  Ormat specifically reported that four new injection

12   wells were going to be constructed in an attempt to increase the Brawley plant's output. (*Id.* at

13   55).  Further, Ormat explained that the instability of the sands and clay in the geothermal

14   resource and the variability in the chemical composition of the geothermal fluid "combined to

15   increase [its] capital expenditures." (*Id.* at 58).  Ormat acknowledged that the development of the

16   Brawley plant was an expensive project. (2011 Annual Report, ECF No. 60-2, at 77, Ex. H).

17   Ormat also disclosed in its 2009 Annual Report that it had "temporarily deferred submitting an

18   application" for a Section 1603 cash grant during which the company was incurring additional

19   expenses in an attempt to increase and stabilize the energy produced by the Brawley plant. (2009

20   Annual Report, ECF No. 60-1, at 43).  The cost basis for the Brawley plant increased during the

21   time of deferment because additional equipment for solids handling (i.e. sand) was installed.

22   (*Id.*).

23

24

1          Moreover, Relators allegations that the second Brawley application was based on a false

2    cost basis are rooted in information that was publicly disclosed prior to the amendment of

3    Relators' original complaint.  Relators claim that the amount of grant money received, which

4    was $14.7 million for the second Brawley application, clearly demonstrates a false cost basis due

5    to a $23.7 million valuation reported by OIL during that same year.  However, OIL's fair value

6    estimation of the Brawley plant at $23.7 million was reported by Ormat in a Form 8-K filed with

7    the SEC on or around November 13, 2013. (Nov. 13, 2013 Form 8-K, ECF No. 60-4, at 298–99,

8    317, Ex. U).  On May 14, 2014, Relators filed their FAC alleging for the first time that the

9    second Brawley application was based on a false cost basis since Section 1603 applicants can

10   receive only 30% of a project's cost and a $23.7 million valuation would have resulted in a much

11   lower grant.  Relators allegations mirror the valuation reported in the November 2013 Form 8-K.

12   Accordingly, the Court finds that Relators' claims related to the second Brawley application are

13   substantially similar to transactions publicly disclosed prior to the filing of the FAC.[16]

14          Relators' fourth and fifth claims relate to the Puna Expansion, namely that Ormat falsely

15   stated that Puna Expansion was a stand-alone facility and that Ormat improperly allocated the

16   total cost of the KS-14 well to the Expansion rather than to the existing facility.  Ormat's 2011

17   Annual Report states that the original Puna plant "commenced commercial operation in 1993"

18   and that the Expansion was placed in service in 2011. (2011 Annual Report, ECF No. 60-2, at

19   78).  It also states that the various production wells are "connected to the plants through a

20

21   _____
     [16] The Court also finds that Relators' allegations that Ormat misrepresented the viability of the Brawley plant in its
     annual reports are also based on publicly disclosed information.  As stated, the difficulties in reaching a 50 MW
22   production level were reported multiple times in the SEC filings and the fact that the Brawley plant never came
     close to producing 50 MW of energy was as well.  Moreover, the SEC fillings make clear that Ormat's expenses
     were increasing at it attempted to correct problems with the geothermal resource.  Thus, Relators' claim that Ormat
23   misrepresented the viability of the plant is barred because the information upon which those allegations are based
     appears in the various Form-10K filings submitted prior to this lawsuit. *See A-1 Ambulance Serv., Inc. v. California*,
     202 F.3d 1238, 1243 (9th Cir. 2000) (noting that the Bar applies if the material elements of the fraud are disclosed in
24   the public domain).

                                                          31

1  gathering system." (*Id.*).  The report further indicates that Ormat was "preparing to drill a sixth

2  production well." (*Id.*).  Since the report lists both the production wells and the injection wells as

3  connected to the plants through a gathering system, it follows that the sixth production well

4  would also be connected to both plants.  Accordingly, the Court finds that the publicly disclosed

5  information was substantially similar to the transactions alleged in the FAC.

6                                   **(ii)  Original Source**

7              Finding that the SEC filings contain substantially the same transactions as at least some

8  of Relators allegations, the Court next evaluates whether Relators can be consider an "original

9  source" under the statute.  The post-amendment version of the Public Disclosure Bar states that a

10  relator is an original source if he or she has "knowledge that is independent of and materially

11  adds to the publicly disclosed allegations." 31 U.S.C. § 3730(e)(4)(B).[17]  A relator has

12  independent knowledge when he or she "knows about the allegations before that information is

13  publicly disclosed." *Meyer*, 565 F.3d at 1202.  A relator's knowledge materially adds to what has

14  been publicly disclosed if it contributes something of import to the public knowledge about the

15  alleged fraud. *See U.S. ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 694 (8th Cir. 2014).

16  Further, "[t]he original source analysis must be conducted on a claim-by-claim basis." *Malhotra*,

17  770 F.3d at 861.  A relator may be an original source for one claim in the complaint while he or

18  she is not an original source for another claim in that same complaint. *Id.*

19              Relators argue that even if much of the information contained in the FAC was publicly

20  disclosed prior to the filing of this lawsuit, they nevertheless are original sources because they

21  worked closely with Ormat executives, were included in email chains, and participated in

22  _____

[17] The statute also states that the relator must voluntarily provide his or her independent and material knowledge to
23  the government before filing an action under the FCA. 31 U.S.C. § 3730(e)(4)(B).  Ormat does not contend that
   Relators failed to transmit their alleged knowledge before filing suit and neither party addresses the issue.  Since
   Relators initially filed this action under seal as required by the FCA so that the United States could choose whether
   to intervene, it stands to reason that the Government was apprised of Relators' alleged knowledge at that time.
24  Therefore, there appears to be no reason for the Court to find that Relators have not met this additional requirement.

1    conversations relating to Ormat's Section 1603 applications. Since there are three separate

2    Section 1603 applications at issue in this case—the first and second Brawley plant applications

3    and the Puna Expansion application—the Court must determine whether Relators are original

4    sources as to the claims asserted under each individual application. *Malhotra*, 770 F.3d at 861.

5            *First Brawley Application*

6            The Court first notes that Relators need not be original sources as to their claim that

7    Ormat misrepresented the placed-in-service date of the Brawley plant, since the Court found that

8    the allegation pertaining thereto is not substantially similar to the publicly disclosed information.

9    *Meyer*, 565 F.3d at 1199. Nevertheless, the Court finds that an original source analysis further

10   clarifies the Court's position on the issue.

11           Frustratingly, and perhaps indicative of the overall strength of their claims, Relators cite

12   generally to the FAC rather than directing the Court to specific provisions that contain what

13   Relators consider to be their independent and material knowledge as it pertains to the Brawley

14   plant. (Relators' Resp. 20–21 (supporting their arguments with "*See* FAC" rather than

15   identifying specific provisions)). Thus, the Court must parse through the FAC to determine

16   whether Relators have in fact alleged sufficient independent and material information such that

17   they qualify as original sources of their allegations pertaining to the Brawley plant applications.

18           As to the first application, there are two pieces of information alleged in the FAC that do

19   not appear in any of the publicly disclosed documents. The first is that not only was the Brawley

20   plant producing energy prior to January 15, 2010, but that it was also synced into the power grid

21   before this date. (FAC ¶¶ 172–74). The second allegation is that the Brawley plant began selling

22   electricity as early as December 2008 and earned $2.5 million in revenues over the year prior to

23   the January 2010 date. (*Id.* ¶ 172). This information is material because it brings into question

24

                                                    33

1    whether Ormat's reported placed-in-service date is legitimate.  After a review of the various

2    publicly disclosed documents, the Court could not find any references to the fact that the

3    Brawley plant was synchronized to the power grid in 2008 and 2009, or especially that Ormat

4    sold $2.5 million worth of electricity produced by the Brawley plant before January 2010.

5    Accordingly, the Court finds that Relators must know this information independent of what has

6    been publicly disclosed.  Relators, therefore, overcome the Public Disclosure Bar for this claim.

7            The claims related to the Brawley plant's eligible cost basis are another matter.  Relators

8    fail to highlight a single fact that they know on their own and apart from the publicly disclosed

9    information regarding the costs basis for the Brawley plant.  As previously stated, Ormat's

10   geothermal resource issues at the Brawley plant were disclosed in nearly all of its SEC filings.

11   Ormat stated numerous times that additional expenses were being incurred to remedy the

12   problem, though it appears that the measures were ultimately unsuccessful in bringing the

13   Brawley plant anywhere near the 50-MW nameplate.  However, Relators offer nothing more in

14   the way of privately obtained information that would allow the Court to infer that they are in fact

15   original sources as to these claims.  Thus, these claims are barred.

16           *Second Brawley Application*

17           The Court finds that Relators are not original sources as to the second Brawley

18   application.  Relators allege nothing in the FAC that does not appear in the publicly disclosed

19   documents.  For example, Relators argue that the second application must be fraudulent since

20   Ormat only valued the Brawley plant at $23 million but the grant awarded was $14.67 million.

21   (FAC ¶ 190).  Because a Section 1603 grant can only equate to 30% of the eligible basis of the

22   property, Relators claim that Ormat necessarily overstated the cost of the additional work done to

23   the Brawley plant. (*Id.*).  This argument fails to demonstrate that Relators are an original source

24

                                                    34

1    because both Ormat's valuation of the Brawley plant and the grant received for the expansion to

2    the Brawley plant were publicly disclosed prior to the amending of the complaint on May 14,

3    2014, (*see* Nov. 13, 2013 Form 8-K, ECF No. 60-5, at 317),[18] which included for the first time

4    claims based on the second Brawley plant application.  And a relator's ability to recognize the

5    potential legal consequences of certain publicly disclosed transactions does not alter the fact that

6    the transactions were already publicly disclosed.  *See U.S. ex rel. Findley v. FPC-Boron Emps.'*

7    *Club*, 105 F.3d 675, 688 (D.C. Cir. 1997).

8            Furthermore, Relator Calilung was no longer an Ormat employee when the second

9    Brawley application was submitted.  The application was submitted on September 18, 2012, (*see*

10   Hen Decl. ¶ 8), while Relator Calilung's employment ended in June 2012, (FAC ¶ 24).  Relator

11   Kell was also no longer participating in the day-to-day affairs of Ormat at that time.[19] (FAC

12   ¶ 29).  Although being an employee at the time when an allegedly fraudulent claim is made to

13   the United States is certainly not a prerequisite to maintaining a *qui tam* action, it is stronger

14   evidence that allegations pertaining to the fraud are based on independent knowledge. *See Wang*,

15   975 F.2d at 1416 (implying that knowledge derived from personal participation in a project that

16   is the basis of a fraudulent claim is more indicative of independent knowledge than information

17   obtained elsewhere).  This is particularly true here where the Court cannot find a single fact that

18   Relators allege that stands apart from the information contained in the SEC filings and press

19   releases.  Thus, Relators are not original sources as to the claims based on the second Brawley

20   plant application, and those claims are barred.

21

22   [18] U.S. Dep't of the Treasury, *Section 1603 Awards*, *available at*
     http://www.treasury.gov/initiatives/recovery/Documents/Section%201603%20Awards.xlsx.

23   [19] Relator Kell was diagnosed with breast cancer on April 3, 2010 and immediately began treatment. (FAC ¶ 29 n.1).
     Kell filed formal complaints with the U.S. Equal Employment Opportunity Commission in April 2012 regarding
     Ormat's response to her cancer treatment and when she attempted to return to work in August 2012, Ormat refused.
24   Kell and Ormat settled her EEOC complaints in August 2012 and she signed a severance agreement on September
     24, 2012. (*Id.*).

*Puna Expansion Application*

The Court finds that Relators have provided sufficient independent and material information related to the Puna Expansion to overcome the Public Disclosure Bar.  Both Relator Calilung and Relator Kell allege to have worked specifically on the Section 1603 application for the Puna Expansion.  Relator Calilung claims that during her interactions with investors and Ormat executives she was told that a reserve account was supposed to generate $17 million in cash reserves for maintenance of the 30-MW plant, in part so that additional production wells could be drilled to support that plant. (FAC ¶ 256).  She also claims that the 30-MW plant was only producing 17 MW of electricity, which was problematic for Ormat because its contracts required at least 30 MW of production. (*Id.* ¶ 257).  After attempting to stimulate Puna's well field with chemical and mechanical cleanouts, Relator Calilung claims that Ormat executives decided to drill the KS-14 well as another effort to help the plant reach its 30 MW nameplate. (*Id.* ¶ 259).  The leaseback situation of the Puna Complex required that Ormat obtain the lessor's approval prior to drilling and Relator Calilung claims that Ormat specifically represented to the lessor that "the sole purpose of the KS-14 well was to bring the 30 MW plant back to capacity." (*Id.* ¶ 261).  Additionally, Relator Calilung alleges that the KS-14 well was financed in part with funds out of the reserve account that had been designated for maintenance of the 30-MW plant. (*Id.* ¶ 262).  All these facts, Relators allege, are proof that the KS-14 well was constructed to benefit the existing power plant and was not actually part of the Expansion for which Ormat sought the Section 1603 grant.

Relator Calilung also claims to have interviewed Paul Spielman, Ormat's Manager of Operations Support for Resources, who explained that the Puna Expansion was designed to

1    utilize the 30-MW plant's byproduct to generate electricity.[20] (*Id.* ¶¶ 276–77).  She alleges that

2    this is further proof that Ormat should not have represented the Expansion as a stand-alone plant.

3    She claims that Ormat knowingly misrepresented the eligible basis of the Expansion by

4    misallocating the cost of the KS-14 well in order to obtain extra Section 1603 funds. (*Id.* ¶ 279).

5          Similarly, Relator Kell claims to have viewed a draft of the Section 1603 application for

6    the Puna Expansion.  Relator Kell and Tsaniff discussed the factual representations contained in

7    the narrative portion and Kell alleges that she asked Tsaniff about the false information it

8    provided. (*Id.* ¶ 281).  Relator Kell claims that Tsaniff "acknowledged that the information was

9    incorrect and admitted that she was aware of the legal implications of submitting a false § 1603

10   application." (*Id.*).  However, Tsaniff allegedly told Relator Kell that Bronicki had ordered the

11   changes in the application including the allocation of the full cost of the KS-14 well,

12   approximately $12.5 million, to the Expansion. (*Id.* ¶¶ 282–84).

13         The Court finds that these factual allegations materially add to what was publicly

14   disclosed prior to Relators' filing this lawsuit.  The details relating to the ability of the Expansion

15   to operate on its own, the purpose of the KS-14 well, the representations made to third parties

16   regarding the well, and the alleged alteration of Ormat's Section 1603 application to include the

17   full cost of the well in order to increase the eligible basis of the Expansion do not appear in any

18   of the SEC filings.  Rather, these facts seem to be based solely on the personal interactions of the

19   Relators as former Ormat employees. *See Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465,

20   1476 (9th Cir. 1996) (finding that relator was an original source since he had worked a great deal

21   on the project that was the basis of the alleged fraud); *U.S. ex rel. Guardiola v. Renown Health*,

---

22   [20] Relators allege that the Expansion utilizes a binary system to generate electricity, meaning that the 30-MW plant
     draws the geothermal resources from the production wells, including KS-14, and then uses those resources to

23   generate steam.  That steam is harnessed by the 30-MW plant to generate electricity.  The byproduct of this process
     is a condensed hot water that is called "geothermal injection fluid."  Once the 30-MW plant uses the steam, the
     excess fluid passes to the Expansion.  This fluid is then used to generate additional electricity. (FAC ¶ 266).  This

24   process, Relators claim, clearly demonstrates that the Expansion is not a stand-alone facility.

No. 3:12-cv-00295-LRH-VPC, 2014 WL 5307955, at *6 (D. Nev. Oct. 16, 2014) (Hicks, J.) (recognizing that relator was an original source because much of the information provided for the claim came from knowledge she acquired as an employee who witnessed the alleged fraudulent behavior).  Further, the Court finds nothing in the various public disclosures that implies that the cost of the KS-14 well was improperly allocated to the Expansion when its intended purpose was to benefit the first plant.

Therefore, the Court finds that Relators overcome the Public Disclosure Bar as to the Brawley plant's first Section 1603 application and as to the Section 1603 application based on the Puna Expansion.  However, the Court finds that Relators' claims relating to the second Brawley plant application are barred because Relators fail to demonstrate that they are original sources of any information pertaining thereto.

### c.   Rule 9(b) – Adequately Pleading Fraud

Because the Court finds that Realtors' FCA claims survive both the Tax Bar and the Public Disclosure Bar, the Court must now determine whether Relators have sufficiently pleaded fraud as required by Rule 9(b).  To adequately plead fraud, Relators must have identified the "who, what, where, when, and how" of their claims in the FAC. *Vess*, 317 F.3d at 1106.  The Court finds that this burden has been met.

Relators allege that Bronicki and her management team are the center of the alleged fraud.  They are supposedly responsible for reporting to the Treasury an inaccurate placed-in-service date for the Brawley plant. (*See* FAC ¶¶ 177–179).  According to Relators, January 15, 2010 carried no special significance other than presenting the Brawley plant as a qualifying property under the ARRA.  Relators allege that this allowed Ormat to receive approximately

38

1   $108 million in grant funds to which it was not entitled under the Section 1603 program. (*Id.*

2   ¶ 179).

3         Additionally, Relators claim that Tsaniff, at the direction of Bronicki, altered the

4   information contained in the Puna Expansion's Section 1603 application in order to reflect that

5   the Puna Expansion was a stand-alone facility and to increase the eligible basis for the project by

6   allocating the total cost of the KS-14 well to the Expansion. (*See* FAC ¶¶ 280–81).  Relators

7   found it inconsistent to claim the Expansion as a stand-alone facility since allegedly it depends

8   on the 30-WM plant's production process to generate byproduct.  Relators also found Bronicki's

9   alterations troubling since, as they claim, it was clear that the KS-14 well was intended to benefit

10  the 30-MW plant, which was ineligible for a Section 1603 grant. (*See id.* ¶ 279).  At a minimum,

11  Relators claim that the cost of the well should have been divided pro rata between the Expansion

12  and the existing plant. (*Id.* ¶ 284).  Relators allege that Ormat's failure to truthfully represent the

13  relationship between the 30-MW plant and the Expansion, as well as Ormat's misrepresentation

14  of the cost basis of the Expansion, resulted in an overpayment by the Treasury of at least

15  $3,000,000 in Section 1603 grant money. (*Id.*).

16        Based on these factual allegations, the Court finds that Relators have sufficiently pleaded

17  fraud under Rule 9(b) for the alleged misrepresentations related to the first Brawley application

18  as well as the Puna application. *See Bly-Magee*, 236 F.3d at 1019 (noting that a relator satisfies

19  Rule 9(b) when the complaint gives the defendant notice of the particular misconduct which is

20  purported to constitute the alleged fraud).

21        **d.  Rule 12(b)(6) – Failure to State a Claim**

22        The next issue for the Court to resolve on Ormat's Motion to Dismiss is whether Relators

23  have failed to state a claim for which relief can be granted pursuant to Rule 12(b)(6).  Relators'

24

1    remaining claims must be based on false or inaccurate statements presented to the Treasury as

2    part of Ormat's Section 1603 applications. *See Stoner v. Santa Clara Cnty. Office of Educ.*, 502

3    F.3d 1116, 1124 (9th Cir. 2007) (citing 31 U.S.C. § 3729(a)(1)).  The FCA "requires a showing

4    of knowing fraud." *Hagood*, 81 F.3d at 1478.  "The requisite intent is the knowing presentation

5    of what is known to be false." *Id.* (quotations and citations omitted).  Innocent mistakes or mere

6    negligence do not satisfy the standard, the statement must be a "palpable lie." *U.S. ex rel.*

7    *Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (citing *Hagood*, 81 F.3d at 1478).  The two

8    major questions in a case wherein a party received a governmental benefit through which

9    eligibility was allegedly created through false statements are "(1) whether the false statement is

10   the cause of the Government's providing the benefit; and (2) whether any relation exists between

11   the subject matter of the false statement and the event triggering the Government's loss." *Id.*

12   (citing John T. Boese, *Civil False Claims and Qui Tam Actions* 1-29 to 1-30 (1995)).

13        Ormat argues that these claims must be dismissed because Relators fail to plead

14   particular facts that plausibly show that Ormat submitted an objective falsehood to the Treasury.

15   (Mot. to Dismiss 15).  The Court disagrees.  The Treasury's Program Guidance states that a

16   property is placed in service when it "is ready and available for its specific use."[21]  If Relators

17   are able to develop factual support through discovery that the Brawley plant was ready for use

18   and was in fact generating revenue prior to January 2010, then Ormat's representation that the

19   plant was placed in service on January 15, 2010 could certainly be considered a knowing

20   misrepresentation.  Moreover, if the Brawley plant was actually placed in service in December

21   2008, then the project would be ineligible for Section 1603 funds.

22        Further, the Section 1603 application for the Puna project states that the Expansion "can

23   operate without the existing facility" and that "the [Expansion] is separate from the existing

24   ─────────────────
     [21] *Program Guidance* at 5.

40

1    facility." (Puna Application 4, ECF No. 61-5).  Based on these assertions, Ormat claimed that the

2    Expansion "[met] the 'original use' test as provided by the ARRA." (*Id.*).  If the Expansion relies

3    on the byproduct of the 30-MW plant in order to produce energy as Relators allege, then these

4    statements could also constitute a palpable lie.

5            The Puna application further states that the development and construction costs incurred

6    during the project "were for the generating unit and the KS-14 well." (*Id.*).  Although the

7    application is quite clear that the Expansion and the existing facility share the same resource,

8    (*see id.*), there is no indication that the KS-14 well was proposed and drilled primarily for the

9    benefit of the 30-MW plant, which is what Relators allege.  Rather, the application explicitly

10   states that "[t]he Project consists of two (2) OECs and one (1) *new* production well ("KS-14"),

11   both owned by PGV." (*Id.* at 1) (emphasis added).  The application also states that "[t]he Project

12   site construction, including the drilling of the KS-14 well, began in January 2009.  The Project

13   was completed in November 2011." (*Id.* at 3).  These statements imply that the KS-14 well was

14   drilled for the sole benefit of the Expansion and that its conception and construction originated as

15   part of the Expansion project.

16           This is contrary to what Relators allege to be the truth.  Having already incurred the

17   expense for the KS-14 well in an effort to boost the production of the 30-MW plant, Relators

18   claim that Bronicki knowingly ordered Tsaniff to change the application to reflect that the cost of

19   the well was incurred solely as part of the Expansion project with the intent to receive more grant

20   money than Ormat may have otherwise been entitled. (*See* FAC ¶¶ 280–81).  Thus, calling

21   KS-14 a "new" production well drilled as part of the Expansion could qualify as a lie or an

22   intentionally misleading statement under the FCA. *Hagood*, 81 F.3d at 1478.

23

24

1        Since the nature of the Expansion and the total cost of the KS-14 well presumably

2    contributed to the overall eligible basis of the project that Ormat reported to the Treasury in its

3    Section 1603 application, the Court finds that the alleged false statements contributed to the

4    Treasury awarding $13,821,143 in grant money.  Without the inclusion of this information,

5    including the total cost of the KS-14 well, the amount of the grant might well have been lower.

6    Though, the amount of grant funds that should have legitimately been awarded for the Puna

7    Expansion, if any, remains unknown at this point.  Furthermore, it is clear that these alleged false

8    or intentionally misleading statements were the reason that the Treasury awarded the amount that

9    it did for the Puna application.  The Treasury had no reason to consider whether the total cost of

10   the KS-14 well should be covered by the Section 1603 grant since Ormat presented it as a new

11   well that was drilled as part of the construction for the Expansion.

12        Therefore, the Court finds that Relators have sufficiently pleaded their claims relating to

13   Ormat's first Brawley application as well as its Puna application, demonstrating the plausibility

14   that Ormat made false or intentionally misleading statements to the Treasury and was awarded

15   grant money because of those statements.  The Court emphasizes, however, that a finding of

16   plausibility says nothing about the merits of Relators' claims, and Relators will need proof that

17   Ormat was actually ineligible for the funds it received under the Section 1603 program in order

18   to survive a motion for summary judgment.  Nevertheless, at this point the Motion to Dismiss for

19   failure to state a claim is denied.

20                        **e.   Ormat's Motion to Dismiss OTI and ONI**

21        Finally, Ormat moves the Court to dismiss OTI and ONI as defendants in this case

22   because it argues that Relators failed to plead that either of these entities engaged in false or

23   fraudulent activities. (Mot. to Dismiss 27).  Relators contend that they have sufficiently alleged

24

                                                  42

that OTI and ONI violated the FCA under an alter ego theory.  Relators allege that OTI, ONI, PGV, and ORNI were acting as alter egos of each other and are jointly and severally liable in this action. (FAC ¶ 51).  Further, they claim that each of these entities "share[] common ownership, board membership and management, as well as corporate, group and divisional resources to perform operational, administrative, manufacturing, and financial functions." (*Id.* ¶ 52).  Relators allege that OIL is the ultimate owner of these companies and that it controls them such that they are "mere shell corporations." (*Id.*).

As Ormat points out, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations cofounding his alleged participation in the fraud." *United States v. Corinthian Colls.*, 655 F.3d 984, 997–98 (9th Cir. 2011).  Thus, the relevant question is whether Relators have alleged that OTI and ONI were involved with the submission of either the first Brawley application or the Puna application through an alter ego theory or otherwise. *Id.* (stating that a complaint cannot simply "attribute[] wholesale" all of the allegations against one defendant to the other defendants under Rule 9(b)).

To establish that one party is the alter ego of another, a plaintiff must show that "(1) the corporation is influenced and governed by the person asserted to be its alter ego; (2) there is a unity of interest and ownership such that one is inseparable from the other; and (3) the facts are such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice." *Las Vegas Metro. Police Dep't Health & Welfare Trust v. P&P Ins. Servs., LLC*, No. 2:11-cv-00734-RCJ-PAL, 2011 WL 6106411, at *7 (D. Nev. Dec. 7, 2011).

In this case, it is clear that at the very least PGV was influenced by both ONI and OTI.  In Ormat's corporate structure, OTI is the parent of ONI and owns 100% of that company. (Puna

1    Application 2–3). And ONI is the 100% owner of PGV. (*Id.*). OTI provided the necessary funds

2    to ONI in order to develop and construct the Puna Expansion and ONI, in turn, "developed and

3    constructed the Project for PGV." (*Id.* at 2). ONI contracted with its wholly-owned subsidiary,

4    Geodrill, LLC, to provide the drilling services during the project construction, presumably

5    including the drilling for the KS-14 well. (*Id.*). This certainly qualifies as a unity of interest at

6    least as far as the Puna Expansion is concerned. Further, the individuals at the center of Ormat's

7    alleged false statements, Tsaniff and Bronicki, are employees of OTI but they apparently had

8    complete discretion as to what PGV included in the Puna application. Indeed, according to

9    Relators it was Bronicki who ordered that the application be revised so as to represent that the

10   total cost of the KS-14 well was incurred as part of the Expansion project. Recognizing the

11   corporate form in this case would essentially require the Court to ignore the fact that it was OTI

12   and ONI calling the shots during the funding and construction of the Expansion. Such a result

13   could, if Relators' allegations are correct, sanction Ormat's fraudulent activity by failing to hold

14   the proper party responsible.

15           Therefore, the Court finds that the facts included in the FAC together with the

16   information PGV provided to the Treasury in the Puna Section 1603 application warrants

17   recognition of Relators' alter ego theory. Accordingly, Ormat's Motion that the Court dismiss

18   OTI and ONI from this case is denied.

19   ///

20   ///

21   ///

22   ///

23   ///

24

44

**CONCLUSION**

IT IS HEREBY ORDERED that Ormat's Motion to Dismiss (ECF No. 59) is GRANTED in part and DENIED in part.

The Motion is GRANTED as to Relators' claims relating to the eligible cost basis for the first Brawley plant application as well as to all claims arising from the second Brawley plant application. The Court finds that the transactions that form the basis of these claims were publicly disclosed prior to the amending of the original complaint and that Relators failed to provide any independent and material information pertaining to the alleged misrepresentations.

The Motion is DENIED as to Relators' remaining claims pertaining to Ormat's first Brawley plant application and as to the claims arising from the Puna application.

Ormat's request that OTI and ONI be dismissed from the case is also DENIED.

IT IS FURTHER ORDERED that Ormat's Request for Judicial Notice (ECF No. 62) is GRANTED for the purposes of ruling on the Motion to Dismiss.

IT IS FURTHER ORDERED that Relators' Motion for Leave to File a Surreply (ECF No. 99) is DENIED.

IT IS FURTHER ORDERED that Relators' Motion to Extend Time for Service (ECF No. 102) as well as Ormat's Motion to Extend Time (ECF No. 104) are DENIED as moot since the foreign defendants have been voluntarily dismissed by stipulation (ECF No. 105).

IT IS SO ORDERED.

Dated:  March 24, 2015

_____
ROBERT C. JONES
United States District Judge

45