UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. TINA CALILUNG & JAMIE KELL,<br><br>Plaintiffs/Relators,<br><br>v.<br><br>ORMAT INDUSTRIES, LTD., *et al.*<br><br>Defendants. | 3:14-cv-00325-RCJ-VPC<br><br>**MEMORANDUM AND ORDER** |

This dispute concerns documents withheld on the basis of privilege by defendants Ormat Technologies, Inc., Ormat Nevada, Inc., ORNI 18, LLC, and Puna Geothermal Venture GP (collectively, "Ormat"). Plaintiffs Tina Calilung and Jamie Kell ("Relators") filed a motion to compel on June 17, 2016 (ECF No. 241), arguing that privilege had been waived as to two categories of documents. Ormat opposed (ECF No. 246), Relators replied (ECF No. 247), Ormat filed a surreply (ECF No. 249), and Relators filed a notice of supplemental authority (ECF No. 250). The matter fully briefed, this court conducted a hearing on July 15, 2016 to discuss the parties' positions. (*See* ECF No. 254.) Having considered the arguments set forth in the papers and hearing, the court hereby grants Relators' motion to compel consistent with the following.

**I.   BACKGROUND AND PROCEDURAL HISTORY**

This *qui tam* action, brought under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, arises from Ormat's allegedly fraudulent actions in connection with federal grant money received pursuant to § 1603 of the American Recovery and Reinvestment Act of 2009 ("ARRA"). Section 1603 temporarily provided cash grants to specified energy properties in lieu of tax credits. Only individuals and projects meeting certain conditions qualified:

> First, the individual or entity applying for the grant must be eligible. Second, the property must be a "specified energy property." Under Section 1603, specified energy property "consists of two broad categories of property—certain property that is part of a facility described in IRC [S]ection 45 (Qualified Facility Property) and certain other property described in IRC [S]ection 48." Section 45 of the IRC includes a geothermal energy facility as a "qualified facility" if it uses geothermal energy to produce electricity. "Specified energy property," as used in Section 1603, further includes "geothermal property," as described in Section 48(a)(3)(A) of the IRC, and "geothermal heat pump property," as described in Section 48(a)(3)(A) of the IRC. The Secretary has explained that these encompass "[e]quipment used to produce, distribute, or use energy derived from a geothermal deposit . . . ." Third, the qualified property must be "placed in service" in 2009, 2010, or 2011 (or construction must begin during one of those years).
>
> If these three requirements are met, then the ARRA provides a reimbursement of 30 percent of the basis of the property.

(ECF No. 220 at 4–5 (internal citations omitted).)

Relators contend that Ormat knowingly and purposefully submitted false or fraudulent grant applications, certifications of compliance, reports, and claims to the federal government, thereby obtaining grant payments to which it was not entitled. (ECF No. 27 at 5–6, 19.) Broadly speaking, Relators' claims can be divided into those arising from misrepresentations related to the North Brawley Geothermal Power Plant ("Brawley") in Imperial County, California, and those arising from misrepresentations related to the Puna Geothermal Power Plant ("Puna") on the island of Hawaii. (*Id.* at 7.) With regard to Brawley, Relators allege that Ormat (1) misrepresented the date on which the plant was placed in service on a 2010 grant application; (2) consistently misrepresented the plant's eligible basis; and (3) applied for and received a second grant in 2013 based on false information regarding the plant's expansion. (*Id.* at 42.) As for Puna, Relators maintain that Ormat (1) improperly applied for and received a § 1603 grant by misrepresenting the project as a stand-alone facility rather than an expansion of a nonqualified property; and (2) misrepresented the plant's eligible basis. (*Id.* at 61–62, 70.)

To prevail, Relators must prove that Ormat knowingly submitted the false claims alleged with intent to violate the law. 31 U.S.C. § 3729(a). "Violations of laws, rules, or regulations alone do not create a cause of action under the FCA." *United States ex rel. Hopper v. Anton*, 91 F.3d

1261, 1266 (9th Cir. 1996). In answer to Relators' amended complaint, Ormat denies scienter and "affirmatively asserts that, at all times, Ormat and its officers acted reasonably and in good faith in light of all circumstances and in compliance with all applicable legal requirements. All accusations of intent to defraud the Treasury or to obtain grants to which Ormat was not entitled are specifically rejected." (ECF No. 127 at 2.) Likewise, Ormat states in its eighth affirmative defense that "any statements made by Defendants regarding legal matters cannot as a matter of law constitute a false statement of fact required for FCA liability, and . . . disagreements on legal or regulatory matters are not FCA violations," and in its ninth affirmative defense that "the United States had actual or constructive knowledge of the relevant facts regarding the Section 1603 grant applications . . . , and therefore Relators' claims are not false or knowingly false . . . ." (*Id.* at 49.)

On May 16, 2016, Relators served Ormat with interrogatories inquiring after the factual basis for its eighth affirmative defense, among other things. (ECF No. 241-1 at 4.) Ormat responded that it had not yet completed its factual investigation and would supplement its response at a later date. (ECF No. 241-2 at 4.) Relators have informed the court that during a June 16, 2016 meet and confer, "Ormat's counsel confirmed that it was unwilling to provide any further response to the Interrogatories or to provide any additional information on its affirmative defenses at this time." (ECF No. 241 at 3.)

To characterize the number of documents implicated by this case as "voluminous" appears a gross understatement. The original privilege log, produced by Ormat on March 11, 2016, contained 41,290 entries and was some 4,300 pages long. (ECF No. 241 at 4 n.2.) The revised version, produced April 4, 2016, contains over 19,000 documents and spans over 760 pages. (*Id.*) The parties previously stipulated to a protocol by which Relators could challenge the log's contents in waves of 250 documents at a time. (*See* ECF No. 222 at 1–2.) Ormat would provide Relators' counsel with the challenged documents, marked "Attorneys' Eyes Only," and the parties would meet and confer in an attempt to resolve the privilege dispute. (*Id.* at 2.) If unsuccessful, the parties would submit the documents for *in camera* review. (*Id.*) Through this protocol, Relators

have challenged approximately 2,250 documents in nine waves over the last handful of months. (ECF No. 246 at 2.)

Relators now suggest that the Attorneys' Eyes Only protocol is burdensome, inefficient, and prejudicial in light of the deposition schedule and their belief that privilege has been waived with respect to many of the documents withheld. As a consequence, they ask the court to find blanket waivers of privilege for communications implicated by Ormat's good faith defenses and communications disclosed to third parties. (ECF No. 241 at 2.)

## II. DISCUSSION

### A. At-Issue Waiver of Attorney-Client Privilege

The attorney-client privilege protects confidential communications between a client and his or her attorney for the purpose of obtaining or dispensing legal advice. *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Federal privilege law applies where the court's jurisdiction is based on a federal question. *Nat'l Labor Relations Bd. v. N. Bay Plumbing, Inc.*, 102 F.3d 1005, 1009 (9th Cir. 1996) (citing Fed. R. Evid. 501)).

The burden of establishing the attorney-client relationship and the privileged nature of each communication lies with the party claiming privilege. *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997). "One of the elements that the asserting party must prove is that it has not waived the privilege." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981). Waiver may be express or implied. *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).

A party may not use the doctrine of attorney-client privilege "to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Put another way, the privilege is not to be "'used both as a sword and a shield.'" *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1042 (9th Cir. 2009) (quoting *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.

-4-

1992)); *see also Bilzerian*, 926 F.2d at 1292. Thus, the privilege may be implicitly waived "'[w]here a party raises a claim which in fairness requires disclosure of the protected communication.'" *Kaiser*, 552 F.3d at 1042 (quoting *Chevron*, 974 F.2d at 1162). The Ninth Circuit determines the existence of an implied waiver by considering whether:

> (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975); *see also United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999) (citing *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995)). Because the party asserting privilege must put its communications at issue by some affirmative act, the mere denial of scienter is insufficient to waive privilege. *Genetech, Inc. v. Insmed Inc.*, 236 F.R.D. 466, 469 (N.D. Cal. 2006).

Relators argue in their motion to compel that Ormat affirmatively placed attorney-client communications at issue by asserting a good faith belief that its conduct was lawful. (ECF No. 241 at 4.) As a consequence, fairness requires that Relators be able to access otherwise-privileged communications to determine whether the legal advice Ormat sought or received in connection with the Brawley and Puna grants supports the FTCA claims. (*Id.* at 8–9.) Alternatively, if no waiver is found, Relators request an order that would prevent Ormat from asserting reliance on the advice of counsel or other professional advisers. (*Id.* at 12.)

Ormat responded to the motion by voluntarily waiving privilege over communications related to the Brawley placed-in-service subject matter, noting that it may affirmatively rely on those communications as part of its defense. (ECF No. 246 at 3.) Ormat also opposed the notion that privilege was implicitly waived for other subject matters, including Puna's grant applications. Because the motion to compel only identified documents relating to Brawley's placed-in-service date, no other subject matter is before the court. (*Id.* at 3–4.) In effect, Ormat's voluntary waiver rendered Relators' motion moot. (*Id.*)

In reply, Relators maintain that the question of implicit waiver is not moot so long as Ormat preserves the right to rely on communications with counsel in connection with any good faith defense. (ECF No. 247 at 1–2.) Relators note, for example, that Ormat could "at some undefined point in the future" waive privilege as to Puna if it locates attorney-client communications which support its defense, and express concern for the effect such a waiver would have on the depositions currently under way. (*Id.* at 2.)

Both in surreply and during the July 15 hearing, Ormat emphasized that Relators have yet to identify specific documents on the privilege log that are related to the Puna claims. (ECF No. 249 at 3.) It argues that the cases Relators cite contemplate a preliminary showing by the party challenging privilege that the disputed communications actually exist, and, therefore, that Relators should proceed with any challenges through the Attorneys' Eyes Only protocol. (*See id.*) "[P]rivilege is not waived the abstract." (*Id.*)

The court first considers whether Ormat placed its attorney-client communications at issue by asserting its good faith defenses. The "quintessential example" is a defendant who raises an affirmative defense that he relied on the advice of counsel, and is thereby deemed to have waived the attorney-client privilege with respect to that advice. *In re Kidder Peabody Secs. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996); *see also Chevron*, 974 F.2d at 1162–63 (finding implied waiver of privilege where defendant claimed its tax position was reasonable based on advice of counsel, thereby putting the tax advice received directly at issue). As Relators have argued, however, at-issue waivers are not limited to situations in which the advice of counsel is expressly relied upon. (ECF No. 241 at 6–7.) In *Bilzerian*, on which the Ninth Circuit relied in deciding *Chevron*, the defendant argued that the evidence "he sought to introduce regarding his good faith attempt to comply with the securities laws would not have disclosed the content or even the existence of any privileged communications . . . ." 926 F.2d at 1291. Nevertheless, the Second Circuit concluded that an affirmative defense grounded in the defendant's good faith belief "that he thought his actions were legal would have put his knowledge on the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes

would have been directly relevant in determining the extent of his knowledge and, as a result, his intent." *Id.* at 1292. Plaintiff was entitled to discover those at-issue communications. *Id.* at 1293–94.

Consistent with *Bilzerian*, courts "have found implied waiver of attorney-client privilege in instances in which the magic words 'advice of counsel' are not used but where the circumstances underlying an affirmative defense necessarily rely on otherwise privileged material." *Olvera v. Cnty. of Sacramento*, No. CIV. 10–550 WBS CKD, 2012 WL 273158, at *3 (E.D. Cal. Jan. 30, 2012). The asserting party need not make actual use of the privileged communications. *In re Kidder Peabody Secs. Litig.*, 168 F.R.D. at 470. On this point, *Phelps v. MC Communications*, No. 2:11-cv-00423-PMP-VCF, 2013 WL 3944268 (D. Nev. July 22, 2013), an unpublished decision from this district, is instructive. There, in defending against the plaintiff's Fair Labor Standards Act ("FLSA") claims, the defendants raised two affirmative defenses: that they "at all times had a good faith and reasonable belief that [they] had compensated plaintiff in accordance with the FLSA," and that "any alleged violation of the FLSA was not willful." *Id.* at *13. Although defendants conceded to discussing the legal requirements of the FLSA with their attorneys they refused to answer questions regarding those communications, arguing that privilege had not been waived because their defenses did not expressly rely on advice of counsel. *Id.* at *16. The court disagreed:

> Defendants, through these affirmative defenses, put their state of mind and their knowledge regarding the FLSA, its requirements, and their obligations "at issue." Any communication between defendants and counsel regarding conduct relating to the allegations in this action which could arguabl[y] form the basis for defendants' "reasonable belief" that they were acting in "good faith" and did not intentionally violate the FLSA, would have a direct bearing on the viability of defendants' affirmative defenses. The court finds, therefore, that the "at issue" exception applies.

*Id.* at *19.

Similarly here, Ormat's affirmative defenses go beyond mere denial of scienter to put its state of mind and knowledge of the § 1603 requirements at issue. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994) (defendant "injected the issue of its knowledge of

-7-

1  the law into the case" by affirmatively asserting good faith, rather than simply denying intent).
2  Ormat maintains that it "acted reasonably and in good faith in light of all the circumstances and in
3  compliance with all applicable legal requirements," that its statements regarding legal matters
4  cannot constitute "false statements of fact," and that it did not make "false or knowingly false"
5  statements of fact to the federal government. (ECF No. 127 at 2, 49.) Because such good faith
6  defenses are asserted "with respect to [Ormat's] understanding and compliance with the law,
7  '[Ormat's] knowledge about the law is vital, and the advice of counsel is highly relevant to the legal
8  significance of [its] conduct.'" *Hamilton v. Yavapai Cmty. Coll. Dist.*, No. CV-12-08193-PCT-
9  GMS, at *3 (D. Ariz. June 29, 2016) (quoting *Everest Indem. Ins. Co. v. Rea*, 342 P.3d 417, 419
10  (Ariz. App. 2015)) (filed at ECF No. 250-1). Moreover, while Ormat has not confirmed that it
11  plans to rely on attorney-client communications in proving its defenses (with the possible exception
12  of communications about Brawley's placed-in-service date), it wishes to retain its option to do so.
13  (*See* ECF No. 247 at 1–2; ECF No. 249 at 3.) The court finds this posture untenable in light of the
14  deposition schedule and document-intensive nature of this case.

15        Ormat emphatically states that Relators must identify specific privileged communications
16  related to Puna before an implied waiver for that subject matter may be considered. (ECF No. 246
17  at 2–3; ECF No. 249 at 3.) As Ormat has noted, some of the cases cited in Relators' briefing do
18  discuss implied waivers in the context of specific documents. *See Hernandez v. Creative Concepts*,
19  No. 2:10–CV–02132–PMP, 2013 WL 1182169, at *3 (D. Nev. Mar. 19, 2013) (discussing waiver
20  as to certain categories of documents identified on the privilege log); *Favors v. Cuomo*, 285 F.R.D.
21  187, 212 (E.D.N.Y. 2012) (deferring a ruling on waiver until documents reviewed *in camera*);
22  *Rhoehrs v. Minn. Life Ins. Co.*, 228 F.R.D. 642, 647 (D. Ariz. 2005) (finding that plaintiff failed to
23  show privilege was waived "*vis a vis* the subject documents" identified in the exhibits). Ormat
24  takes particular note of *Hernandez,* which purportedly describes "the appropriate procedure for
25  raising a claim of at-issue waiver [as] requir[ing] a party to make an initial showing that the
26  privilege log contains attorney-client communications and work product dealing with the issues in
27

1 the case so that the court can conduct an *in camera* review of the documents to make a ruling on at-issue waiver." (ECF No. 246 at 4 (citing *Hernandez*, 2013 WL 1182169, at *3).)

The court is not convinced that *Hernandez*, nor any other case cited, states a hard and fast rule; rather, the matter appears largely left to the court's discretion. In *Hernandez*, for example, the court concluded that *in camera* review of the allegedly privileged documents was necessary, but expressly described the procedure as proper "in the circumstances of this case."[1] *Id. See also In re Consol. Litig. Concerning Int'l Harvesters Disposition of Wis. Steel*, 666 F. Supp. 1148, 1157–58 (D. Ill. 1987) (noting that "[f]or the most part, the parties have not focused on individual documents" in discussing whether privilege had been waived). Considering the circumstances of *this case*, the court finds it would be unduly burdensome to require Relators to identify specific documents on the privilege log before raising the question of at-issue waiver.

The court therefore concludes that Ormat waived privilege over attorney-client communications, with the following caveats. First, the waiver does not entitle Relators to discover "everything Ormat knew . . . ." (ECF No. 241 at 7.) "The court must impose a waiver no broader than needed to ensure the fairness of the proceedings." *Bittaker*, 331 F.3d at 720. The waiver's scope must be "closely tailored . . . to the needs of the opposing party in litigating the claim in question." *Id.* Considering Relators' claims and Ormat's affirmative defenses, the waiver is limited to communications between Ormat and its attorneys regarding the requirements of § 1603 or the § 1603 grant applications, as pertaining to Brawley's placed in service date, eligible basis, and expansion project, and Puna's expansion project and eligible basis. Notably, its scope does not include the placed-in-service determinations or other subject matters for Ormat's other plants and

---

[1] The court also notes that, in describing *Hernandez*, Ormat seems to flip the parties' respective burdens. The court there ordered the party claiming privilege to identify the particular documents it wished to withhold and to explain how attorney-client privilege applied. *Hernandez*, 2013 WL 1182169, at *3. There is no indication the party arguing in favor of an at-issue waiver was asked to do the same. *See id.*

1  projects.² The period of waiver shall be up to May 14, 2014, the date Relators' filed their amended
2  complaint. (*See* ECF No. 27.)

3  Second, in accordance with Ninth Circuit precedent and consistent with Relators' motion,
4  the court finds it appropriate to give Ormat a choice. *See Bittaker*, 331 F.3d at 720. Ormat may
5  proceed with its good faith defenses and produce the relevant documents, in accordance with the
6  discussion above, or preserve the communications' confidentiality by abandoning the defenses that
7  giving rise to the waiver. *See id.* Should Ormat opt for production of the withheld documents, the
8  parties are to meet and confer to determine the appropriate procedures for doing so in a timely
9  manner.

10  **B.     Disclosure of Privileged Communications to Third Parties**

11  As a general rule, the voluntary disclosure of privileged documents or communications to
12  third parties waives attorney-client privilege. *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27
13  (9th Cir. 2012). The rationale for the waiver rule "is that, if clients themselves divulge such
14  information to third parties, chances are that they would also have divulged it to their attorneys,
15  even without the protection of the privilege." *Id.* (internal quotation omitted). Relators contend
16  that Ormat waived privilege for communications that were disclosed to third parties, including RLR
17  Consultants, LLC ("RLR"), Capstar Capital Partners, LLC ("Capstar"), PricewaterhouseCoopers
18  ("PwC"); and BDO Use LLP ("BDO"), because it has not met its burden of showing that an
19  exception to the waiver rule applies. (ECF No. 241 at 13–18.) More specifically, Relators insist
20  that Ormat has not shown the third parties to be the functional equivalent of employees or agents to
21  its attorneys. (*Id.*)

22  In opposition, Ormat argues that the communications disclosed to its third-party consultants
23  remain privileged because they "helped it understand and structure complex financial transactions
24  and perform sophisticated cost-accounting tasks, thereby allowing its lawyers to provide sound

---

² Similarly, and contrary to Relators' arguments, the court finds that Ormat's express waiver of privilege as to Brawley's placed-in-service date does not waive privilege for communications related to determinations made at other plants. (*See* ECF No. 2473–4; ECF No. 249 at 4.)

-10-

1  advice about related legal matters." (ECF No. 246 at 4.) In addition, waiver based on disclosure
2  requires an *in camera* review of the documents at issue, and Relators' motion improperly attempts
3  to bypass the parties' Attorneys' Eyes Only protocol. (*Id.* at 5.) The need for Relators to identify
4  specific documents is "especially important" in this case because Ormat claims 7,000 privilege log
5  entries are protected work product, and the standard for waiver differs between attorney-client
6  privilege and work-product claims. (*Id.*)

7  Relators' reply disputes Ormat's application of the "functional equivalent" and "agent of an
8  attorney" exceptions and, further, suggests that adherence to the Attorneys' Eyes Only protocol
9  would require Relators to bear the burden to disproving privilege, contrary to established law.
10 (ECF No. 247 at 4–6.) Still, Ormat reasserts in its surreply that it cannot respond to the privilege
11 challenge until Relators specifically identify documents on the privilege log that were disclosed to
12 third parties. (ECF No. 249 at 2.)

13 In *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981), the Supreme Court held that a
14 corporation's attorney-client privilege extends to communications between its employees and
15 counsel as long as the communications are made "at the direction of corporate superiors in order to
16 secure legal advice," concern "matters within the scope of the employees' corporate duties," and the
17 employees were "sufficiently aware that they were being questioned in order that the corporation
18 could obtain legal advice." Interpreting *Upjohn*, the Eight Circuit applied the privilege to extend to
19 communications between a partnership's counsel and an independent contractor. *In re Bieter Co.*,
20 16 F.3d 929, 937–38 (8th Cir. 1994). The court reasoned that "too narrow a definition of
21 'representative of the client' will lead to attorneys not being able to confer confidentially with
22 nonemployees who, due to their relationship to the client, possess the very sort of information that
23 the privilege envisions flowing most freely." *Id.* Because the contractor in question interacted on a
24 daily basis with the partnership's principals and was "intimately involved" in the transaction that
25 gave rise to the suit, there was "no principled basis to distinguish [his] role from that of an
26 employee." *Id.* at 933–34, 938. The Ninth Circuit adopted *Bieter*'s "functional employee"
27 principles in *United States v. Graf*, 610 F.3d 1148, 1159 (2010). *Graf* held that a consultant who

"regularly communicated with insurance brokers and others on behalf of [the company], marketed the company's insurance plans, managed its employees, and was the company's voice in its communications with counsel" was a functional employee and, therefore, the communications between him and corporate counsel were privileged. *Id.* at 1158–59.

As this district discussed in *Fosbre v. Las Vegas Sands Corp.*, Case No. 2:10-cv-00765-APG-GWF, 2016 WL 183476, at *3–*4 (D. Nev. Jan. 14, 2016), courts have adopted varying constructions of the functional equivalent doctrine. Relators, unsurprisingly, prefer the narrower approach set forth in *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 232 F.R.D. 103 (S.D.N.Y. 2005). (*See* ECF No. 241 at 14; ECF No. 248 at 5.) Under that test, a court determines whether a consultant is the functional equivalent of an employee by looking to whether he or she was responsible for a key corporate job, the nature of the working relationship between the consultant and the principals, whether the relationship was critical to the company's position in litigation, and whether the consultant possessed information not held by others in the company. *Ex.-Imp. Bank*, 232 F.R.D. at 113. However, the *Fosbre* court expressly rejected *Export-Import Bank* in favor of a "broad practical approach in applying the functional equivalent doctrine" that better fit "today's marketplace." 2016 WL 183476, at *4 (discussing *In re Flonase Antitrust Litig.*, 879 F. Supp. 2d 454, 459 (E.D. Pa. 2012); *Stafford Trading, Inc. v. Lovely*, No. 05-C-4868, 2007 WL 611252, at *5 (N.D. Ill. Feb. 22, 2007)). The dispositive question, *Fosbre* reasoned, was "whether the consultant performs duties similar to those performed by an employee and whether by virtue of that relationship, he or she possesses information about the company that would assist the company's attorneys in rendering legal advice." *Id.* at *5. Because "Goldman Sachs acted in the role of financial advisor to the upper echelon of [the company's] management" attended Board of Directors meetings, and made recommendations as to financing alternatives, among other things, the relationship between Goldman Sachs and the company was "not an 'arms-length' negotiation" but rather "that of a financial advisor developing [the company's] complex financing strategy." *Id.* at *5. In sum, Goldman Sachs personnel were functionally equivalent to employees. *Id.*

It makes little difference which approach the court adopts in this case, as Ormat has failed to make the "detailed factual showing" required by the functional equivalent doctrine. *See Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 492 (2000) (noting that "a detailed factual showing is necessary to establish the relationship between a third party that is sought to be included within the protection of the attorney-client privilege," and describing the affidavits considered in *Bieter* as "very detailed"); *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002) (same). In its opposition, Ormat describes the roles of its third party consultants as follows:

> Capstar was hired to help Ormat understand the monetization of available tax benefits related to the Brawley plant, including assisting Ormat's counsel in developing equity investor sheets. RLR Consultants helped Ormat organize and acquire financing for its projects. BDO performed an accounting of Ormat's cost basis for the Puna 8 MW 1603 grant application. And [PwC] performed general accounting audits and an accounting of Ormat's cost basis for the Brawley 1603 grant application.

(ECF No. 246 at 4) (internal citations, quotations, and alterations omitted). This cursory statement of responsibilities is insufficient to show the court that any of the four consulting companies performed duties similar to those performed by Ormat employees or that they possessed information that would assist in rendering legal advice.

Relatedly, Ormat failed to demonstrate that any individuals within the consulting companies who were party to the communications qualify as functional employees of Ormat. As *Fosbre* noted, *Upjohn* requires that the privilege be applied to communications with corporate employees on a case-by-case basis. 2016 WL 183476, at *6 (citing *Upjohn*, 449 U.S. at 394). Therefore, where communications are disclosed to numerous employees of third parties, the party asserting privilege must provide the court with enough information to establish not just that the functional equivalent doctrine is met, but also that the individuals in question "were involved in the performance of services with which the attorney communications were concerned, that the employees were aware that the communications were for the purposes of providing or obtaining legal advice, and that the employees understood the communications were intended to be confidential." *Id.*; *see also Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 633 (D. Nev. 2013) (the

court must make an "individual determination" as to whether each consultant meets the functional equivalent test). Based on the current record the court cannot conclude Ormat has met its burden.

Still, a second exception to the waiver rule may apply. Ormat cites *Ferko v. National Association for Stock Car Auto Racing*, a case in which the district court held that the disclosure of confidential documents to consultants hired to help "translate complicated financial information" and perform audits concerning potential litigation did not waive attorney-client privilege where the purpose for which they were hired "relate[d] significantly to the documents and communications at issue." 218 F.R.D. 125, 139–140 (E.D. Tex. 2003). The decision was based on a test set forth by the Second Circuit in *United States v. Kovel*, 296 F.R.D. 918 (2d Cir. 1961). *Id.* at 138. Thereunder, attorney-client communications remain privileged if they are shared with an accountant retained by the attorney "as a listening post," and who "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."[3] *Kovel*, 296 F.R.D. at 922; *see also United States v. Judson*, 322 F.2d 460, 462 (9th Cir. 1963). *Kovel* extends the attorney-client privilege to certain "representatives of the attorney, such as accountants; administrative practitioners not admitted to the bar; and non-testifying experts." *U.S. Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 161 (E.D.N.Y. 1994).

In applying *Kovel*, courts have found that to meet the exception, "third-party communications must be interpretive and serve to translate informative information between the client ant he attorney." *Cohen v. Trump*, No. 13–CV–2519–GPC (WVG), 2015 WL 3617124, at *14 (S.D. Ca. June 9, 2014) (collecting cases). "*Kovel* explicitly excludes the broader scenario in which the accountant is enlisted merely to give his or her own *advice* about the client's situation." *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1072 (N.D. Cal. 2002) (emphasis in original) (finding privilege waived where PwC assisted Chevron attorneys to evaluate the legal merits of a transaction but did not serve in a "'translator' function"). Further, "under *Kovel*, 'the

---

[3] There is no stand-alone accountant-client privilege under federal law. *Ferko*, 218 F.R.D. at 138 (citing *Couch v. United States*, 409 U.S. 322, 335 (1973)).

1  available case law indicates that the "necessity" element means more than just useful and
2  convenient. The involvement of the third party must be nearly indispensable or serve some
3  specialized purpose in facilitating the attorney-client communications.'" *Cavallaro v. United*
4  *States*, 284 F.3d 236, 249 (1st Cir. 2002) (quoting E.S. Epstein, *The Attorney-Client Privilege and*
5  *the Work-Product Doctrine* 187 (4th ed. 2001)) (accounting services provided by Ernst & Young
6  which "benefit[ted] the quality of the legal advice" given were not enough to show Ernst &
7  Young's involvement was necessary or highly useful).

8  Of the four consultants Ormat discusses in its opposition, only Capstar appears to approach
9  the contemplated role: "Capstar was hired to *help Ormat understand* the monetization of available
10 tax benefits related to the Brawley plant, including assisting Ormat's counsel in developing equity
11 investor sheets." (ECF No. 246 at 5 (emphasis added).) Based on this description, as well as on the
12 engagement letter attached to Relators' motion (ECF No. 241-10), the court can certainly imagine
13 circumstances in which Capstar's involvement meets the exception; however, circumstances in
14 which they do not are equally plausible. "[T]his ambiguity is troublesome," and counsels against a
15 finding of privilege. *FTC v. TRW, Inc.*, 628 F.2d 207, 213 (D.D.C. 1980). Nor is the court
16 persuaded by Ormat's assertion that Relators must identify specific documents on the privilege log
17 before it can address the possibility of waiver. (ECF No. 246 at 7; ECF No. 249 at 4–5.) As the
18 party asserting privilege, it is Ormat's burden—not Relators'—to show the court that attorney-client
19 privilege is both established and has not been waived. *Bauer*, 132 F.3d at 507; *Weil*, 647 F.2d at 25.
20 Ormat was provided ample time and opportunity to apprise the court of the specific roles its third-
21 party consultants played, and yet it declined to do so.

22 For the reasons set forth above, the court finds that Ormat waived attorney-client privilege
23 by disclosing the confidential communications to third parties. Still, the finding does not
24 necessarily compel Ormat to produce the relevant documents, many of which may be protected
25 work product. (*See* ECF No. 246 at 6.) The work product doctrine offers broader protection than
26 the attorney-client privilege, *Hickman v. Taylor*, 329 U.S. 495, 508 (1947), and extends "to
27 investigators and consultants" employed by attorneys so long as the documents were created in

anticipation of litigation. *Phillips*, 290 F.R.D. at 634–35. Work-product protection is not "waived by disclosure to a third party who does not share a common legal interest." *Ferko*, 218 F.R.D. at 136. The court suggests that Ormat weigh the extent and limitations of the work product doctrine, and take stock of its privilege log accordingly. To the extent that there are documents appearing on the log for which Ormat has not claimed work product protection and which this court has deemed not privileged, they must be produced. Ormat and Relators are to meet and confer to determine the appropriate procedures and a timeline for doing so.

### III.   CONCLUSION

Consistent with the above, the court finds that Ormat has waived attorney-client privilege by affirmatively asserting its good faith belief in the lawfulness of its conduct. It may either abandon those defenses and maintain its privilege or produce those attorney-client communications that fall within the scope of the implied waiver. In addition, because Ormat failed to show that an exception applies, the court finds Ormat also waived privilege for those communications that were disclosed to third parties. Therefore, the court **GRANTS** Relators' motion to compel (ECF No. 241).

**IT IS SO ORDERED.**

**DATED:** August 1, 2016.

_____
**UNITED STATES MAGISTRATE JUDGE**